**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**
**CENTRAL ISLIP DIVISION**

| | | |
|---|---|---|
| **CARDCONNECT, LLC,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CASE NO. 2:20-cv-01526** |
| **LAW OFFICE OF FRANCISCO J.** | § | |
| **RODRIGUEZ and FRANCISCO J.** | § | |
| **RODRIGUEZ,** | § | |
| **Defendant.** | § | |
| **LAW OFFICE OF FRANCISCO J.** | § | |
| **RODRIGUEZ and FRANCISCO J.** | § | |
| **RODRIGUEZ** | § | |
| **Defendant/Third-Party Plaintiff** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ANTONIO JUAREZ HERNANDEZ,** | § | |
| **NEREYDA VEGA, ROYAL LIBERTY** | § | |
| **OIL LEASING, LLC, AND ROYAL** | § | |
| **INTERNATIONAL INVESTMENT** | § | |
| **GROUP, LLC** | § | |
| **Third-Party Defendants** | § | |

**DEFENDANTS/THIRD-PARTY PLAINTIFFS' RESPONSE TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW LAW OFFICE OF FRANCISCO J. RODRIGUEZ and FRANCISCO

J. RODRIGUEZ ("FJR"), Defendants/Third-Party Plaintiffs, and files this Response to

Plaintiff CARDCONNECT, LLC's ("CardConnect") Motion for Summary Judgment, and

respectfully shows as follows:

1

## INTRODUCTION

1.      On March 24, 2020, CardConnect sued FJR[1] for breach of contract, breach of duty of good faith and fair dealing, conversion, unjust enrichment, and quantum meruit. (Doc. 1).

2.      FJR filed his Original Answer on June 18, 2020 (Doc. 9). FJR filed a Third-Party Complaint on July 6, 2020 (Doc. 10) against Third-Party Defendants ANTONIO JUAREZ HERNANDEZ ("Hernandez"), NEREYDA VEGA ("Vega"), ROYAL LIBERTY OIL LEASING, LLC ("Royal Leasing"), and ROYAL INTERNATIONAL INVESTMENT GROUP, LLC ("Royal Investments") asserting claims against Hernandez for breach of contract, breach of duty of good faith and fair dealing, and fraud, as well as civil conspiracy to defraud against all Third-Party Defendants.

3.      On October 23, 2020, CardConnect served FJR with a Motion for Summary Judgment solely on its breach of contract claim. (Doc. 26). Throughout its Motion, CardConnect relies on a 50-page document labeled "Program Terms and Conditions" ("Program Guide") packed with self-serving and exculpatory language which it regularly attempts to tack on to its Merchant Application and Agreements with merchants. Considering that the Merchant Application and Agreement is not binding according to its own terms, this Court should deny CardConnect's Motion for Summary Judgment on its breach of contract claim.

## EVIDENCE IN SUPPORT OF RESPONSE

4.      In support of this response, FJR submits the following exhibits:

    a. **Exhibit 1** – Affidavit of Francisco J. Rodriguez

---

[1] The Law Office of Francisco J. Rodriguez is a sole proprietorship of Francisco J. Rodriguez. For the purposes of this Response, they will both be considered one and the same person and referred to as "FJR".

    b.  **Exhibit 2** – Contract of Employment

    c.  **Exhibit 3** – February and March Emails between Efraim Ochoa and Cliff Roberts

    d.  **Exhibit 4** – April Emails between Efraim Ochoa and Cliff Roberts

    e.  **Exhibit 5** – May Emails between Efraim Ochoa and CardConnect Representatives

    f.  **Exhibit 6** – Affidavit of Efraim Ochoa

    g.  **Exhibit 7** – Screenshot of Transactions

    h.  **Exhibit 8** – Letter Withdrawing Representation

    i.  **Exhibit 9** – Mastercard Rules

    j.  **Exhibit 10** – CardConnect Responses to Requests for Admissions

    k.  **Exhibit 11** – *Liberty Salad* Program Guide

**FACTS**

5.    In late January, 2019, Hernandez engaged FJR to represent Hernandez regarding certain business ventures, including the purchase and acquisition of properties, businesses, and participating in business ventures in the State of Texas. **Exhibit 1, ¶ 6.** The agreement between FJR and Hernandez was reduced to writing on February 18, 2019. **Exhibit 2**. Hernandez authorized the use of his debit card to fund these transactions and FJR's attorney fees. **Exhibit 1, ¶ 6.**

6.    To facilitate the transactions, FJR applied with CardConnect for an account to process the debit card transactions. **Exhibit 1, ¶ 7-8**. FJR signed the "Merchant Application and Agreement" ("Agreement") furnished by CardConnect, but neither CardConnect nor its member bank, Wells Fargo, ever signed the Agreement. (Doc. 1-3,

pg. 5-6). FJR disputes that this contract is binding because it was not finalized according to its own terms.[2] CardConnect then provided additional documents to FJR, as well as an account with a username and password to monitor the transactions. **Exhibit 1, ¶ 8.**

7.      The first transaction occurred on or about February 11, 2020. **Exhibit 1, ¶ 10.** FJR ran the card purportedly belonging to Hernandez for $50,000, and the deposit was made into FJR's IOLTA trust account. **Exhibit 1, ¶ 10.** CardConnect then attempted to debit the same amount from FJR's operating account, which resulted in a hold on the account due to insufficient funds. **Exhibit 1, ¶ 10.** FJR's office administrator, Efraim Ochoa, contacted Cliff Roberts, an agent of CardConnect, to discuss the purpose of the hold and what CardConnect needed to remove the hold. **Exhibit 3**. On February 12, 2019, Cliff Roberts requested the following items to "complete the sale": (1) the cardholder's name and billing address; (2) delivery timeframe for product/service; (3) updated projection for future similar activity, to include frequency, and (4) three months bank statements. **Exhibit 3**. Efraim Ochoa emailed Cliff Roberts back the requested information. **Exhibit 3**. After Efraim Ochoa provided the requested information, the hold on FJR's operating account was released. **Exhibit 1, ¶ 12**. At no time during this first transaction was there any discussion between CardConnect and FJR that Hernandez's card was fraudulent. **Exhibit 1, ¶ 12**.

8.      On March 29, 2019, Efraim Ochoa emailed Cliff Roberts requesting that the monthly deposit limit be increased to $200,000. **Exhibit 3**. Cliff Roberts emailed that he

---

[2] FJR admits in his Original Answer under ¶ 10 that he entered the Agreement, which is apparent on the face of the Agreement which contains his digital signature. (Doc. 1-3). However, FJR does not admit and disputes that CardConnect entered into the agreement, which is also apparent from the lack of CardConnect's signature and the member bank's signature, which the contract expressly requires. Any previous consent of FJR to enter the written Agreement is withdrawn.

only needed a letter requesting the increase. **Exhibit 3**. FJR provided the letter to Cliff Roberts the same day. **Exhibit 3**. On April 12, 2019, Cliff Roberts emailed Efraim Ochoa, that CardConnect approved the request to increase the monthly limit to $200,000. **Exhibit 4**.

9.      On or about April 23, 2019, and pursuant to the limit increase provided by CardConnect, FJR ran the debit card purportedly belonging to Hernandez for two transactions: (1) $85,000; and (2) 99,999. **Exhibit 1, ¶ 16**. The funds were deposited into FJR's IOLTA trust account. **Exhibit 1, ¶ 16**. CardConnect again attempted clawing back the funds out of the operating account, resulting in a hold due to insufficient funds. **Exhibit 1, ¶ 16**. Since the hold exceeded the funds available in FJR's operating account, FJR's law firm was unable to pay for day to day transactions. **Exhibit 1, ¶ 16**. On April 24, 2019, after contacting Cliff Roberts to discuss what would be needed to remove the hold, Cliff Roberts emailed Efraim Ochoa the "exact wording from Corp folks" regarding what was needed to remove the hold: "Invoices or contracts, I would think the bank would be the source for this information since they authorized the sale or transfer. *We will not need the 6 digit code from BBVA* for this transaction but any other information will prove the validity of the transfer. Once this is completed this should be a done deal." **Exhibit 4 (emphasis added)**. Efraim Ochoa emailed Cliff Roberts the contract and a letter from Hernandez authorizing the $184,999.99 transaction. **Exhibit 4**. The hold was then released on FJR's operating account. **Exhibit 1, ¶ 18.**

10.      CardConnect did not begin indicating to FJR that the transactions were fraudulent until late May, 2019. **Exhibit 1, ¶ 19; Exhibit 5; Exhibit 6, ¶ 9**. On May 24, 2019, Rich Yanek requested Efraim Ochoa to provide documentation from Hernandez's

bank account confirming the account was debited. **Exhibit 1, ¶ 19; Exhibit 5; Exhibit 6,**
**¶ 9.** Hernandez was adamant that his account had been debited when FJR requested
bank statements. **Exhibit 1, ¶ 19.** On May 28, 2019, Rich Yanek provided Efraim Ochoa
via email a spreadsheet showing the card had been declined. **Exhibit 6, ¶ 9**. On May 30,
2019, Kevon Lakeman confirmed to Efraim Ochoa that the client's card was fraudulent
and his account had never been debited, providing a screenshot that the card
transactions had not been processed. **Exhibit 6, ¶ 9; Exhibit 7**. FJR was unaware of
these facts prior to these events in late May, 2019. **Exhibit 1, ¶ 19.** CardConnect engaged
in various collection efforts to recoup the $234,999.99 that had been deposited into FJR's
trust account, and during CardConnect's collection FJR made numerous efforts to recoup
the funds from Hernandez. **Exhibit 1, ¶ 20**. However, Hernandez became unresponsive,
and FJR withdrew representation of Hernandez on November 25, 2019. **Exhibit 8**.

## ARGUMENT

### A. Legal Standards

11.     Rule 56 provides that a party may move for summary judgment, identifying
each claim or defense on which the summary judgment is sought, and the court shall
grant summary judgment if the movant shows that there is "no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56. A plaintiff moving for summary judgment must satisfy its burden by submitting
summary-judgment proof that establishes all elements of its claim as a matter of law. *See*
*Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *San*
*Pedro v. United States*, 79 F.3d 1065, 1068 (11th Cir. 1996). This burden is satisfied only
if, after viewing the evidence in the light most favorable to defendant, no genuine disputes

of material fact exist and no reasonable trier of fact could find in favor of defendant. *San Pedro*, 79 F.3d at 1068.

12.    In determining whether there is a genuine dispute of material fact that prevents summary judgment, a court must consider all evidence in the light most favorable to the nonmovant. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). The court must also resolve all reasonable doubts about the facts in favor of the nonmovant. *Tolan*, 572 U.S. at 656.

## B. The Merchant Agreement and Program Guide are Not Binding

13.    The elements of a breach of contract are (1) the existence of a contract between plaintiff and defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract; and (4) damages to plaintiff caused by breach. *In Re M/V MSC Flaminia*, 339 F.Supp.3d 185, 241-42 (S.D.N.Y. 2018). To form a valid contract, the law requires "an offer, acceptance, consideration, mutual assent and intent to be bound." *Arakelian v. Omnicare, Inc.*, 735 F.Supp.2d 22, 31 (S.D.N.Y. 2010). Conditions precedent to the formation or existence of a contract are "conceptually distinct," and "no contract arises 'unless and until the condition occurs.'" Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 660 N.E.2d 415, 418 (1995). Conditions precedent must be "literally performed; substantial performance will not suffice." *MHR Capital Partners v. Presstek*, 12 N.Y.3d 640, 645 (N.Y. 2009); *Office of Comptroller Gen. of Republic of Bolivia on Behalf of Gen. Command of Bolivian Air Force v. Int'l Promotions & Ventures, Ltd.*, 618 F.Supp. 202, 205, 207 (S.D.N.Y. 1985) (construing a condition that a contract "would not become effective" as a condition precedent to the existence of a contract); Richard A. Lord, 13 Willston on Contracts § 38.7 (4th ed. 2017) (explaining that when the

7

parties agree "that the contract is not to be effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified or have been performed").

14.    The Merchant Application and Agreement that FJR signed contained express language providing that "Merchant understands this agreement ***shall not take effect*** until Merchant has been approved by CardConnect and/or the Member Bank and a merchant number is issued." (Doc. 1-3; pg. 5) (emphasis added). At the bottom of the page that requires the agreement be "approved by CardConnect and/or the Member Bank" are two boxes with signature lines for CardConnect and the Member Bank, Wells Fargo, to sign to denote their approval with the phrase "**Application Approved By**" in bold type next to both signature lines. (Doc. 1-3; pg. 5). Neither of these boxes were signed by either CardConnect or Wells Fargo. Their approval must be manifested by signature as shown by other provisions of the agreement. For example, the following page, labeled "Confirmation Page" has a section for "Important Member Bank Responsibilities" which includes a requirement under letter (b) that "The Bank must be a principal (signer) to the Agreement." (Doc. 1-3; pg. 6).

15.    CardConnect's Program Guide incorporates the rules of the card organizations. (Doc. 1-4; Section 22) (providing that the parties shall "comply with all applicable Card Organization Rules"). These rules require member banks to sign the merchant agreement. For example, § 7.6.1 of Mastercard's Rules provides that the merchant agreement must be "signed by the Customer". **Exhibit 9**, § 7.6.1(1). Mastercard's Rules define the word "Customer" to mean the member bank, not a merchant such as FJR. **Exhibit 9**, § 1.1. The Mastercard Rules also require that the

8

merchant agreement state the following: "The Merchant Agreement **is not effective** and may not be modified in any respect **without the express written agreement** of the Customer." **Exhibit 9**, § 7.6.1(1)(b) (emphasis added). Mastercard explicitly requires that the merchant agreement "[n]ot take effect or state or imply that it takes or has taken effect **prior to being signed by the Customer**." **Exhibit 9**, § 7.6.1(3). These requirements are not without punishment—entities such as CardConnect and Wells Fargo who violate the Mastercard Rules "may be assessed up to USD 2,500 per day" for each day they are not in compliance as to each merchant. **Exhibit 9**, § 5.1.

16.    It is undisputed that neither CardConnect nor Wells Fargo signed the merchant agreement. CardConnect's own evidence attached to its pleadings and its Motion for Summary Judgment show that neither entity signed the agreement. (Doc. 1-3; pg. 5). This crucial omission to the agreement is unsurprising given that CardConnect has admitted in previous litigation that it does not have a policy of requiring an authorized representative of either CardConnect or Wells Fargo to sign the merchant agreements. **Exhibit 10**, Request 6 ("CardConnect admits that it did not have a policy requiring employees to physically sign Merchant Processing Applications"); Request 7 ("CardConnect admits that it did not have a policy requiring an authorized representative of Wells Fargo Bank to physically sign Merchant Processing Applications"); Request 9; Request 10. In that previous litigation, the court determined that there was no express binding contract between the parties. *Koa v. CardConnect Corp.*, 2019 WL 2615720, *2 (E.D. Pa. 2019). By the contract's plain language, these signatures were a necessary condition precedent to the contract's formation.

17.     In *Liberty Salad, Inc. v. Groundhog Enterprises, Inc.*, the court considered a similarly worded provision of a merchant processing agreement which stated: "By signing below, Merchant and the Undersigned agree, acknowledge and understand that: a) The Agreement ***will not take effect*** unless and until Merchant has been approved by Bank and IPayment and Merchant is assigned and issued a Merchant Account Number . . ." 2017 WL 2903154, *1 (E.D. Pa. 2017) (emphasis added). The court noted that below this provision "is a place for the Bank and a separate place for Ipayment to sign showing Approval/Acceptance. Neither is signed." *Id.* The Court then concluded that "[c]learly then the Agreement, i.e. the Application and the Program Guide, did not take effect which ends all of Defendant's contract assertions." *Id.*

18.     *Liberty Salad* is directly on point with the facts of this case. CardConnect furnished a Merchant Application and Agreement, with an attached Program Guide. (Doc. 1-3; Doc 1-4). FJR signed the Merchant Application and Agreement, but both CardConnect and Wells Fargo did not. Accordingly, the contract (the Application and Program Guide) never took effect and is thus not binding on FJR.

19.     In *Bolivian Air Force*, the parties entered two contracts wherein the defendants would provide the plaintiffs with military aircraft and equipment in exchange for the plaintiffs providing promissory notes guaranteed by the Central Bank of Bolivia in the amount of $69.9 million. 618 F.Supp. at 203, 205. To facilitate the sale, the parties required a "transfer license" issued by the United States Government. *Id.* at 204. Accordingly, the contract provided that it "***would not become effective*** unless and until the transfer license was issued." *Id.* at 205. The United States did not issue the transfer license, and the plaintiffs sued for return of the promissory notes. *Id.* at 206. The court

10

concluded that the provision requiring the transfer license was a condition precedent to the contract. *Id.* at 206-07. The court stated that "[s]ince such even never occurred, plaintiffs' duty to perform was discharged," and that the plaintiffs were entitled to return of the outstanding notes. *Id.* at 207

20.     Similar to *Bolivian Air Force*, the merchant agreement here provides that the agreement "***shall not take effect*** until Merchant has been approved by CardConnect and/or the Member Bank and a merchant number is issued." (Doc. 1-3; pg. 5) (emphasis added). The Mastercard Rules, which Plaintiff's Program Guide seeks to incorporate, provides that a merchant agreement "is not effective" without the "express written agreement" of the member bank. **Exhibit 9**, § 7.6.1(1)(b). Accordingly, these signatures were a condition precedent to the formation of this agreement.

21.     In *MHR Capital Partners*, the defendant entered a stock purchase agreement with the plaintiff to purchase the stock of the plaintiff's subsidiary, A.B. Dick Company. 12 N.Y.3d at 643. The parties subsequently executed a separate escrow agreement, requiring that the stock purchase agreement be placed in escrow and not be released until the lender consented to the stock purchase transaction. *Id.* The escrow agreement required the lender's consent through the "execution of a consent form annexed to the escrow agreement." *Id.* The lender refused to sign the consent form that was attached, but faxed back a one-page letter "consenting" to the transaction but containing different terms. *Id.* at 644.

22.     The New York Court of Appeals concluded that the lender's approval of the stock purchase agreement, through its execution of the consent form, was an express condition precedent of the contract's formation. *Id.* at 646. The Court concluded that since

the lender failed to execute the consent form, the express condition in the contract failed, and the defendant had no duty to perform under the stock purchase agreement. *Id.* at 647.

23.     Here, the merchant agreement has clear language stating that "this agreement ***shall not take effect*** until Merchant has been approved by CardConnect and/or the Member Bank and a merchant number is issued." (Doc. 1-3; pg. 5) (emphasis added). As discussed above, Mastercard's Rules require that the agreement be signed by the member bank (i.e. Wells Fargo), and mandate that the agreement "is not effective" without the express written consent of the member bank. The signatures of CardConnect and Wells Fargo were a condition precedent to the formation of the agreement. Accordingly, there is no binding contract between CardConnect and FJR, and terms of the Merchant Application and Agreement and the Program Guide are unenforceable.

## C. The Contract is Unconscionable

24.     Even if the contract is binding, it is unenforceable because of its unconscionable provisions. A contract is unconscionable when it is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (N.Y. 1988). Generally, there must be a showing that such a contract is both procedurally and substantively unconscionable. *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F.Supp.2d 566, 571 (S.D.N.Y. 2009). "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract." *Id.* However, there have been exceptional cases where a provision of a contract is so

outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone. *Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115, 122 (2nd Cir. 2010).

     25.    The Program Guide contained the following unconscionable provisions:

    a.  Section 25.5 provides that "Subject to Section 30.3, we may also increase our fees or add new fees for Services for any reason at any time, by notifying you thirty (30) days' prior to the effective date of any such change or addition." "Services" is defined in the glossary as "the activities undertaken by us to authorize, process and settle Card transactions undertaken by Cardholders at your location(s), and all other services provided by us and this Agreement." Section 30.3 provides that "[i]n the event we provide notice to you of any new fees or increases in existing fees for Services, pursuant to Section 25.5, you may terminate this Agreement without further cause or penalty by notifying us that you are terminating this Agreement prior to the effective date of such new fees or increases. However, maintaining your merchant account, or your continued use of the Services after the effective date of any such fee changes shall be deemed your acceptance of such fee changes for the Services, throughout the term of this Agreement." (Doc. 1-4). Accordingly, regardless of the processing fees agreed to and conspicuously displayed in the Merchant Application and Agreement, the Program Guide allows CardConnect to escape those agreed fees.

    b.  Section 27.4 states "OUR CUMULATIVE LIABILITY FOR ALL LOSSES, CLAIMS, SUITS, CONTROVERSIES, BREACHES OR DAMAGES FOR ANY CAUSE WHATSOEVER (INCLUDING, BUT NOT LIMITED TO THOSE ARISING OUT OF OR RELATED TO THIS AGREEMENT) REGARDLESS OF THE FORM OF ACTION OR LEGAL THEORY, SHALL NOT EXCEED, (1) $50,000; OR (2) THE AMOUNT OF FEES RECEIVED BY US PURSUANT TO THIS AGREEMENT FOR SERVICES PERFORMED IN THE IMMEDIATELY PRECEDING 12 MONTHS, WHICHEVER IS LESS. (Doc. 1-4).

    c.  Section 27.5 provides that "OUT LIABILITY FOR ANY DELAY IN FUNDING TRANSACTIONS TO YOU FOR ANY REASON, OTHER THAN FOR ANY REASON DESCRIBED IN SECTIONS 23.4 AND 23.6, WILL BE LIMITED TO INTEREST COMPUTED FROM THE DATE THAT YOU SUBMIT THE TRANSACTION TO THE DATE THAT WE FUND THE TRANSACTION AT THE RATE OF THE FEDERAL FUNDS AS SET BY THE FEDERAL RESERVE BANK OF NEW YORK, NEW YORK, FROM TIME TO TIME, LESS ONE PERCENT (1%). (Doc. 1-4).

    d.  Section 33.1 provides that "[y]ou agree to indemnify and hold us and the Card Organizations harmless from and against all losses, liabilities, damages and expenses: (a) resulting from the inaccuracy or untruthfulness of any representation or warranty, breach of any covenant or agreement or any misrepresentation by you under this Agreement; (b) arising out of your or your employees' or your agents' negligence or willful misconduct, in connection with Card transactions or otherwise arising from your provision of goods and services to Cardholders; (c) arising out of your use of the Services; or (d) arising out of any third party indemnifications we are obligated to make as a result of your actions (including indemnification of any Card Organization or Issuer)." Section 33.2 provides a similar reciprocal indemnification from CardConnect to the merchant, except CardConnect's indemnification is limited to the liability limit in Section 27.4. In other words, CardConnect's liability under its indemnification is limited to, at most, $50,000, whereas the merchant's liability under its indemnification is virtually unlimited. (Doc. 1-4).

26.    Regarding procedural unconscionability, FJR did not have a meaningful choice in the matter, as this boilerplate self-serving language is standard in most Program Guides entities such as CardConnect attempt to force on their merchants. Attached as **Exhibit 11** is the Program Guide from *Liberty Salad*, containing almost the exact same provisions.[3] Accordingly, even had FJR decided to apply with another merchant acquirer such as CardConnect, FJR would likely have been stuck with the same self-serving provisions in these boilerplate Program Guides.

27.    Regarding substantive unconscionability, courts analyze "whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Gillman*, 73 N.Y.2d at 12. It is clear from the fine-print language contained in the Program Guide above that the agreement unreasonably favors CardConnect. CardConnect appears to agree to conspicuously labeled processing fees in the Merchant Application and Agreement. (Doc. 1-3). However, the Program Guide fine-print gives CardConnect

---

[3] *Compare* Doc. 1-4, Section 25.5 *with* **Exhibit 11** Section 18.5; *compare* Doc. 1-4, Section 27.4 *with* **Exhibit 11** Section 20.4; *compare* Doc. 1-4 Section 27.5 *with* **Exhibit 11** Section 20.5; *compare* Doc. 1-4, Sections 28.3 *and* 28.3.4 *with* **Exhibit 11** Sections 21.3 *and 21.3.4*.

freedom to increase the fees at any time. (Doc. 1-4; Section 25.5). Furthermore, the Program Guide limits its liability for all losses to either $50,000 or their fees under the agreement for the immediately preceding 12 months, whichever is less. Doc. 1-4; Section 27.4). CardConnects liability for delay in processing transactions is limited to simple interest as calculated by the federal reserve for federal funds, less one percent. (Doc. 1-4; Section 27.5). As of now, this means CardConnect would bear no liability for delay in processing since the current rate is 0% to 0.25%. Board of Governors of the Federal Reserve-System,

https://www.federalreserve.gov/newsevents/pressreleases/monetary20201105a.htm

(last visited Nov. 19, 2020). Lastly, CardConnect's liability under its indemnification to the merchant is limited to, at most, $50,000, whereas the merchant's liability under its indemnification of CardConnect is virtually unlimited. (Doc. 1-4; Sections 33.1, 33.2, and 27.4). Accordingly, the contract is unconscionable, and this Court should deny CardConnect's Motion for Summary Judgment.

## D. CardConnect did not Mitigate Damages

28.    "The venerable rule that requires a plaintiff to mitigate his damages has been explained by the principle that 'damages which the plaintiff might have avoided with reasonable effort. . .are. . .not caused by the defendant's wrong . . .and, therefore, are not to be charged against him.'" *M. Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103, 1112 (2nd Cir. 1985). This duty applies to those damages that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense. *U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 696 F.Supp.2d 428, 441 (S.D.N.Y. 2010). A

plaintiff's efforts to mitigate its damages need not be successful, but they must be reasonable. *In re Worldcom, Inc.*, 361 B.R. 675, 684 (Bankr. S.D.N.Y. 2007).

29.     Here, CardConnect did not exercise reasonable efforts to mitigate its damages. CardConnect admits in its pleadings and in its Motion that the first transaction involving $50,000 occurred back on February 11, 2019. (Doc. 1, ¶ 17). CardConnect's risk management department made no inquiry at the time as to whether the card was fraudulent, despite CardConnect's admission that it "had little to no information to suggest it was a legitimate transaction." (Doc. 1, ¶ 18). Instead, CardConnect, through its agent Cliff Roberts, worked with FJR's administrator Efraim Ochoa to get the hold removed on FJR's operating account by requesting various documents and information. **Exhibit 3**. Efraim Ochoa provided the documents and information Cliff Roberts requested, and the hold was removed on the account shortly thereafter. **Exhibit 3**.

30.     On March 29, 2020, Cliff Roberts emailed Efraim Ochoa expressing CardConnect's desire to move forward and increase the trust account deposit limits to $200,000 per month. **Exhibit 3**. Subsequently, on April 12, 2019, Cliff Roberts emailed Efraim Ochoa informing him that CardConnect approved the limit increase to $200,000 per month. **Exhibit 4**. Accordingly, over two months after the first transaction, CardConnect failed to investigate whether the $50,000 transaction processed, and even increased the monthly deposit limit to $200,000. Furthermore, it appears that CardConnect's risk management did not conduct an investigation into the charges until late May, 2019 over three months after the first transaction. The first time FJR became aware that the transactions were fraudulent was on May 30, 2019 when CardConnect's risk management representative Kevon Lakeman spoke with Efraim Ochoa, confirming

16

to him that the client and the card are fraudulent. **Exhibit 5; Exhibit 6, ¶ 9**. Given these facts, CardConnect failed to take reasonable measures to mitigate its damages, and even provided the means for the two larger transactions in April, 2019 by increasing FJR's monthly limit to $200,000. This Court should deny CardConnect's Motion for Summary Judgment.

## PRAYER

31.    For the above reasons, FJR asks the Court to deny CardConnect's Motion for Summary Judgment on its breach of contract claim, and provide all other relief to which FJR is entitled.

Respectfully Submitted,

By: */s/ Francisco J. Rodriguez*

FRANCISCO J. RODRIGUEZ, PRO SE
1111 West Nolana, Suite A
McAllen, Texas 78504
Telephone No.: (956) 687-4363
Telecopier No.: (956) 687-6415
frankr@mcallenlawfirm.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served to the following counsel of record on this 20th day of November, 2020, to wit:

VIA E-MAIL: john.peterson@polsinelli.com

John W. Peterson
Polsinelli, PC
401 Commerce St., Ste. 900
Nashville, TN 37219
*Attorney for Plaintiff*

/s/ Francisco J. Rodriguez
FRANCISCO J. RODRIGUEZ

18