

<div style="border:1px solid black;">EXHIBIT 11</div>

**MERCHANT SERVICES**

**PROGRAM TERMS AND CONDITIONS**
**(PROGRAM GUIDE)**

**IMPORTANT:  PLEASE READ CAREFULLY AND RETAIN THIS DOCUMENT IN YOUR RECORDS**
**AS IT FORMS PART OF YOUR MERCHANT PROCESSING AGREEMENT.**

**PREFACE**

These Program Terms and Conditions ("the Program Guide") presents terms governing the acceptance of Visa®, MasterCard® and Discover® Network Credit Card and Non-PIN Debit Card payments related to Payment Services. The Program Guide also includes provisions applicable to American Express® and Other Services. Other Services include all services related to: JCB® Card, PIN Debit Card, and Electronic Benefits Transfer payments, and acceptance of Cards from other Non-Bank Card Organizations such as Voyager Fleet Systems, Inc. ("Voyager"), Wright Express Corporation and Wright Express Financial Services Corporation (collectively, "WEX"). Your Merchant Processing Application will indicate the types of payments and services You have elected to accept on behalf of Merchant. This Program Guide also sets forth general terms with respect to all Services to be performed whether or not Payment Services.

**This Program Guide, Your Merchant Processing Application and the schedules thereto (collectively, the "Agreement"), contains the terms and conditions under which We and/or Bank and/or third parties will provide the Services to You, which include the Payment Services and any Additional Services. We will not accept any alterations or strike-outs to the Agreement and, if made, any such alterations or strike-outs shall not apply. Please read this Program Guide completely as it contains important information. A copy of the Program Guide is also available for viewing and/or downloading from the Internet at: http://www.merchantlynx.com.**

**You acknowledge that all Services referenced in the Agreement may not be available to You.**

**IMPORTANT INFORMATION ABOUT BANK'S RESPONSIBILITIES:**

**Discover Network Card Transactions, American Express Card Transactions and Other Services are not provided to You by Bank, but are provided by iPayment and/or third parties.**

**The provisions of this Agreement regarding Discover Network Card Transactions, American Express Card Transactions and Other Services constitute an agreement solely between You and iPayment and/or third parties. Bank is not a party to this Agreement insofar as it relates to Discover Network Card Transactions, American Express Card Transactions and Other Services, and Bank is not responsible, and shall have no liability to You in any way with respect to Discover Network Card Transactions, American Express Card Transactions and Other Services.**

OTHER IMPORTANT INFORMATION:

Cards present risks of loss and non-payment that are different than those with other payment systems. In deciding to accept Cards, You should be aware that You are also accepting these risks.

Visa U.S.A., Inc. ("Visa") and MasterCard Worldwide ("MasterCard"), DFS Services LLC ("Discover Network"), and American Express Company, Inc. ("American Express") are payment card networks that electronically exchange Sales Drafts and Chargebacks for Card sales and Credits. Sales Drafts are electronically transferred from banks (in the case of MasterCard and Visa Transactions) or network acquirers (in the case of Discover Network Transactions) that acquire them from merchants such as Yourself through the appropriate Card Organization, to the Issuers. These Issuers then bill their Cardholders for the Transactions. The Card Organizations charge the Acquirers interchange fees and assessments for submitting Transactions into their systems. A substantial portion of the Discount Rate or Transaction Fees that You pay will go toward these fees and assessments.

In order to speed up the payment process, the Issuer transfers the funds back through the Card Organization to the Acquirer at approximately the same time that the Issuer receives the electronic Sales Drafts. Even though the payments under this system are made simultaneously, all payments made through the Card Organizations are conditional and subject to reversals and adjustments.

Each Card Organization has developed Card Organization Rules that govern their Acquirers and Issuers and the procedures, responsibilities and allocation of risk for this process. Merchants are also bound by Card Organization Rules. The Card Organization Rules and applicable laws give Cardholders and Issuers certain rights to dispute Transactions, long after payment has been made to the merchant, including Chargeback rights.

We do not decide what Transactions are charged back and we do not control the ultimate resolution of the Chargeback. While we can attempt to reverse a Chargeback to the Issuer, we can only do so if the Issuer agrees to accept it or the Card Organization requires the Issuer to do so after a formal appeal process. Sometimes Your customer may be able to successfully charge back a Card Transaction even though You have provided Your goods or services and are otherwise legally entitled to payment from Your customer. While You may still be able to pursue claims directly against that customer, neither we nor the Issuer will be responsible for such Transactions.

Merchant will be responsible for all Chargebacks and adjustments associated with the Transactions that You submit for processing.

Please refer to the Glossary for capitalized terms used in the Agreement, including this Preface (if not defined above).

Thank You for selecting us for Your payment processing needs.

# TABLE OF CONTENTS

**PART I: CARD SERVICES**

**A. Operating Procedures**

1. MasterCard, Visa, Discover Network and American Express Card Acceptance………………… .....................6
    1.1. Card Descriptions ...............................................................................................................6
    1.2. Effective/Expiration Dates ................................................................................................7
    1.3. Valid Signature ................................................................................................... ...............7
    1.4. Users Other Than Cardholders .............................................................................. ...........8
    1.5. Special Terms .....................................................................................................................8
    1.6. Delayed Delivery or Deposit Balance ...............................................................................8
    1.7. Recurring Transaction and Preauthorized Order Regulations ..........................................8
    1.8. Certain Rules and Requirements.......................................................................................9
    1.9. Card Acceptance ...............................................................................................................9
    1.10. Deposits of Principals ......................................................................................................9
    1.11. Merchants in the Lodging Industry .................................................................... ...........9
    1.12. Customer Activated Terminals and Self Service Terminals ...........................................10
    1.13. Displays and Advertising ................................................................................. ...........10
    1.14. Cash Payments by and Cash Disbursements to Cardholders ........................ ...........10
    1.15. Discover Network Cash Over Transactions ...................................................................11
    1.16. Telecommunication Transactions ................................................................... ...........11
2. Suspect Transactions ..................................................................................................................11
3. Completion of Sales Drafts and Credit Drafts .............................................................................12
    3.1. Information Required .........................................................................................................12
    3.2. Mail/Telephone/Internet (Ecommerce) Orders and Other Card Not Present Sales ……………...............12
    3.3. Customer Service Telephone Numbers for Cards
        Other Than MasterCard, Visa and Discover Network ...............................................................12
4. Data Security ........................................................................................................ ...............14
    4.1. Payment Card Industry Data Security Standards (PCI DSS)............................................14
    4.2. Data Security Requirements..............................................................................................14
    4.3. Compliance Audits............................................................................................................14
    4.4. Immediate Notice Required...............................................................................................15
    4.5. Investigation......................................................................................................................15
    4.6. Required Information for Discover Network Security Breaches..........................................15
    4.7. Merchant Providers...........................................................................................................15
    4.8. Noncompliance Fees.........................................................................................................15
    4.9. Costs.................................................................................................................................15
5. Authorizations .............................................................................................................................15
    5.1 Card Not Present Transactions ......................................................................... ...........16
    5.2 Authorization via Telephone (Other Than Terminal/Electronic Device Users) ......................16
    5.3. Authorization via Electronic Devices .................................................................................16
    5.4. Third Party Authorization System .....................................................................................16
    5.5. Automated Dispensing Machines .....................................................................................17
    5.6. Pre-Authorization for T&E (Travel & Entertainment) and Restaurant Merchants ......................17
    5.7. Discover Network Procedure for Request for Cancellation of Authorization ..........................17
    5.8. Partial Authorization and Authorization Reversal..............................................................17

6.   Submission/Deposit of Sales Drafts and Credit Drafts ........................................................18

    6.1.  Submission of Sales for Merchants Other Than Your Business ..................... ............18

    6.2.  Timeliness .......................................................................................... .............18

    6.3.  Mail/Branch Deposit Procedures ............................................................................18

    6.4.  Electronic Merchants: Daily Batching Requirements & Media Submission .....................18

7.   Settlement ........................................................................................................18

8.   Refunds/Exchanges (Credits) ...............................................................................18

    8.1.  Refunds ...........................................................................................................18

    8.2.  Exchanges .......................................................................................................19

9.   Retention of Records for Retrievals and Chargebacks .................................................19

    9.1.  Retain Legible Copies ............................................................................. ......19

    9.2.  Provide Sales Drafts and Credit Drafts .................................................................19

10.  Chargebacks, Retrievals and Other Debits .............................................................19

    10.1. Chargebacks ................................................................................. ............19

    10.2. Other Debits ......................................................................................23

    10.3. Summary (Deposit) Adjustments/ Electronic Rejects ...........................................24

    10.4. Disputing Other Debits and Summary Adjustments ...............................................24

11.  Account Maintenance ................................................................................ .......24

    11.1. Change of Settlement Account Number ...........................................................24

    11.2. Change in Your Legal Name or Structure .........................................................24

    11.3. Change Company DBA Name, Address or Telephone/Facsimile Number ......................24

    11.4. Other Changes in Merchant Profile .................................................................24

    11.5. Charges for Changes to Account Maintenance....................................................25

12.  Card Organization Monitoring ..............................................................................25

13.  Supplies.........................................................................................................25


**B. Card General Terms**

14.  Payment Services ......................................................................................... ..25

15.  Operating Procedures; Card Organization Rules and Compliance ..................................25

16.  Settlement of Card Transactions ..........................................................................25

17.  Exclusivity ...................................................................................................26

18.  Fees; Adjustments; Collection of Amounts Due .......................................................26

19.  Chargebacks ................................................................................................27

20.  Representations; Warranties; Covenants, Limitations on Liability; Exclusion of Consequential Damages ............27

21.  Confidentiality ..............................................................................................28

22.  Assignments ................................................................................................28

23.  Term; Events of Default ...................................................................................29

24.  Reserve Account; Security Interest ......................................................................30

25.  Financial and Other Information ..........................................................................31

26.  Indemnification .............................................................................................31

27.  Special Provisions Regarding Non-Bank Cards ........................................................31

28.  Special Provisions for PIN Debit Card ..................................................................32

29.  Special Provisions Regarding EBT Transactions ......................................................33

30.  Special Provisions Regarding Wireless Services .......................................................35

31.  Special Provisions Regarding Additional Services......................................................37

32.  Choice of Law; Venue; Waiver of Jury Trial ..........................................................38

33.  Other Terms ................................................................................................38

34.  Glossary .....................................................................................................39

**PART II: Third Party Agreements**

Equipment Lease Agreement …………………………………………………… …………………45

Authorize.Net Payment Gateway Agreement …………………………………………………46

Agreement For American Express Card Acceptance -

    American Express OnePoint Program  …………………………………………………………47

**PART III: Additional Important Information For Cards**

A.1.  Electronic Funding Authorization ……………………………………………………………54

A.2.  Funding Acknowledgement ……………………………………………………………………54

A.3.  Additional Fees and Early Termination Fee…………………… …………………………………54

A.4.  Addresses for Notices…………………………………………………………………………54

**PART IV: Card Organization Disclosure** …………………………………………………………56

# PART I: CARD SERVICES

## A. OPERATING PROCEDURES

This part of the Program Guide (through Section 13) describes the procedures and methods for submitting Credit Card Transactions for payment, obtaining authorizations, responding to Chargebacks and Media Retrieval requests, and other aspects of the operations of our Payment Services.

The Operating Procedures contained in this part focus primarily on certain of the MasterCard, Visa, and Discover Network Card organizations Rules, and seek to provide You with the principles for a sound Card program; however You should consult the Card Organization Rules for complete information and to ensure full compliance with them. They are designed to help You decrease Your Chargeback liability and train Your employees. (In the event we provide authorization, processing or settlement of Transactions involving Cards other than MasterCard, Visa and Discover Network, You should also consult those independent Issuers' proprietary rules and regulations.)

The requirements set forth in these Operating Procedures will apply unless prohibited by law. You are responsible for following any additional or conflicting requirements imposed by Your state or local jurisdiction.

## 1. MASTERCARD, VISA, DISCOVER NETWORK AND AMERICAN EXPRESS ACCEPTANCE

**1.1. Card Descriptions.** At the point of sale, the Card must be carefully examined to determine whether it is a legitimate and valid Card. The name of the Card (e.g., Visa, MasterCard or Discover Network) should appear in bold letters on the Card. For all MasterCard and Visa Cards and for some Discover Network Cards, the Issuer (e.g., XYZ Bank, etc.) should also appear in bold letters on the Card. The following is a description of the authorized Visa, MasterCard and Discover Network Card designs:

<u>Visa</u>: Visa Cards have the Visa symbol on the right-hand side of the Card. Above the Visa symbol is the 3-dimensional hologram of the Visa Dove design. The expiration date must be followed by one space and may contain the symbol "V". Visa Cards contain a 16-digit account number embossed across the middle of the Cards and the first digit is always a four (4). In addition, Visa Cards have the first four digits of the account number printed directly below the embossed number. You must always check these numbers carefully to ensure that they are the same. Beginning January 2006, Visa has a new Card design which differs significantly from the previous description. You are required to familiarize Yourself with the new design by consulting the document entitled "Card Acceptance and Chargeback Management Guidelines for Visa Merchants" (VRM 08.12.16). You may download the document free of charge from Visa's website at http://www.visa.com/merchant or order a hardcopy to be mailed to You for a nominal charge by telephoning Visa Fulfillment at 800-VISA-311. Both the old and new Visa Card designs will be circulating concurrently in the marketplace through the year 2010. Only Visa Cards fitting the old or new descriptions may be accepted.

Beginning May 2008, Visa issued a new card design for un-embossed Visa cards. Unlike embossed Visa cards with raised numbers, letters and symbols, the un-embossed card has a smooth, flat surface. Because of the un-embossed cards flat surface, it cannot be used for Transactions that require a card imprint. Un-embossed cards can only be used by merchants who process with an electronic Point of Sale Terminal. As a result, the bottom of the card bears the following note, "Electronic Use Only."

<u>MasterCard</u>: MasterCard Cards are issued under the following names: MasterCard, EuroCard, Access, Union, Million and Diamond. The MasterCard symbol appears on the front or back of the Card. MasterCard and the Globe designs appear in a 3-dimensional hologram above the symbol. In addition, the words Classic, Preferred, Gold or Business may appear. MasterCard account numbers are sixteen (16) digits, and the first digit is always a five (5). The first four digits of the account must be printed directly below the embossed number. Only MasterCard Cards fitting this description may be accepted. Pursuant to an alliance with MasterCard, Diners Club Cards issued in the United States and Canada are being re-issued with a sixteen (16) digit account number the first two digits of which are now fifty-five (55) and with the MasterCard Mark and hologram on the front of the Diners Club Card. These Diners Club Cards shall be accepted and processed in the same manner as MasterCard Transactions. Diners Club International Cards that are issued outside the U.S. and Canada may be re-issued with the MasterCard Mark on the back of the Card. These Diners Club Cards will have account numbers that are fourteen (14) digits, the first two digits or which are thirty-six (36). When these Diners Club Cards are used within the United States, Canada and other designated areas, they will be processed as MasterCard Transactions. Beginning January 2006, MasterCard has a new Card design significantly different from the previous description. You are required to familiarize Yourself with the new design by consulting a document "MasterCard Card Identification Features". You may download the document free of charge from MasterCard's website at http://www.mastercardmerchant.com. Both the old and new MasterCard Card designs will be circulating concurrently in the marketplace through the year 2010. Only MasterCard Cards fitting the old or new descriptions may be accepted.

<u>Discover Network</u>: All valid standard rectangular plastic Cards bearing the Discover Network Acceptance Mark or the Discover/NOVUS Acceptance Mark as indicated below, include the following common characteristics and distinctive features.

- Card Numbers are composed of 16 digits and are displayed on the front of the Card.

- Card Numbers are clear and uniform in size and spacing within groupings.

- An embossed security character, displayed as a stylized "D", appears on the same line as the embossed "Member" since date or "Year Joined" date (if present) and the "Valid Thru" date. The embossed "Valid Thru" date, if present, appears in mm/yy format and indicates the last month in which the Card is valid. An overprint on the signature panel reads "Discover" or "Discover Network." On some Cards, the overprint may display the name of the Card (e.g., Discover, Discover 2GO®, Discover Platinum).

- **Cards manufactured before October 3, 2008** display the Discover Network three-dimensional hologram, bearing a distinct circular shape and images of a globe pierced by an arrow, water, and stars on a repetitive pattern background (the "Discover Network Hologram") on the front of the Card.

- The Discover Network Hologram reflects light and appears to move as the Card is rotated.

- All Cards display a magnetic stripe on the reverse side of the Card. **Cards manufactured on or after October 3, 2008** feature a three-dimensional design that is incorporated into the magnetic stripe. A series of distinct circular shapes will be visible across the length of the magnetic stripe, with blue glows between each shape. When the Card is rotated, the holographic design will reflect light and there will be apparent movement and color switching within the circular shape.

Cards displaying either the Discover Network Hologram or the holographic magnetic stripe are valid after the effective dates indicated above, with the Discover Network Hologram eventually replaced by the holographic magnetic stripe for new Cards. Although both the Discover Network Hologram and the holographic magnetic stripe will each appear on Cards, valid Cards will not display both designs.

- Depending on the issuance date of the Card, the word "DISCOVER" or "DISCOVER NETWORK" will appear in ultraviolet ink on the front of the Card when it is held under an ultraviolet light.

- An underprint of "void" on the signature panel becomes visible if erasure of the signature is attempted.

- The Card Number or the portion of the Card Number displayed on the signature panel on the bank of the Card should match the number displayed on the front of the Card and appear in reverse indent printing.

- **CID must be printed in a separate box to the right of the signature panel** on the back of the Card.

- An overprint on the signature panel reads "Discover Network." On some Cards, the overprint may display the name of the Card (i.e. Discover, Discover 2GO®, Discover Platinum).

- A Discover Network Zip Indicator may appear on the back of a standard rectangular plastic Card indicating the Card can be used to conduct Contactless Card Transactions.

**NOTE:** Valid Cards may not always be rectangular in shape (e.g. Discover 2GO® Cards) and certain valid Contactless Payment Devices approved by us for use in accessing Card Accounts (e.g., radio frequency (RF) enabled Cards, key fobs, and Mobile Commerce Devices) and to conduct Contactless Card Transactions may not display the features described above.

**Prepaid Gift Card Security Features**

The features described below are found on Prepaid Gift Cards; however, the placement of these features may vary:

- Depending on the issue date of the Card, the Discover Network Acceptance Mark or the Discover/NOVUS Acceptance Mark will appear on the front or back of the Card.

- The embossed, stylized "D" appears on the front of the Card.

- **A valid expiration date is embossed on the front of the Card.**

**Other Card Features for Cards with a Discover Network Acceptance Mark**

- The front of the Card may display "Temporary Card," "Prepaid Card," "Gift Card," or "Electronic Use Only," must be printed on the front or the back of the Card.

**NOTE:** Prepaid Gift Cards accepted at a limited, specific list of Merchants may, but are not required to display a Discover Network hologram any may, but are not required to, bear the Discover Network Acceptance Mark.

Unembossed Prepaid Cards display a printed Card number. The "Valid Thru" date and the Cardholder name may or may not be printed on the Card. The embossed "D" security character is not present. "Electronic Use Only" is printed on the front or the back of an unembossed Card. Obtain an electronic Authorization Response using a POS device for unembossed Prepaid Cards.

You are required to remain familiar with Discover Network Card designs and may reference the document "Discover Network Security Features." You may download the document free of charge from Discover Network's website http://www.discovernetwork.com/fraudsecurity/fraud.html.

American Express Card: Some Cards contain a holographic image on the front or the back of the plastic to determine authenticity. Not all American Express Cards have a holographic image.

- All American Express Card Numbers start with "37" or "34." The Card number appears embossed on the front of the Card. Embossing must be clear, and uniform in sizing and spacing. Some Cards also have the Card Number printed on the back of the Card in the signature panel. These numbers, plus the last four digits printed on the Sales Draft, must match.

- Pre-printed Card Identification (CID) Numbers must always appear above the Card Number on either the right or left edge of the Card.

- Only the person whose name appears on the American Express Card is entitled to use it. Cards are not transferable.

- The signature on the back of the Card must match the Cardmember's signature on the Sales Draft, and must be the same name that appears on the front of the Card. The signature panel must not be taped over, mutilated, erased or painted over.

- Some Cards also have a three digit Card Security Code (3CSC) number printed on the signature panel.

- Do not accept a card outside the valid from and to dates.

1.2. **Effective/Expiration Dates.** At the point of sale, the Card should be carefully examined for the effective (valid from) (if present) and expiration (valid thru) dates which are located on the face of the Card. The sale date must fall on or between these dates. Do not accept a Card prior to the effective date or after the expiration date. If the Card has expired, You cannot accept it for a Card sale unless You have verified through Your Authorization Center that the Card is in good standing, otherwise, You are subject to a Chargeback and could be debited for the Transaction.

1.3. **Valid Signature.** Check the back of the Card. Make sure that the signature panel has not been disfigured or tampered with in any fashion (an altered signature panel may appear discolored, glued or painted, or show erasure marks on the surface). The signature on the back of the Card must compare favorably with the signature on the Sales Draft. These Cards must be signed by the Card presenter in the presence of Your authorized representative (unless a Card Not Present Sale) and in the same format as the signature panel on the Card; e.g., Harry E. Jones should not be signed H.E. Jones. The signature panels of Visa, MasterCard, and Discover Network Cards now have a 3-digit number (CVV2/CVC2/CID) printed on the panel known as the Card Validation Code.

- Visa, MasterCard and Discover Network: If the signature panel on the Card is blank, in addition to requesting an Authorization, You must do all the following:

  - Review positive identification bearing the Cardholder's signature (such as a passport or driver's license that has not expired) to validate the Cardholder's identity.

indicate the positive identification, including any serial number and expiration date, on the Credit Draft or Sales Draft, provided that You must effect PAN Truncation, and must not include the expiration date on the copy of the Sales Draft or Credit Draft that You provide to the Cardholder, or as required by applicable law, the Sales Draft or Credit Draft You retain.

- Require the Cardholder to sign the signature panel of the Card prior to completing the Transaction.

**1.4. Users Other Than Cardholders.** A Cardholder may not authorize another individual to use his/her Card for purchases. Be sure the signature on the Card matches with the one on the Sales Draft. Furthermore, any Card having two signatures on the back panel is invalid and any sale made with this Card, can result in a Chargeback. For Cards bearing a photograph of the Cardholder, ensure that the Cardholder appears to be the person depicted in the picture which appears on the Card. If You have any questions, call the Voice Authorization Center and request to speak to a Code 10 operator.

**1.5. Special Terms.** If You limit refund/exchange terms or impose other specific conditions for Card sales, the words "No Exchange, No Refund," etc. must be <u>clearly printed</u> (in 1/4" letters) on the Sales Draft near or above the Cardholder's signature. The Cardholder's copy, as well as Your copy, must clearly show this information.

During a liquidation and/or closure of any of Your outlets, locations, and/or businesses, You must post signs clearly visible to customers stating that "All Sales Are Final," and stamp the Sales Draft with a notice that "All Sales Are Final."

Generally, do not give cash, check or in-store Credit refunds for Card sales. Visa allows for the following exclusions: A cash refund to the Cardholder for a small ticket Transaction or a no signature required Transaction, a cash refund, Credit, or other appropriate form of Credit to the recipient of a gift purchased as a Mail/Phone Order Transaction, or a cash refund or in-store Credit for a Visa prepaid card Transaction if the Cardholder states that the Visa prepaid card has been discarded. **NOTE:** A disclosure does not eliminate Your liability for a Chargeback. Consumer protection laws and Card Organization Rules frequently allow the Cardholder to dispute these items notwithstanding such disclosures.

**1.6. Delayed Delivery or Deposit Balance.** In a delayed delivery Transaction where a Cardholder makes a deposit toward the full amount of the sale, You should execute two separate Sales Drafts (each completed fully as described in Section 3.1.), the first for a deposit and the second for payment of the balance upon delivery of the merchandise or the performance of the services.

<u>Visa:</u> For Visa Transactions, You must obtain an authorization if the cumulative total of both Sales Drafts exceeds the floor limit. You must obtain an authorization for each Sales Draft on each Transaction date. You must assign the separate authorization numbers to each Sales Draft, respectively. You must note on such Sales Drafts the words "delayed delivery," "deposit" or "balance," as appropriate, and the authorization dates and approval codes.

<u>MasterCard:</u> For MasterCard Transactions, You must obtain one authorization. You must note on both Sales Drafts the words "delayed delivery," "deposit" or "balance," as appropriate, and the authorization date and approval code.

<u>Discover Network:</u> For Discover Network Transactions, You must label one Sales Draft "deposit" and the other "balance," as appropriate. You must obtain the "deposit" authorization before submitting the sales data for the "deposit" or the "balance" to us. If delivery of the merchandise or service purchased will occur more than thirty (30) calendar days after the "deposit" authorization, You must obtain a subsequent authorization for the "balance." In addition, You must complete Address Verification at the time of the "balance" authorization, and You must obtain proof of delivery upon delivery of the services/merchandise purchased. You may not submit sales data relating to the "balance" to us for processing until the merchandise/service purchased has been completely delivered.

<u>American Express:</u> For American Express Card Transactions, You must clearly disclose Your intent and obtain written consent from the Cardmember to perform a delayed delivery Transaction before You request an Authorization. You must obtain a separate Authorization Approval for each delayed delivery Transaction on their respective charge dates and clearly indicate on each record that the charge is either for the deposit or for the balance of the Transaction. You must submit the delayed delivery Transaction record for the balance of the purchase only after the items have been shipped, provided or services rendered. For deposits, submissions must be on the date the Cardmember agreed to pay for the deposit for the purchase. For balances, submissions must be on the date the items are shipped, provided or services rendered. You must submit and authorize each delayed delivery Transaction under the same Merchant Number and treat deposits on the Card no differently than You treat deposits on all other payment products.

**NOTE:** For MasterCard and Visa Transactions, if delivery is more than twenty-five (25) days after the original Transaction date and the initial authorization request (as opposed to the thirty (30) days in Discover Network Transactions), You should reauthorize the unprocessed portion of the Transaction prior to delivery. If the Transaction is declined, contact the Cardholder and request another form of payment. For example: On January 1, a Cardholder orders $2,200 worth of furniture and You receive an authorization for the full amount; however, only a $200 deposit is processed. The above procedures are followed, with a $2,000 balance remaining on the furniture; the $2,000 Transaction balance should be reauthorized.

American Express: For American Express Card transactions, you must clearly disclose your intent and obtain written consent from the Cardmember to perform a delayed delivery transaction before you request an Authorization. You must obtain a separate Authorization Approval for each delayed delivery transaction on their respective charge dates and clearly indicate on each record that the charge is either for the deposit or for the balance of the transaction. You must submit the delayed delivery transaction record for the balance of the purchase only after the items have been shipped, provided or services rendered. For deposits, submission must be on the date the Cardmember agreed to pay for the deposit for the purchase. For balances, submission must be on the date the items are shipped, provided or services rendered. You must submit and Authorize each delayed delivery transaction under the same Merchant Number and treat deposits on the Card no differently than you treat deposits on all other payment products.

**1.7. Recurring Transaction and Preauthorized Order Regulations.** If You process recurring Transactions and charge a Cardholder's account periodically for recurring goods or services (e.g., monthly insurance premiums, yearly subscriptions, annual membership fees, etc.), the Cardholder shall complete and deliver to You a Cardholder approval for such goods or services to be charged to his account. The approval must at least specify the Cardholder's name, address, account number and expiration date, the Transaction amounts, the timing or frequency of recurring charges and the duration of time for which the Cardholder's permission is granted. For Discover Network Transactions, the approval must also include the total amount of recurring charges to be billed to the Cardholder's account, including taxes and tips and Your Merchant Number.

If the recurring Transaction is renewed, the Cardholder must complete and deliver to You a subsequent written request for the continuation of such goods or services to be charged to the Cardholder's account. You may not complete a recurring Transaction after receiving a cancellation notice from the Cardholder or Issuer or after a request for authorization has been denied.

If we or You have terminated Your Merchant Agreement, You may not submit authorization requests or sales data for recurring Transactions that are due after the termination date of Your Merchant Agreement.

You must obtain an authorization for each Transaction and write "Recurring Transaction" (or "P.O." for MasterCard Transactions) on the Sales Draft in lieu of the Cardholder's signature. A positive authorization response for one recurring Transaction Card Sale is not a guarantee that any future recurring authorization request will be approved or paid.

For all recurring Transactions, You should submit the 3 digit Card Validation Code number with the first authorization request, but not subsequent authorization requests. Discover Network Card Organization Rules specifically require that You follow this Card Validation Code procedure for Discover Network recurring Transactions.

Also, for Discover Network recurring Transactions, the Sales Draft must include a general description of the Transaction, Your merchant name and a toll-free customer service number that the Cardholder may call to obtain customer assistance from You or to cancel the written approval for the recurring Transaction.

For American Express recurring Transactions, You should periodically verify with Cardmembers that their information (e.g., Card Number, expiration date, billing address) is still accurate. This will improve the likelihood of obtaining an approval to an Authorization request.

All recurring Transactions or preauthorized orders may not include partial payments for goods or services purchased in a single Transaction.

You may not impose a finance charge in connection with a recurring Transaction or preauthorized order.

If You process Recurring Payment Transactions, the Recurring Payment Indicator must be included in each authorization request, and as applicable, each Batch submission entry. Penalties can be assessed by the Card Organizations for failure to use the Recurring Payment Indicator.

**1.8. Certain Rules and Requirements.** The following rules are requirements strictly enforced by Visa, MasterCard and Discover Network:

- Your minimum Credit Card acceptance amount cannot exceed $10.00. Such minimum amount must be established to all Credit Cards regardless of Card Issuer or Card brands. Unless You are a federal government entity or institution of higher learning, You may not establish a maximum amount as a condition for accepting a Card, except that for Discover Network Transactions, You may limit the maximum amount a Discover Network Cardholder may spend if, and only if, You have not received a positive authorization response from the Issuer. Setting a minimum Transaction amount limit for Debit Cards (PIN Debit or Non-PIN Debit) is prohibited.

- You cannot impose a surcharge or fee for accepting a Card.

- You cannot establish any special conditions for accepting a Card.

- You may provide a discount/incentive for a consumer to pay with cash, check, Credit Card, Debit Card, etc., however, You must clearly and conspicuously disclose the discount to consumers. Also, You must offer the discount to all consumers and You cannot discriminate based upon Card brand or Card Issuer. However, You may choose not to accept either U.S. issued Debit Cards or U.S. issued Credit Cards under the terms described in Section 1.9.

- You cannot require the Cardholder to supply any personal information (e.g., home or business phone number; home or business address; or driver's license number) unless instructed by the Authorization Center. The exception to this is for a mail/telephone/Internet order or delivery-required Transaction, and zip code for a card-present key-entered Transaction in order to obtain an Address Verification ("AVS"). Any information that is supplied by the Cardholder must not be in plain view when mailed.

- Any tax required to be collected must be included in the total Transaction amount and not collected in cash.

- You cannot submit any Transaction representing the refinance or transfer of an existing Cardholder obligation deemed uncollectible.

- You cannot accept a Visa Consumer Credit Card or Commercial Visa Product, issued by a U.S. Issuer, to collect or refinance an existing debt.

- You cannot submit a Transaction or sale that has been previously charged back.

- You must create a Sales Draft or Credit Draft for each Card Transaction and deliver at least one copy of the Sales Draft or Credit Draft to the Cardholder.

- You cannot submit a Transaction or sale to cover a dishonored check.

- If You accept Card checks, Your Card check acceptance policy must treat the acceptance of checks from all payment card brands that You accept equally (e.g., if You accept MasterCard, Visa and Discover Network, Your check acceptance policy must treat checks for all three payment card brands equally). You should handle these Card checks like any other personal check drawn upon a bank in the United States.

- Failure to comply with any of the Card Organization Rules may result in fines or penalties.

- You will inform the Cardholder that You are responsible for the Card Transaction including Your goods and services and for related customer service, dispute resolution and performance of the terms and conditions of the Transaction.

**1.9. Card Acceptance.** If You have indicated either in the Application or by registering with us at least thirty (30) days in advance that, as between Non-PIN Debit Cards Transactions and Credit Card Transactions, You will limit Your acceptance to either (i) only accept Non-PIN Debit Transactions; or (ii) only accept Credit Card Transactions, then the following terms in this Section 1.9 will apply:

**1.9.1.** You will be authorized to refuse to accept for payment either Non-PIN Debit Cards or Credit Cards that are issued within the United States. You will, however, continue to be obligated to accept all foreign issued Credit Card or Debit Cards issued by MasterCard, Visa or Discover Network so long as You accept any type of MasterCard, Visa or Discover Network branded Card.

**1.9.2.** While many Debit Cards include markings indicating debit (such as "Visa Checkcard, Visa Buxx, Gift Card, DEBIT, or Mastermoney), many Debit Cards may not include any such markings. It will be Your responsibility to determine at the point of sale whether a Card is of a type that You have indicated that You will accept. You agree to institute appropriate systems and controls to limit Your acceptance to the Card types indicated. You may purchase a table of ranges of numbers currently associated with Debit Card Transactions upon execution of confidentiality/non-disclosure agreements required by the Card Organizations. You will be responsible for updating Your systems to utilize such tables and to obtain updated tables.

**1.9.3.** To the extent that You inadvertently or unintentionally accept a Transaction that You are not registered to accept, such Transaction will downgrade and You will be charged the Non Qualified Rate or, if You are utilizing the Enhanced Recovery Reduced Discount option, You will be charged the Enhanced Recovery Reduced Rate on the volume of said Transaction that Client was not registered to accept, in addition to the difference between the MasterCard/Visa/Discover Network Qualified Rate agreed to in the Schedule of Fees section of the Merchant Application and the actual Interchange rate assessed to the downgraded Transaction.

**1.9.4.** Based upon Your choice to accept only the Card types indicated in the Application, You must remove from Your premises any existing signage indicating that You accept all Visa, MasterCard or Discover Network Cards and use approved specific signage reflecting Your policy of accepting only Non-PIN Debit or Credit Cards.

**1.9.5.** Even if You elect not to accept Non-PIN Debit Card Transactions as provided above, You may still accept PIN Debit Card Transactions if You have signed up for PIN Debit Card Services.

**1.10. Deposits of Principals.** Owners, partners, officers and employees of Your business establishment, and the guarantors who signed the Application, are prohibited from submitting Sales Drafts or Credit Drafts transacted on their own personal Cards, other than Transactions arising from bona fide purchases of goods or services in the ordinary course of Your business. Such use in violation of this Section 1.10 is deemed a cash advance, and cash advances are prohibited.

**1.11. Merchants in the Lodging Industry.**

**1.11.1. Generally:** There are additional rules and requirements that apply to merchants in the lodging industry (in addition to those stated below in Section 5.6 regarding Authorizations) for practices including, but not limited to, Guaranteed Reservations and charges for no shows, advance deposits, overbookings, and priority checkout. If You are a merchant in the lodging industry, **You must contact us for these additional rules and requirements. Failure to do so could result in additional charges or termination of this Agreement.**

**1.11.2. Lodging Services Programs.** In the event You are a lodging merchant and wish to participate in Visa's and/or MasterCard's lodging services programs, please contact Your sales representative or relationship manager for details and the appropriate MasterCard and Visa requirements.

**1.11.3. Written Confirmation of Guaranteed Reservations.** You must provide the Cardholder with written confirmation of a guaranteed reservation. The confirmation must contain:

- Cardholder's name as it appears on the Card, if present.

- Card Number, truncated where required by applicable law to You or Us and Card expiration date if present, unless prohibited by applicable law to You or Us.

- Reservation confirmation number.

- Anticipated arrival date and length of stay.

- The cancellation policy in its entirety, inclusive of the date and time the cancellation privileges expire.

- Any other pertinent details related to the reserved accommodations.

**1.11.4. Cancellation of Guaranteed Reservations.** If a Cardholder requests a cancellation in accordance with Merchant's cancellation policy and specified time frames, Merchant must provide the Cardholder with a cancellation number and instructions to retain a record of it. If a Cardholder requests a written confirmation of the cancellation, Merchant must forward this confirmation within three (3) Business Days of the Cardholder's request. The cancellation confirmation must contain:

- Cardholder's reference that charges were placed on the Card, if applicable, or a guarantee that a "no-show" charge will not be placed on the Card.

- Cardholder's name as it appears on the Card, if present.

- Card Number, truncated as required by applicable law to You or Us.

- Card expiration date, if present, unless prohibited by applicable law to You or Us.

- Reservation cancellation number.

- Date of cancellation.

- The name of the Merchant's employee that processed the cancellation.

- Any other pertinent information related to the reserved accommodations.

**1.12. Customer Activated Terminals and Self-Service Terminals**: Prior to conducting Customer Activated Terminal ("CAT") Transactions or Self-Service Terminal Transactions **You must contact us for approval and further instructions, rules and requirements that apply to CAT and Self-Service Terminal Transactions. Failure to do so could result in additional charges or termination of this Agreement.**

**1.13. Displays and Advertising.** You must prominently display appropriate Visa, MasterCard, Discover Network, American Express and, if applicable, other Card Organization decals and program marks at each of Your locations, in catalogs, on websites and on other promotional materials as required by Card Organization Rules. You may not indicate that Visa, MasterCard, Discover Network, American Express, or any other Card Organization endorses Your goods or services.

Your right to use the program Marks of the Card Organizations terminates upon the earlier of (i) if and when Your right to accept the Cards of the respective Card Organization terminates (e.g., if Your right to accept Discover Network Cards terminates, You are no longer permitted to use Discover Network program Marks), (ii) delivery of notice by us or the respective Card Organization to You of the termination of the right to use the program Mark(s) for that Card Organization, or (iii) termination of the license to use the program Marks by the respective Card Organization to Us.

**1.13.1. Discover Network Sublicense to Use Discover Network Program Marks.** You are prohibited from using the Discover Network Program Marks, as defined below, other than as expressly authorized in writing by us. "Discover Network Program Marks" means the brands, emblems, trademarks and/or logos that identify Discover Network Cards, including without limitation, Diners Club International Cards. Additionally, You shall not use the Discover Network Program Marks other than as a part of the display of decals, signage, advertising and other forms depicting the Discover Network Program Marks that are provided to You by us or otherwise approved in advance in writing by us.

You may use the Discover Network Program Marks only to promote the services covered by the Discover Network Program Marks by using them on decals, indoor and outdoor signs, advertising materials and marketing materials; provided that all such uses by You must be approved in advance by us in writing.

You shall not use the Discover Network Program Marks in such a way that customers could believe that the products or services offered by You are sponsored or guaranteed by the owners of the Discover Network Program Marks. You recognize that You have no ownership rights in the Discover Network Program Marks. You shall not assign to any Person any of the rights to use the Program Marks.

**1.13.2. American Express Sublicense to Use American Express Marks.** You must not use our Marks in any way that injures or diminishes the goodwill associated with that Mark, nor (without our prior written consent) indicate that we endorse Your goods or services. You shall only use our Marks as reasonably necessary to perform Your obligations under the Agreement and shall cease using our Marks upon termination of the Agreement. The guidelines listed below apply to the Merchant's use of the American Express "Blue Box" logo.

- The "Blue Box" logo must appear on all point of purchase materials and signs.

- The space around the "Blue Box" must equal at least 1/3 the size of the box.

- The "Blue Box" logo minimum size is 3/8" and 1/2" is the preferred size.

- Always spell out American Express.

- A minimum distance of 1-1/2 times the size of the "Blue Box" must be allowed between the "Blue Box" logo and another Mark.

**1.14. Cash Payments by and Cash Disbursements to Cardholders.** You must not accept any direct payments from Cardholders for charges of merchandise or services which have been included on a Sales Draft; it is the right of the Issuer to receive such payments. You may not make any cash disbursements or cash advances to a Cardholder as part of a Card Transaction unless You are a financial institution with express authorization in writing in advance from Servicers. For Discover Network, cash advances in authorized jurisdictions other than the United States may be conducted in an originating currency provided that cash advances may be subject to dispute and/or Acquirer fees.

**1.15. Discover Network Cash Over Transactions.** Cash Over Transactions are not available for MasterCard or Visa Transactions. You may issue Cash Over in connection with a Discover Network Card sale, provided that You comply with the provisions of this Agreement including the following requirements:

- You must deliver to us a single authorization request for the aggregate total of the goods/services purchase amount and the Cash Over amount of the Card sale. You may not submit separate authorization requests for the purchase amount and the Cash Over amount.

- The Sales Draft must include both the purchase amount and the Cash Over amount, and You may not use separate Sales Drafts for the purchase amount and Cash Over amount.

- No minimum purchase is required for You to offer Cash Over to a Discover Network Cardholder, provided that some portion of the total Card sale must be attributable to the purchase of goods or services.

- The maximum amount of cash that You may issue as Cash Over is $100.00.

**(Cash Over may not be available in certain markets. Contact us for further information.)**

**1.16. Telecommunication Transactions.** Telecommunication Card Sales occur when a telephone service provider is paid directly using a Card for individual local or long-distance telephone calls. (NOTE: Pre-paid telephone service cards are not and do not give rise to Telecommunication Card Sales). **Prior to conducting Telecommunication Transactions You must contact us for approval and further instructions, rules and requirements. Failure to do so could result in additional charges or termination of this Agreement.**

## 2. SUSPECT TRANSACTIONS

If the appearance of the Card being presented or the behavior of the person presenting the Card is suspicious in nature, You must immediately call the Voice Authorization Center and ask to speak to a Code 10 operator. Answer all their questions and follow their instructions. While not proof that a Transaction is fraudulent, the following are some suggestions to assist You in preventing fraudulent Transactions that could result in a Chargeback:

**Ask Yourself, does the Customer:**

- appear nervous/agitated/hurried?

- appear to be making indiscriminate purchases (e.g., does not care how much an item costs, the size, etc.)?

- make purchases substantially greater than Your usual customer (e.g., Your average Transaction is $60, but this Transaction is for $360)?

- insist on taking the merchandise immediately (e.g., no matter how difficult it is to handle, is not interested in free delivery, alterations, etc.)?

- appear to be purchasing an unusual amount of expensive items or the same items?

- take an unusual amount of time to sign the Sales Draft, or look at the back of the Card as he signs?

- talk fast or carry on a conversation to distract You from checking the signature?

- take the Card from a pocket instead of a wallet?

- repeatedly come back, in a short amount of time or right before closing time, to make additional purchases?

- cause an unusual, sudden increase in the number and average sales Transactions over a one to three-day period?

- tell You he has been having some problems with his Issuer and request that You call a number (that he provides) for a "special" handling or authorization?

- have a previous history of disputed charges?

- place orders to be shipped to an address other than the billing address, or use anonymous/free email domains?

- place orders sent to zip codes or countries where You show a history of fraudulent claims?

**Does the Card:**

- have characters the same size, height, style and all within alignment?

- appear to be re-embossed (the original numbers or letters may be detected on the back of the Card)?
- have a damaged hologram?
- have a Magnetic Stripe on the back on the Card?
- have an altered signature panel (e.g., appear discolored, glued or painted, or show erasure marks on the surface)?
- have "valid from" (effective) and "valid thru" (expiration) dates consistent with the sale date?

If You use an electronic terminal and swipe the Card, make sure the account number displayed on the terminal and/or the Sales Draft matches the number on the Card. If You cannot or do not verify the account number and accept the sale, You are subject to a Chargeback and could be debited for the amount of the Transaction. IF THE NUMBERS DO NOT MATCH, DO NOT ACCEPT THE CARD AS A FORM OF PAYMENT, EVEN THOUGH AN AUTHORIZATION CODE FOR THE MAGNETICALLY SWIPED CARD NUMBER MAY BE RECEIVED.

**Fraud-Prone Merchandise Tips:**

- Jewelry, video, stereo, computer and camera equipment, shoes and men's clothing are typically fraud-prone because they can easily be resold.
- Be suspicious of high dollar amounts and Transactions with more than one fraud-prone item, e.g., two VCRs, three gold chains, etc.

**If You suspect fraud:**

- Call the Voice Authorization Center and ask to speak to a Code 10 operator.

If the terminal does not display the Card number, call the POS Help Desk for terminal assistance.

**Remember:** AN AUTHORIZATION CODE ONLY INDICATES THE AVAILABILITY OF A CARDHOLDER'S CREDIT AT THE TIME OF THE TRANSACTION. IT DOES NOT WARRANT THAT THE PERSON PRESENTING THE CARD IS THE RIGHTFUL CARDHOLDER. IF PROPER PROCEDURES ARE NOT FOLLOWED AT THE TIME OF THE TRANSACTION, YOU ARE SUBJECT TO A CHARGEBACK AND YOUR ACCOUNT MAY BE DEBITED FOR THE AMOUNT OF THE TRANSACTION.


## 3. COMPLETION OF SALES DRAFTS AND CREDIT DRAFTS

You must prepare a Sales Draft or Credit Draft, as applicable, for each Card Transaction and provide a copy of it or a Transaction receipt or copy of the Draft to the Cardholder at the time the Card Transaction is completed.

**3.1. Information Required.** All of the following information must be contained on a single page document constituting a Sales Draft::

- Cardholder's account number must appear on the Credit Draft or Sales Draft in the manner required by applicable law and Card Organization Rules. **NOTE: The copy of the Sales Draft or Credit Draft You provide to a Cardholder must not include the Cardholder's Card expiration date or any more than the last four digits of the Cardholder's Card number. Some states have similar requirements that also apply to the Sales Drafts or Credit Drafts You retain. MasterCard requires that Card expiration dates be excluded from the Sales Drafts or Credit Drafts Your business retains. You are solely responsible to determine the Card account number truncation requirements and Card expiration date exclusion requirements for Your state/jurisdiction;**
- Clear imprint of the Card. Whenever the term "imprint" is used it refers to the process of using a manual imprinting machine to make an impression of the Card on a Sales Draft; it does not include the printout from a printer attached to an electronic device. If You use an electronic device (e.g., authorization/draft capture terminal, cash register, POS Device, etc.) and swipe the Card to read and capture the Card information via the Magnetic Stripe, You do not have to imprint the Card. **HOWEVER, IF THE TERMINAL FAILS TO READ THE MAGNETIC STRIPE OR IF YOU ARE REQUIRED TO OBTAIN A VOICE AUTHORIZATION, THEN YOU MUST IMPRINT THE CARD. IN ADDITION, THE SALES DRAFT MUST HAVE THE CARDHOLDER'S SIGNATURE. FAILURE TO FOLLOW THESE PROCEDURES WILL PREVENT YOU FROM DEFENDING A TRANSACTION IN THE EVENT THAT IT IS CHARGED BACK UNDER A CLAIM THAT THE RIGHTFUL CARDHOLDER DID NOT AUTHORIZE THE PURCHASE. ENTERING INFORMATION INTO A TERMINAL MANUALLY WILL NOT PREVENT THIS TYPE OF CHARGEBACK. FOR MAIL, TELEPHONE, INTERNET AND OTHER CARD NOT PRESENT ORDERS SEE SECTION 3.2;**
- Cardholder's signature. However, eligible merchants participating in MasterCard's Quick Payment Service Program, Visa's Easy Payment Program, and Discover Network's No Signature Program, and/or certain Discover Network Transactions (see note below) are not required to obtain the Cardholder's signature under certain conditions set forth by each program;
- Date of the Transaction;
- Amount of the Transaction (including the approved currency of sale);
- Description of the goods and/or services involved in the Transaction (if there are too many items, combine them into one description; e.g., "clothing" instead of "one pair of pants, one shirt"). Do not carry information onto a second Sales Draft;
- Description of Your merchandise return and Credit/refund policy;
- A valid authorization code, and;
- Merchant's Doing Business As ("D/B/A") name and location (city and state required) and Merchant Account Number.

When imprinting Sales Drafts, do not alter the Cardholder account number, circle or underline any information on the Sales Draft or alter a Sales Draft in any way after the Transaction has been completed and signed. Stray marks and other alterations on a Sales Draft may render it electronically unscannable, unreadable or illegible. This may result in a Chargeback or Summary Adjustment to Your account.

For Discover Network sales using a paper Sales Draft (as opposed to Electronic Draft Capture), the paper Sales Draft must also contain the initials of Your representative or employee that conducted the Transaction. For Discover Network Credits, the Credit Draft must contain the signature of Your authorized representative or employee that conducted the Transaction.

Discover Network Card sales in an amount more than $25.00 including sales taxes, tip, and/or Cash Over amount are not eligible for treatment as No Signature Required Card sales and You may lose a dispute of such a Card sale if the Merchant fails to obtain the Cardholder's signatures on the Sales Draft.

Eligible merchants participating in NO Signature Program, Quick Payment Service and/ or Small Ticket are only required to provide the Cardholder with the completed Sales Draft when requested by the Cardholder.

NOTE: For Discover Network Transactions, if You are a merchant operating under certain merchant category codes approved by Discover Network, You are not required to obtain the Cardholder's signature so long as the full track data is transmitted in the authorization request and the sale amount is $25.00 or less.

**3.2. Mail/Telephone/Internet (Ecommerce) Orders and Other Card Not Present Sales.** You may only engage in mail/telephone/Internet orders provided they do not exceed the percentage of Your total payment Card volume reflected on Your application. Failure to adhere to this requirement may result in cancellation of Your Agreement. Merchants conducting Internet Transactions using MasterCard or Visa Cards must have special codes (an "Electronic Commerce Indicator") added to their authorization and settlement records. Discover Network does not use an Electronic Commerce Indicator. Failure to register as a merchant conducting Internet Transactions can result in fines imposed by the Card Organizations.

Mail, Telephone, Internet and other Card Not Present Transactions have a substantially higher risk of Chargeback. Since You will not have an imprinted or magnetically swiped Transaction and You will not have the Cardholder's signature on the Sales Draft as You would in a face-to-face Transaction, You will assume all risk associated with accepting a mail/telephone/Internet or other Card Not Present Transactions. The following procedures, while they will not eliminate Chargebacks, are useful in reducing them and should be followed by You:

- Obtain the expiration date of Card.

- On the Sales Draft, clearly print the Cardholder's account number; effective and expiration dates; date of Transaction; description of the goods and services; amount of the Transaction (including shipping, handling, insurance, etc.); Cardholder's name, billing address and shipping address; authorization code; and merchant's name and address (city and state required); provided that You effect PAN Truncation, and must not include the expiration date on the copy of the Sales Draft or Credit Draft that You provide to the Cardholder, or as required by applicable law, the Sales Draft or Credit Draft You retain.

- For mail orders, write "MO"; for telephone orders, write "TO" on the Cardholder's signature line.

- If feasible, obtain and keep a copy of the Cardholder's signature on file on a form authorizing You to submit telephone and mail order Transactions.

- You should utilize the Address Verification Service for all Card Not Present Transactions (see note below). Address Verification is specifically required for all Discover Network Card Not Present Transactions, and **if You do not receive a positive match through AVS, You may not process the Discover Network Card Not Present Transaction. If You do not have AVS, contact us immediately.**

- You should obtain the 3-digit Card Validation Code number and include it with each authorization request. Discover Network Card Organization Rules specifically require that You submit the Card Validation Code with the authorization request for all Discover Network Card Not Present Transactions.

- For telephone orders, it is recommended that written verification of the sale be requested from the Cardholder (sent by mail or fax).

- You may not submit a Transaction for processing until after the merchandise has been shipped or the service has been provided to the customer. (The Card Organizations will permit the immediate billing of merchandise manufactured to the customer's specifications [i.e., special/custom orders] provided the Cardholder has been advised of the billing details.)

- You should provide a copy of the Sales Draft to the Cardholder at the time of delivery. You must also obtain proof of delivery of the goods or services to the address designated by the Cardholder (i.e., by getting a signature of the Cardholder or person designated by the Cardholder through the delivery carrier). If the Cardholder visits one of Your locations to receive the goods or services purchased, obtain an imprint of the card and the Cardholder's signature.

- Notify the Cardholder of delivery time frames, special handling and/or cancellation policies. Merchandise shipping dates must be within seven (7) days of the date authorization was obtained. If, after the order has been taken, additional delays will be incurred (e.g., out of stock), notify the Cardholder and reauthorize the Transaction.

- You may not require a Cardholder to complete a postcard or other document that displays the Cardholder's account number in clear view when mailed.

- If You accept orders via the Internet, Your web site must include all the following information in a prominent manner:

  – Complete description of the goods or services offered;

  – Description of Your merchandise return and Credit/refund policy;

  – Customer service contact, including email address and/or telephone number;

  – Transaction currency (U.S. dollars, unless permission is otherwise received from Servicers);

  – Any applicable export or legal restrictions;

  – Delivery policy;

  – Consumer data privacy policy;

  – A description of the Transaction security used on Your website,;

  – The sale or disclosure of databases containing Cardholder account numbers, personal information, or other Card Transaction information to third parties is prohibited;

  – Address of merchant including country;

  – Cancellation policy; and

  – Date any free trial period ends.

- You may not accept Card Account Numbers through Electronic Mail over the Internet:

**Note:** Although Address Verification Service ("AVS") does not guarantee against Chargebacks, but used properly, it assists You in reducing the risk of fraud by confirming whether certain elements of the billing address provided by Your customer match the billing address maintained by the

Issuer. AVS also may help You avoid incurring additional interchange expenses. AVS is a separate process from obtaining an Authorization and will provide a separate response. A Transaction may not match addresses when submitted for AVS and still receive an Authorization. It is Your responsibility to monitor the AVS responses and use the information provided to avoid high-risk Transactions.

**3.2.1 Discover Network Protocol for Internet Transactions.** Each Internet Discover Network Card Transaction accepted by You and submitted to us shall comply with Discover Network standards, including, without limitation, Discover Network standards governing the formatting, transmission and encryption of data, referred to as the "designated protocol." You shall accept only those Internet Discover Network Card Transactions that are encrypted in accordance with the designated protocol. As of the date of these Operating Procedures, the designated protocol for the encryption of data is Secure Socket Layer (SSL). We may, at our discretion, withhold Settlement until security standards can be verified. However, the designated protocol, including any specifications with respect to data encryption, may change at any time upon thirty (30) days advance written notice. You shall not accept any Internet Discover Network Card Transaction unless the Transaction is sent by means of a browser which supports the designated protocol.

**3.3. Customer Service Telephone Numbers.** For Card types, which are funded by individual non-bank Card Organizations:

| | |
|---|---|
| American Express Direct Servicing (ESA) | 1-800-528-5200 |
| American Express OnePoint® | 1-800-554-4777 (Note: Transactions funded in same deposit as Visa, MasterCard and Discover Network) |
| JCB, International | 1-800-366-4522 |
| Voyager | 1-800-987-6591 |
| WEX | 1-800-492-0669 (24 hours) |

# 4. DATA SECURITY

**THE FOLLOWING IS IMPORTANT INFORMATION REGARDING THE PROTECTION OF CARDHOLDER DATA. PLEASE REVIEW CAREFULLY AS FAILURE TO COMPLY CAN RESULT IN SUBSTANTIAL FINES AND LIABILITIES FOR UNAUTHORIZED DISCLOSURE AND TERMINATION OF THIS AGREEMENT.**

**4.1 Payment Card Industry Data Security Standards (PCI DSS).** Visa, MasterCard, Discover Network, JCB, and American Express aligned data security requirements to create a global standard for the protection of Cardholder data. The resulting Payment Card Industry Data Security Standards (PCI DSS) defines the requirements with which all entities that store, process, or transmit payment card data must comply. PCI DSS is the name used to identify those common data security requirements. The Cardholder Information Security Program (CISP) is Visa USA's data security program, and the Site Data Protection (SDP) program is MasterCard's data security program, Discover Network Information Security and Compliance (DISC) is Discover Network's data security program, and the Data Security Operating Policy (DSOP) is American Express' data security Program, each based on the PCI DSS and industry aligned validation requirements. PCI DSS compliance validation is focused on Merchant Equipment (as defined below) where Cardholder data is processed, stored, or transmitted, including:

- All external connections into Your network (i.e., employee remote access, third party access for processing, and maintenance);
- All connections to and from the authorization and settlement environment (i.e., connections for employee access or for devices such as firewalls, and routers); and
- Any data repository outside of the authorization and settlement environment.

For the purpose of this Section 4, "Merchant Equipment" means any and all equipment You use in connection with Card authorization, clearing, completing, settling, transmitting or other related processing, including, without limitation, all telecommunication lines and wireless connections and software, systems, point-of-sale terminals, card readers, merchandise and card scanners, printers, PIN pad devices and other hardware, whether owned by You, Merchant Providers or other Persons used by You.

The Card Organizations or we may impose fines or penalties, or restrict You from accepting Cards if it is determined that You are not compliant with the applicable data security requirements. We may in our sole discretion, suspend or terminate Services under this Agreement for any actual or suspected data security compromise. You agree that You will not request any Authorizations, submit any Sales Drafts or Credit Drafts until You have read and understood the PCI DSS, CISP, SDP, and DISC for which You acknowledge We have provided You sufficient information to obtain, and You will be deemed to have done so upon our receipt of Your request or submission of any Authorizations, Sales Drafts or Credit Drafts.

You must comply with the data security requirements described in this Section 4.1, including, without limitation, PCI DSS, SDP, CISP, DSOP and DISC, and any additional Card Organization requirements applicable to payment applications and PIN Transactions.

Detailed information about PCI DSS can be found at the PCI DSS Council's website: www.pcisecuritystandards.org

Detailed information about Visa's CISP program can be found at Visa's CISP website: www.visa.com/cisp.

Detailed information about MasterCard's SDP program can be found at the MasterCard SDP website: www.mastercard.com/sdp

Detailed information about DISC can be found at Discover Network's DISC website: http://www.discovernetwork.com/merchants/data-security/disc.html

Detailed information about DSOP can be found at American Express' DSOP website: www.americanexpress.com/datasecurity

**4.2. Data Security Requirements. You must comply with the data security requirements shown below:**
- You must install and maintain a secure network firewall to protect data across public networks.
- You must protect stored data and data sent across networks, using methods indicated in the PCI DSS.
- You must use and regularly update anti-virus software and keep security patches up-to-date.
- You must restrict access to data by business "need to know," assign a unique ID to each person with computer access to data and track access to data by unique ID.
- You must not use vendor-supplied defaults for system passwords and other security parameters.
- You must regularly test security systems and processes.
- You must maintain a policy that addresses information security for employees and contractors.

- You must restrict physical access to Cardholder information;
- You may not transmit Cardholder account numbers to Cardholders for Internet Transactions.
- You cannot store or retain Card Validation Codes (three-digit values printed in the signature panel of most Cards, and a four-digit code printed on the front of an American Express Card) after final Transaction authorization.
- You cannot store or retain Magnetic Stripe data, PIN data or AVS data. Only Cardholder account number, Cardholder Name and Cardholder expiration date can be retained subsequent to Transaction authorization.
- You must destroy or purge all Media containing obsolete Transaction data with Cardholder information.
- You must keep all systems and Media containing Card account, Cardholder, or Transaction information (whether physical or electronic) in a secure manner so as to prevent access by, or disclosure to any unauthorized party.
- For Internet Transactions, copies of the Transaction records may be delivered to Cardholders in either electronic or paper format.
- You must use only services and Merchant Equipment that have been certified as PCI DSS compliant by the Card Organizations.

**4.3   Compliance Audits.** You may be subject to ongoing validation of Your compliance with PCI DSS standards. Furthermore, we retain the right to conduct an audit at Your expense, performed by Us or a Person designated b Us to verify Your compliance, or that of Your agents or Merchant Providers, with security procedures and these Operating Procedures.

**4.4   Immediate Notice Required.** In the event that Transaction data is known or suspected of having been accessed or retrieved by any unauthorized Person, You must contact us immediately, and in no event more than 24 hours after becoming aware of such activity.

**4.5.   Investigation.** You must, at Your own expense (i) perform or cause to be performed an independent investigation, including a forensics analysis performed by a certified forensic vendor acceptable to Us and the Card Organizations, of any data security breach of Card or Transaction data; (ii) perform or cause to be performed any remedial actions recommended by any such investigation; and (iii) cooperate with us in the investigation and resolution of any security breach. Notwithstanding the foregoing, if required by a Card Organization, we will engage a forensic vendor approved by a Card Organization at Your expense. You must cooperate with the forensic vendor so that it may immediately conduct an examination of Merchant Equipment, and Your and Merchant Provider's procedures and records and issue a written report of its findings.

**4.6   Required Information for Discover Network Security Breaches:**   For security breaches involving Discover Network Transactions and/or data, You must provide us and/or Discover Network with the following information: (i) the date of breach; (ii) details concerning the data compromised (e.g. account numbers and expiration dates, Cardholder names and addresses, etc.); (iii) the method of such breach; (iv) Your security personnel contacts; (v) the name of any person (including law enforcement) assisting You with Your investigation of such breach; and (vi) any other information which we reasonably request from You concerning such breach, including forensics reports.   You shall provide such information as soon as practicable, and the items listed in (i) – (v) shall be provided to us in any event within 48 hours of Your initial notification to us of the breach.

**4.7   Merchant Providers.** The data security standards set forth in this Section 4 also apply to Merchant providers. Before You engage any Merchant Provider, You must provide to Us in writing (a) the Merchant Provider's legal name, (b) contact information, and (c) intended function. You acknowledge and agree that You will not use, or provide Cardholder data access to any Merchant Provider until You receive our approval and, if required, confirmation of our registration of that Merchant Provider with applicable Card Organizations. You must ensure that You and Merchant Providers: (i) comply with the registration process which can involve site inspections, background investigations, provision of financial statements, and any other information required by a Card Organization; (ii) comply with the periodic and other reporting required by a Card Organization; and (iii) comply with all applicable Card Organization Rules, including without limitation, those requiring security of Cardholder data. You may allow Merchant Providers access to Cardholder data only for purposes authorized under and in conformance with the Card Organization Rules. You are responsible for all our costs and expenses associated with our review, approval, certification (and recertification as may be required by Us or the Card Organization Rules) and registration of any Merchant Providers.

Your use of the Services, equipment, software, systems, materials, supplies or resources of third parties regarding Your Card Transactions processing, including, without limitation, Merchant Providers and any third party lessors or licensors, will not affect Your obligations under this Agreement to Us which will apply to the same extent as if You had not used them. We have no liability or responsibility to You or others regarding these third parties, even if we referred them to You. These third parties are Your agents, and You are solely responsible for (i) determining whether they can meet Your needs and standards, (ii) their actions, inactions and compliance with the terms of this Agreement and the Card Organization Rules and (iii) any and all fees, costs, expenses and other obligations owed to them by You or owed by them to Us or to the Card Organizations.

**4.8   Noncompliance Fees.** If we have not received receipt of Your validation of compliance with Your PCI DSS standards within the first ninety (90) days of the date of the Agreement, You will be charged a monthly PCI Non-Action Fee as set forth in the Application or as otherwise communicated to You, for the period beginning upon expiration of the ninety (90) day period, until such time as You are compliant or this Agreement is terminated, whichever comes first. This monthly PCI Non-Action Fee is in addition to any and all other fees for which You are responsible related to Your failure to be compliant as required hereunder.

**4.9   Costs.** If You or a Merchant Provider (or other Person used by You) are determined by any Card Organization, regardless of any forensic analysis or report, to be the likely source of any loss, disclosure, theft or compromise of Cardholder data or Card Transaction information (together, **"Compromised Data Events"**) and regardless of Your belief that You have complied with the Card Organization Rules or any other security precautions and are not responsible for the Compromised Data Event, You must promptly pay Us for all related expenses, claims, assessments, fines, losses, costs, and penalties and Issuer reimbursements imposed by the Card Organizations against Us (together, "Data Compromise Losses"). In addition to the foregoing, You must also pay Us promptly for all expenses and claims made by Issuers against Us alleging Your responsibility for the Compromised Data Event, apart from any claim procedures administered by the Card Organizations.


## 5.  AUTHORIZATIONS

Each authorization request You submit to us must fully comply with the applicable provisions of this Agreement.  Submissions of an authorization request that does not fully comply may result in assessment of additional fees to You, a declined authorization response or a Chargeback to You.

You must obtain an Authorization Approval Code from us (or a Person, as provided in Section 5.4) for all Transactions. A positive authorization response for MasterCard remains valid for seven (7) days for electronic processed Transactions. For true paper merchants for MasterCard and Visa Transactions the Authorization remains valid for thirty (30) days.  A positive authorization response for Discover Network Transactions remains valid for ninety (90) days. Failure to settle within these timeframes may result in a late presentment Chargeback.

Failure to obtain an Authorization Approval Code for a sales Transaction may result in a Chargeback and/or the termination of Your Agreement. Authorization Approval Codes can be obtained through Your POS Terminal or a Voice Response Unit ("VRU").  Any fees related to authorizations will be charged for a request for an Authorization Approval Code, whether or not the Transaction is approved.

Do not attempt to obtain an Authorization Approval Code provided by someone other than us except as described in Section 5.4. If a Cardholder or another service provider provides You with either an authorization number or with a telephone number for obtaining authorizations, the Authorization Approval Code You receive may not be valid. Even if the Transaction is initially processed and funded, it may be charged back at a later date. Also, if You receive a purported Authorization Approval Code from someone other than us, we will not have the supporting records and will be unable to verify that You received the authorization if that is later questioned in a Chargeback.

An Authorization Approval Code only indicates the availability of credit on an account at the time the authorization is requested. It does not warrant that the person presenting the Card is the rightful Cardholder, nor is it a promise or guarantee that You will not be subject to a Chargeback.

If You obtain Address Verification, You must review the AVS response separately from the authorization response and make Your own decision about whether to accept the Transaction. A Transaction can receive an Authorization Approval Code from the Issuer even if AVS is unavailable or reflects that the address provided to You does not match the billing address on file at the Issuer. If the authorized Cardholder disputes such a Transaction, You will be responsible for the resulting Chargeback.

If You receive a Referral response to an attempted authorization, You may not submit the Transaction without calling for and receiving a voice authorization. After receiving a Referral response You may not attempt another authorization on the same Card through Your POS Terminal.

If You fail to obtain an Authorization Approval Code or if You submit a Card Transaction after receiving a decline (even if a subsequent authorization attempt results in an Authorization Approval Code), Your Transaction may result in a Chargeback and may be assessed fines or fees by the Card Organizations for which You will be responsible. These currently range from $25 to $150 per Transaction. To avoid these costs and related Chargebacks, always obtain an Authorization Approval Code directly from Your terminal before submitting a Transaction for settlement.

For Cards other than MasterCard, Visa and Discover Network (e.g., American Express, etc.) or for check acceptance, You must follow the procedures for authorization and acceptance for each.

You may not attempt to obtain multiple authorizations for a single Transaction. If a sale is declined, do not take alternative measures with the same Card to obtain an approval of the sale from other authorization sources. Instead, request another form of payment. If You accept and process a Transaction that was declined, or attempt multi-Transactions and/or multi-authorizations, You are subject to a Chargeback, Card Organization fines and/or cancellation of Your Agreement.

For MasterCard Transactions, automated fuel dispensers must ensue that completion messages are submitted for MasterCard Cards within sixty (60) minutes of the Authorization.

**5.1. Card Not Present Transactions.** You must obtain the 3 digit Card Validation Code (CVV2, CVC2, CID) and submit this Code with all authorization requests with respect to Transactions where the Card is not present (e.g., telephone, mail, or internet sales). However, for recurring Transaction authorizations You should submit the Card Validation Code with the first authorization request only, and not with the subsequent recurring Transaction authorization requests. (See Section 1.7). **NOTE: For each Card Not Present Discover Network Transaction, You must also verify the name and billing address of the Discover Network Cardholder using the Address Verification System (AVS), and if You do not receive a positive match, do not process the Discover Network Card Not Present Transaction.**

**5.2. Authorization via Telephone (Other Than Terminal/Electronic Device Users)**

- Call Your designated voice authorization toll free number and enter the authorization information into the VRU using a touch tone phone or hold for an authorization representative.

- If advised to pick up a Card, use reasonable and peaceful means to do so, and do not take any action that will alarm or embarrass the Card presenter. You will bear all responsibility for claims, liabilities, costs and expenses as a result of any action by You, Your employees, vendors, or agents, that attempt to retain a Card without the Issuer's direct request or failure to use reasonable, lawful means in retaining or attempting to retain the Card. Forward the Card to: Attn: Rewards Department, P.O. Box 5019, Hagerstown, MD 21740. You may be paid a reward for the return of the Card.

- On occasion, the Authorization Center will ask You to obtain identification from the Cardholder before issuing an approval code. If You are instructed to do so, clearly write the appropriate identification source and numbers in the space provided on the Sales Draft unless otherwise prohibited by law.

- If the sale is declined, please remember that our operators are only relaying a message from the Issuer. The fact that a sale has been declined should not be interpreted as a reflection of the Cardholder's creditworthiness. The Cardholder should be instructed to call the Issuer.

**5.3. Authorization via Electronic Devices**

- If You use an electronic terminal to obtain an Authorization Approval Code, all sales should be authorized through this equipment. Authorizations through other methods will result in additional charges to You.

- If Your terminal malfunctions, refer to Your Quick Reference Guide, if necessary, or call the POS Help Desk. The problem will either be corrected promptly or may require terminal programming or replacement. During the period in which Your terminal is not functioning, remember to check it periodically since most terminal problems are temporary in nature and are quickly corrected.

- If a terminal is moved or if wires are disconnected, causing malfunction, call the POS Help Desk immediately and follow their instructions. You may be responsible for any service charges incurred for reactivation of the terminal.

- Until the terminal becomes operable, You must call Your designated voice authorization toll free number and enter authorization information into the VRU using a touchtone phone. During this time, each Transaction must be imprinted using a manual Imprinter machine. Failure to obtain an Authorization Approval Code and to imprint these Transactions could result in a Chargeback to Your account.

**5.4. Third Party Authorization System.** If You have contracted with another authorization network to obtain Credit Card authorization, i.e., Your terminal can Split Dial, liability resulting from discrepancies with that network must be resolved between You and that network. We will not research Chargebacks resulting from Authorization Approval Codes obtained from another authorization service organization. Such Chargebacks will be passed through to You for resolution. If an authorization provided by a third party authorization system is challenged in a Chargeback, You must obtain proof (e.g., third party authorization logs) from the authorization source and submit it to us within the time frame specified on the Chargeback documentation.

IF YOU CONTRACTED TO USE ONE OF OUR AUTHORIZATION SERVICES, DO NOT USE ANOTHER THIRD PARTY SYSTEM WITHOUT NOTIFYING CUSTOMER SERVICE. OTHERWISE, WE WILL BE UNABLE TO SUCCESSFULLY RESEARCH AND DEFEND ANY AUTHORIZATION RELATED CHARGEBACKS ON YOUR BEHALF. THIS DELAY WILL SIGNIFICANTLY DECREASE YOUR TIME TO RESEARCH AND PROVIDE PROOF OF AUTHORIZATION, THUS REDUCING YOUR OPPORTUNITY TO REVERSE A CHARGEBACK.

If You utilize another authorization network, You will be responsible for the downgrade of any Transactions to a higher cost interchange that result from a mismatch of information to our systems and those of third party authorization networks (see Section 18.1).

If You use a third party authorization network, You must also comply with Section 4.7.

**Call the following for other Card types:**

| | |
|---|---|
| **American Express Direct Servicing (ESA)** | **1-800-528-2121** |
| **American Express OnePoint®** | **1-800-228-1122** |
| **JCB, International** | **1-800-522-9345** |
| **Voyager** | **1-800-987-6589** |
| **WEX** | **1-800-842-0071** |

**Available 24 hours/day; 7 days/week**

All approved sales authorized in this manner must be entered manually as "post authorization" Transactions into the terminal, once the terminal becomes operational. All Credit Transactions must be entered into the terminal for data capture. You may be subject to a Chargeback if You receive a Referral and subsequently receive an approval. To reduce the risk of such a Chargeback, the Card should be imprinted using a manual Imprinter machine. (For specific procedures on Electronic Data Capture, refer to the Terminal Operating Instructions/Users Guide.) If the terminal malfunctions for more than twenty-four (24) hours, contact Customer Service for further instructions on processing Your Transactions.

**5.5.  Automated Dispensing Machines.** Records must be produced for all Transactions whose origin and data capture use automated dispensing machines or Limited Amount Terminals. Records should include the Cardholder account number, merchant's name, terminal location, Transaction date and amount.

**5.6.  Pre-Authorization for T&E (Travel & Entertainment) and Restaurant Merchants.** If You are a business engaged in providing travel and/or entertainment services (e.g., car rentals, hotels, motels, etc.) or a restaurant business, and engage in the practice of "pre-authorization" You must comply with the following general procedures:

- A hotel, motel, or car rental merchant may obtain an estimated Visa, MasterCard or Discover Network authorization at the time of check-in.

- Restaurants must not add an estimated tip amount to the authorization request beyond the value of the goods provided, or services rendered, plus any applicable tax.

- You must notify the Cardholder of the dollar amount You intend to "Pre-Authorize."

- If the customer decides to use another form of payment (e.g., cash, check, etc.) You must promptly call the Voice Authorization Response Unit to delete the authorization hold. Provide the Cardholder's account number, original dollar amount and date of the Transaction, and the authorization code. If a new Transaction takes place, a new imprinted and signed Sales Draft for the exact amount and a new authorization code for that amount must be obtained.

- **VEHICLE RENTAL PROVIDERS MAY NOT INCLUDE POTENTIAL VEHICLE DAMAGE OR INSURANCE DEDUCTIBLES IN ANY PREAUTHORIZATIONS.**

- If You receive a decline on a Transaction, You must wait twenty-four (24) hours before attempting to reauthorize. If You reauthorize prior to this time frame and receive an approval, You may be subject to a Chargeback and a fine imposed by the Card Organizations.

- Hotels, motels, and car rental merchants are allowed up to a 15% variance above the amount authorized. If the final amount charged to the Cardholder exceeds the original estimate by more than 15% above the pre-authorization, You must authorize any additional amounts and all incremental authorization codes must be written in the authorization area along with the date of authorization and the amount authorized.

- Pre-Authorization for certain establishments are allowed up to a 20% (instead of 15%) variance above the amount authorized. If the final amount exceeds the amount "pre-authorized" by more than 20%, You must authorize the additional amount. Estimating the Authorization amount to include a tip is prohibited. The authorization request should include only the amount associated with the bill presented to the consumer.

- You should obtain an authorization for the initial estimated charges and then monitor the charges to ensure that the actual charges made do not exceed the estimated charges.  If the actual charges exceed the amount of the initial estimated authorization (and any subsequent estimated authorizations), then You must secure a positive authorization for the additional amount.  **NOTE:** Subsequent authorizations should only be for the additional amount of total charges and not include amounts already authorized.

- The estimated amount for any pre-authorization for lodging accommodations must be based on (i) the intended length of stay; (ii) the room rate; (iii) applicable taxes and service charges; and (iv) other miscellaneous charges as dictated by experience.

- If an authorization request is declined, no charges occurring after that date will be accepted for that Cardholder.

- You do not need to obtain a final authorization if the total sum of charges (the final amount) does not exceed 120% of the previously authorized charges.  You must record the dates, authorized amounts, and their respective Authorization Approval Codes on the Sales Draft(s).

**5.7  Discover Network Procedure for Request for Cancellation of Authorization.** If a Discover Network Card sale is cancelled or the amount of the Transaction changes following Your receipt of authorization for the sale, You must call Your Authorization Center directly and request a cancellation of the authorization.  An authorization may be cancelled at any time within fifteen (15) days of Your receipt of the authorization, but must be cancelled before the sales data relating to the Transaction is submitted to us, after which the authorization cannot be changed.  For an authorization cancellation, You must provide us with the following information, in this order:

- The Discover Network Merchant Number used in the authorization;

- The Card number;

- The original amount of the authorization being cancelled;

- The new amount of the total Transaction( if any);

- The original authorization code for the authorization being cancelled;

- The expiration date of the Card, and
- A brief reason for the authorization cancellation.

**5.8 Partial Authorization and Authorization Reversal.** Partial authorization provides an alternative to a declined Transaction by permitting an Issuer to return an authorization approval for a partial amount, an amount less than the Transaction amount requested by the Merchant when the available card balance is not sufficient to approve the Transaction in full. The Cardholder is able to use up the remaining funds on the Card and select another form of payment (i.e. another payment card, cash, check) for the remaining balance of the Transaction. For MasterCard Transactions, partial authorization is optional for batch authorized e-commerce Transactions, mail order, telephone order Transactions and recurring payment Transactions. For Discover Network Transactions, partial Authorization support is optional for Card Not Present Transactions. If You support partial authorizations, a partial authorization indicator must be included in each Authorization request.

Any Authorization reversal must be submitted if the Authorization is no longer needed, a partial amount of the total authorized is submitted for the settled Transaction, or the Cardholder elects not to complete the purchase. The Transaction sent for settlement must be no more than the amount approved in the partial authorization response. In the event that You wish to support the partial authorization functionality, You must contact Servicers for additional rules and requirements.

## 6. SUBMISSION/DEPOSIT OF SALES DRAFTS AND CREDIT DRAFTS

**6.1. Submission of Sales for Merchants Other Than Your Business.** You may present for payment only valid charges that arise from a Transaction between a bona fide Cardholder and Your establishment. If You deposit or attempt to deposit Transactions that arise from sales between Cardholders and a different business than the one approved by us in our Agreement with You, then the Transaction may be charged back, or we may suspend or debit funds associated with all such Transactions, and we may immediately terminate Your account and the Agreement.

**6.1.1. Factoring.** Factoring is considered merchant fraud and strictly prohibited. Factoring is the submission of authorization requests and/or Sales Drafts by a merchant for Card Transactions transacted by another business. If You submit Sales Drafts on behalf of another Person, You will suffer any losses associated with the disputes of any such Sales Drafts and/or Transaction. Also if any fraud is involved, You could face criminal prosecution.

**6.2. Timeliness.** In order to qualify for the lowest interchange Discount Rate, all Sales Drafts and Credit Drafts must be properly completed and submitted daily. If You have not received payment for Transactions after one (1) week from Your normal payment date, contact Customer Service. **Late Submission of Sales or Credit Drafts may result in increased Interchange rates or fees or in a Chargeback to You.**

**6.3. Mail/Branch Deposit Procedures.** Complete the appropriate summary form designated for Your use. Imprint the completed summary with Your Merchant Identification Card, if applicable, and sign it. Please do not staple or clip Sales Drafts together or to summary forms. This will distort the Cardholder's account number and may result in a Summary Adjustment or Chargeback to You. Mail Your deposits daily to us, or, if Your Agreement allows deposit at a local bank branch, You must make daily deposits.

Do not send us the merchant copies (which are for Your records); submit only the Bank hard copies of the Transactions. If merchant copies are submitted, they will be returned to You unprocessed.

**6.4. Electronic Merchants: Daily Batching Requirements & Media Submission.** Batches must be transmitted to us by the time indicated in Section A.2 of Part III of this Agreement in order to be processed on the date of transmission. Additionally, if You deposit via magnetic tape, electronic transmissions, or Electronic Data Capture terminal, and have contracted to send the actual Sales Drafts and Credit Drafts to us for imaging and Retrieval, the Media must be batched daily by register/terminal following the procedures below. Failure to do so may result in a processing fee and/or a Chargeback due to our inability to retrieve the Media as requested by the Issuer.

- A register/terminal Batch header form must be filled out for each Batch of Media.

- The Batch header must be imprinted with Your Merchant Identification Card, and all areas completed properly (i.e., Batch number, date, amount, number of items, etc.).

- The Batch/deposit total must match to the settled/reconciled amount displayed on the terminal upon closing the Batch.

- Any discrepancies between the actual Media and electronic display must be reconciled and corrected before storing the Media (for merchants who contract to hold their Media) or before sending us the copies of the deposit. Otherwise, Transactions may appear to be a new Submission and may be manually keyed (causing duplicate billing to Cardholders and resulting in Chargebacks) or we may not be able to retrieve an item when requested by the Issuer.

- It is Your responsibility to ensure that the actual Media is batched correctly and, depending on the terms of Your Agreement, either stored at Your location or sent to Servicers. (In some cases, the actual Media is sent daily to Your head office, and forwarded to Servicers for imaging.)

- **You must confirm that Your equipment has transmitted its Batches to us at least once daily.** Even if Your equipment is designed or programmed to close and submit Batches without Your intervention, it is ultimately Your responsibility to confirm that the Batches have been transmitted to us for processing.

## 7. SETTLEMENT

Except as otherwise set forth in this Program Guide, Your funds for MasterCard/Visa/Discover Network Transactions will ordinarily be processed and transferred to Merchant's financial institution within two (2) Business Days from the time a Batch is received by Processor if Merchant's financial institution is the Bank. If Merchant's financial institution is not the Bank, Your MasterCard/Visa/Discover Network Transactions will ordinarily be processed via the Federal Reserve within two (2) Business Days from the time a Batch is received by Processor. The Federal Reserve will transfer such amounts to Merchant's financial institution.

If You have been classified by Discover Network as having a Discover Direct Strategic Relationship with Discover Network, we will not acquire Your Discover Network Transactions and they will be subject to Your agreement with Discover Network.

You acknowledge and agree that if we have not agreed to or do not acquire Transactions for any Card type (i) we have no liability or responsibility whatsoever for the settlement of or disputes regarding those Transactions and (ii) You will pursue directly with the related Card Organization all claims and disputes regarding those Transactions. You agree to pay Us for per item processing, Authorization and other fees in the Application for any non-acquired Transaction services You receive from Us.

**8. REFUNDS/EXCHANGES (CREDITS)**

**8.1. Refunds**

- You must promptly complete and submit a Credit Draft for the total amount of the Credit, which must include the following information

  - The account number and expiration date;

  - The Cardholder's name;

  - Your name, city, state and Merchant Account Number;

  - A description of the goods or services;

  - The Transaction date of the Credit;

  - The total amount of the Credit; and

  - For Discover Network Transactions, the approved currency used and the signature of Your authorized representative or employee.

- You cannot process a Credit Transaction that does not correspond to a refund on a previous Transaction on the original Sales Draft.

- Full refunds must be for the exact dollar amount of the original Transaction including tax, handling charges, etc. (You must identify the shipping and handling charges incurred.). The refund amount may not be for more than the original Card sale amount.

- All dollar amounts and other handwritten information must be clearly written. (Stray marks on the Credit Draft will render it unscannable/ illegible.)

- Do not circle or underline any information on the Credit Draft.

- Imprint the Credit Draft with the same Card used by the Cardholder to make the original purchase when applicable. You should not credit an account that differs from the account used for the original Transaction.

- Never give cash or check Credit refunds for Card sales.

- Have the Cardholder sign the Credit Draft, give the Cardholder the appropriate copy, and deposit the Credit Draft immediately. Failure to process a Credit within five (5) calendar days may result in a Chargeback.

- Authorization is not required for Credits.

- You cannot intentionally submit a sale and an offsetting Credit at a later date solely for the purpose of debiting and crediting Your own or a customer's account.

- You are responsible for paying all refunds submitted to us on Your merchant account. We assume no responsibility for verifying any Credits or refunds.

- Do not process a Credit Transaction once a Chargeback is received. Credits issued after a Chargeback has been received may not be recoverable and the Merchant would be financially responsible for the Credit as well as the Chargeback.

- **YOU ARE RESPONSIBLE TO SECURE YOUR TERMINALS AND TO INSTITUTE APPROPRIATE CONTROLS TO PREVENT EMPLOYEES OR OTHERS FROM SUBMITTING CREDITS THAT DO NOT REFLECT BONA FIDE RETURNS OR REIMBURSEMENTS OF PRIOR TRANSACTIONS.**

**8.2. Exchanges.**

- No additional paperwork is necessary for an even exchange. Just follow Your standard company policy.

- For an uneven exchange, complete a Credit Draft (follow the procedures outlined in Section 8.1.) for the total amount of only the merchandise returned. The Cardholder's account will be credited for that amount. Then, complete a new Sales Draft for the total amount of any new merchandise purchased.

**9.  RETENTION OF RECORDS FOR RETRIEVALS AND CHARGEBACKS**

**9.1.  Retain Legible Copies.**

For MasterCard and Visa: You must securely retain legible copies of all Sales Drafts and Credit Drafts or any other Transaction records for a period of eighteen (18) months from the date of each Transaction and a period of five (5) years for the retention of healthcare Sales Drafts and Credit Drafts. The Sales Drafts You retain must comply with all requirements (see Section 3.1).

For Discover Network: You must securely retain legible copies of all Sales Drafts and Credit Drafts or any other Transaction records for the longer of (i) 365 days or (ii) the resolution of any pending or threatened disputes, claims, disagreements or litigation involving the Card Transaction. You must also keep images or other copies of Sales Drafts for no less than three (3) years from the date of the Discover Network Transaction.

For American Express: You must submit the Credit to American Express directly, or through Your Processor, for payment. You must securely retain legible copies of all Sales Drafts and Credit Drafts or any other Transaction records for twenty-four (24) months from the date You submitted the corresponding Credit to Us. You must also provide a copy of the Credit Draft to the Cardmember or as required by applicable law, truncate the Card Number and do not print the Card's expiration date on copies of Credit Drafts delivered to the Cardmember.

**9.2.  Provide Sales Drafts and Credit Drafts.** You must provide all Sales Drafts and Credit Drafts or other Transaction records requested by us within the shortest time limits established by Card Organization Rules. You are responsible for any deficiencies in Card Transaction data transmitted or otherwise delivered to us.

**10. CHARGEBACKS, RETRIEVALS AND OTHER DEBITS**

**10.1. Chargebacks.**

**10.1.1. Generally.** Both the Cardholder and the Issuer have the right to question or dispute a Transaction. If such questions or disputes are not resolved, a Chargeback may occur. As a result, we will debit Your Settlement Account or settlement funds for the amount of each Chargeback. It is strongly recommended that, whenever possible, You contact the Cardholder directly to resolve a disputed Transaction or Chargeback, **unless** the dispute involves a Discover Cardholder, in which case Discover Network rules and regulations expressly prohibit You from contacting the Discover Cardholder regarding the dispute. You are responsible for all Chargebacks, our Chargeback fees, and related costs arising from Your Transactions.

**10.1.2. Transaction Documentation Requests.** In some cases, before a Chargeback is initiated, the Issuer will request a copy of the Sales Draft, via a request for Transaction documentation. We will forward the request to You. **You must respond to the request within the time frame and manner set forth in the request. We will then forward Your response to the Issuer. If You fail to timely respond, we will so notify the Issuer and a Chargeback may result.** Upon receipt of a Transaction documentation request, immediately retrieve the requested Sales Draft(s) using the following guidelines:

- Make a legible copy, centered on 8½ x 11-inch paper (only one (1) Sales Draft per page).

- Write the 'case number' from the request for Transaction documentation on each copy/page.

- If applicable, make copies of a hotel folio, car rental agreement, mail/phone/internet order form, or other form of receipt.

- If a Credit Transaction has been processed, a copy of the Credit Draft is also required.

- Letters are not acceptable substitutes for Sales Drafts.

- Fax or mail legible copies of the Sales Draft(s) and Credit Drafts, if applicable, to the fax number or mail address provided on the request form.

- If You fax Your response, please set Your fax machine to print Your fax number and name on the documents that You send. We can use this information to help determine where the documentation received originated from should additional research be required.

- Additionally, please set the scan resolution on Your fax machine to the highest setting. The higher resolution setting improves the clarity of characters and graphics on the documentation transmitted and helps reduce the number of illegible fulfillments and/or Chargebacks.

If we do not receive a clear, legible and complete copy of the Transaction documentation within the timeframe specified on the request, You may be subject to a Chargeback for "non-receipt" for which there is no recourse.

A handling fee may be charged by the Issuer and will be debited from Your Settlement Account or settlement funds if a Transaction documentation request results from a difference in the following information on the Sales Draft and the transmitted record: Merchant name or an incorrect city, state, foreign country and/or Transaction date.

**10.1.3. Chargeback Process.** Regardless of whether You respond to a Transaction documentation request, a Chargeback may be debited to Your Settlement Account for numerous reasons (see below). If the Issuer submits a Chargeback, we will send You a Chargeback notification, which may also include a request for Transaction documentation. **Due to the short time requirements imposed by MasterCard, Visa, Discover Network, and American Express, it is extremely important that You respond to a Chargeback notification and Transaction documentation request within the time frame set forth in the notification.** Do not process a Credit Transaction once a Chargeback is received; the Issuer will credit the Cardholder's account. Credits issued after a Chargeback has been received may not be recoverable and the Merchant would be financially responsible for the Credit as well as the Chargeback. If the information You provide is both timely and, in our sole discretion, sufficient to warrant a representment of the Transaction and/or reversal of the Chargeback, we will do so on Your behalf. However, representment and/or reversal is/are ultimately contingent upon the Issuer and/or Cardholder accepting the Transaction under applicable Card Organization guidelines. Representment or reversal is not a guarantee that the Chargeback has been resolved in Your favor.

For Visa Chargebacks: If we reverse the Chargeback and represent the Transaction to the Issuer, the Issuer, at its sole discretion, may elect to submit the matter for arbitration before Visa. Visa currently charges a $250 filing fee and a $250 review fee. If a decision is made in favor of the Cardholder and/or Issuer, and the Chargeback is upheld, You will be responsible for all such fees and any other applicable fees and penalties imposed by Visa, as they may change from time to time. Such fees and penalties will be debited from Your Settlement Account or settlement funds, in addition to the Chargeback.

For MasterCard Chargebacks: If we reverse the Chargeback and represent the Transaction to the Issuer, the Issuer, at its sole discretion, may elect to resubmit the Chargeback. In such event, at the discretion of Servicers, we will debit Your Settlement Account or settlement funds for the Chargeback. However, if You feel strongly that that it is an invalid Chargeback, we may, on Your behalf and at Your request, submit the matter for arbitration before MasterCard. MasterCard currently charges a $250 filing fee and a $250 review fee. If a decision is made in favor of the Cardholder and/or Issuer, and the Chargeback is upheld, You will be responsible for all such fees and any other penalties imposed by MasterCard as they may change from time to time. Such fees and penalties will be debited from Your Settlement Account or settlement funds, in addition to the Chargeback.

For Discover Network Chargebacks: If Discover Network rejects our representment request and You feel strongly that the Chargeback is invalid, we may, at the discretion of iPayment and on Your behalf and at Your request, submit the matter for dispute arbitration before Discover Network. Discover Network charges fees for representment requests and an arbitration fee as published in their fee schedule.

If the Chargeback is not disputed within the applicable time limits set forth by MasterCard, Visa, Discover Network and American Express rules and regulations, reversal rights are forfeited. Our only alternative, for Visa and MasterCard non-fraud Chargeback reason codes, is to attempt a "good faith collection" from the Issuer on Your behalf. This process can take up to six (6) months and must meet the Issuer's criteria (e.g. at or above a set dollar amount). Good faith collection attempts are not a guarantee that any funds will be collected on Your behalf. Issuers normally charge good faith collection fees, which are deducted from the Transaction amount if accepted to any processing fees that are charged by Us.

For American Express Chargebacks: You may request a Chargeback reversal if the Chargeback was applied in error. In order for Us to consider Your request, You must have responded to the original inquiry within the specified timeframe, request the Chargeback reversal no later than 20 days after the date of the Chargeback, and provide all supporting documentation to substantiate the error. If a Chargeback is applied, the Chargeback reversal can only be requested if You prove that You already issued a Credit to the Cardmember for the amount of the disputed charge.

**NOTE:** Discover Network does not offer good faith collection for Acquirers.

MasterCard and Visa Card Organization Rules and regulations require that a merchant make a good faith attempt and be willing and able to resolve any disputes directly with the Cardholder. Discover Network rules and regulations, however, prohibit You and/or us from contacting the Cardholder directly regarding dispute(s) or any other matter, except as required for acceptance of Discover Network Transactions, and require You and/or us to submit any responses to dispute notices directly to Discover Network.

Due to Card Organization Rules, You may not re-bill a Cardholder after a Chargeback is received for that Transaction, even with Cardholder authorization.

We strongly recommend that You include a detailed rebuttal letter along with all pertinent documents when responding to a Transaction request or a Chargeback notification (e.g., rental agreement, imprinted portion of the invoice or Sales Draft; the portion signed by the Cardholder; and the area where the authorization codes, with amounts and dates, are located).

Due to the short time frames and the supporting documentation necessary to successfully (and permanently) reverse a Chargeback in Your favor, we strongly recommend the following:

- Avoid Chargebacks by adhering to the guidelines and procedures outlined in these Operating Procedures.

- If You do receive a Chargeback, investigate, and if You dispute the Chargeback, submit the appropriate documentation within the required time frame.

- Whenever possible, contact the Cardholder directly to resolve the dispute, unless the dispute relates to a Discover Network Cardholder, in which case direct contact with the Discover Network Cardholder regarding the dispute is prohibited by Discover Network Card Organization Rules.

- If You have any questions, call Customer Service.

**10.1.4. Chargeback Reasons.** The following section outlines the most common types of Chargebacks. This list is not exhaustive. For ease of understanding, we have combined these Chargebacks into six groupings. We have included recommendations on how to reduce the risk of Chargebacks within each group. These are recommendations only, and do not guarantee that You will be able to prevent Chargebacks.

1. **Authorization Issues.** Proper Authorization procedures were not followed and valid Authorization was not obtained.

**The following scenarios could cause an Authorization related Chargeback to occur.**

- Authorization not obtained.

- Authorization was declined.

- Transaction processed with an expired card and Authorization was not obtained.

- Transaction was processed with an invalid account number and Authorization was not obtained.

- Card Recovery Bulletin (CRB) or Exception File was not checked (Transactions below floor limit).

**To reduce Your risk of receiving an Authorization related Chargeback:**

- Obtain valid Authorization on the day of the Transaction.

  - Card Present Transactions – Authorization must be obtained on the Transaction date for the amount settled.

  - Card Not Present Transactions – Authorization must be obtained on the Transaction date for the amount settled. However, if merchandise is being shipped, Authorization must be obtained within seven (7) calendar days of the Transaction ship date.

- If a declined response is received, then request another form of payment from the Cardholder.

- If a Referral response is received, then follow proper voice procedures to obtain a valid Authorization and obtain an imprint of the Card.

- "Pick-up" response indicates that the Issuer is requesting for the Card to be retained and returned back to them. The Card should not be accepted for payment. Additionally, You can choose to retain the Card and return it to the Acquirer.

- Merchants should not exceed any predetermined thresholds for specific terminal types as specified by each Card Organization.

2. **Cancellations and Returns.** Credit was not processed properly or the Cardholder has cancelled and/or returned items.

**The following scenarios could cause a Cancellation and Return related Chargeback to occur:**

- Cardholder received damaged or defective merchandise.

- Cardholder continued to be billed for cancelled recurring Transaction.

- Credit Transaction was not processed.

**To reduce Your risk of receiving a Cancellation and Return related Chargeback:**

- Issue Credit to the Cardholder for the same account as the purchase in a timely manner.

  - Do not issue Credit to the Cardholder in the form of cash, check or in-store/merchandise Credit as we may not be able to recoup Your funds in the event the Transaction is charged back.

- Ensure customers are fully aware of the conditions for recurring Transactions. Cancel recurring billings as soon as notification is received from the Cardholder or as a Chargeback, and issue the appropriate Credit as needed to the Cardholder in a timely manner.

- Pre-notify the Cardholder of billings within ten (10) days (Domestic) and fifteen (15) days (International) prior to billing, allowing the Cardholder time to cancel the Transaction.

- Provide proper disclosure of Your refund policy for returned/cancelled merchandise, or services to the Cardholder at the time of Transaction.

  - Card Present – Cardholder signed the Sales Draft containing disclosure.

- If applicable, the words "NO EXCHANGE, NO REFUND," etc. must be clearly printed in 1/4-inch lettering on the Sales Draft near or above the Cardholder signature.

  - E-commerce – provide disclosure on website on same page as check out requiring Cardholder to click to accept prior to completion.

  - Card Not Present – provide cancellation policy at the time of the Transaction.

- Provide cancellation numbers to Cardholders when lodging services are cancelled.

3. **Fraud.** Transactions that the Cardholder claims are unauthorized, the account number is no longer in use or is fictitious, or the merchant was identified as "high risk".

**The following scenarios could cause a Fraud related Chargeback to occur:**

- Multiple Transactions were completed with a single Card without the Cardholder's permission.

- Counterfeit Card was utilized and proper acceptance procedures were not followed.

- Authorization was obtained; however, full track data was not transmitted.

- Cardholder states that they did not authorize or participate in the Transaction.

**NOTE:** Visa Fraud Chargebacks: Chargeback representment rights do not exist if You failed to fulfill a retrieval request and/or provide a sales slip that contains all required data elements. To preserve Chargeback representment rights, respond to all retrieval requests with a clear legible copy of the Transaction document that contains all required data elements within the required timeframe that is specified by the retrieval request.

**To reduce Your risk of receiving a Fraud related Chargeback:**

**Card Present Transactions:**

- Obtain an Authorization for all Transactions.

- If You are utilizing an electronic device to capture card information, swipe all Card Transactions through Your electronic authorization device to capture Cardholder information and ensure the displayed Cardholder number matches the number on the Card.

- If You are unable to swipe the Card or if a Referral response is received, imprint the Card using a valid imprinting device that will capture the embossed Card and merchant information. Do not alter the imprint on the draft in any way. Manually entering the information into the terminal does not protect You from this type of Chargeback. All pertinent information relating to the Transaction must be written on the manually imprinted draft (Transaction date, dollar amount, Authorization code and merchandise description) along with the Cardholder signature.

**NOTE:** Do not imprint on the back of a signed Sales Draft. The imprint must be on the Transaction document that contains all Transaction elements to prove the Card was present at the time of the Transaction.

- Obtain the Cardholder signature for all Transactions; ensure the signature on the Sales Draft matches the signature on the back of the Card.

- Process all Transactions one time and do not Batch out Transactions multiple times.

- Educate staff on procedures to eliminate point of sale (POS) fraud.

**Card Not Present Transactions:**

- Participation in recommended Fraud Prevention Tools:
  - Verified by Visa Program
  - MasterCard SecureCode
  - Address Verification Services
  - CVV2, CVC2 and CID Verification

**NOTE:** While Transactions utilizing these tools may still be disputed, the service may assist You with Your decision to accept the Card for the Transaction.

- Ensure You ship to the AVS confirmed address (bill to and ship to should match).

- Obtain Authorization for all Transactions.

- Ensure merchant descriptor matches the name of the business and is displayed correctly on the Cardholder statement.

- Ensure descriptor includes correct business address and a valid customer service number.

American Express offers fraud mitigation tools for both Card Present and Card Not Present Transactions to help verify that a charge is valid. These tools help You mitigate the risk of fraud at the point of sale, but are not a guarantee that a charge is in fact valid or bona fide or that You will not be subject to a Chargeback. For optimal use of the tools, please visit American Express' Fraud Prevention Information at: www.americanexpress.com/fraudinfo.

4. **Cardholder Disputes.** Merchandise or services not received by the Cardholder, Merchandise defective or not as described.

**The following scenarios could cause a Cardholder Dispute related Chargeback to occur:**

- Services were not provided or merchandise was not received by the Cardholder.

- The Cardholder was charged prior to merchandise being shipped or merchandise was not received by agreed upon delivery date or location.

- Cardholder received merchandise that was defective, damaged, or unsuited for the purpose sold, or did not match the description on the Transaction documentation/verbal description presented at the time of purchase.

- Cardholder paid with an alternate means and their Card was also billed for the same Transaction.

- Cardholder cancelled service or merchandise and their Card was billed.

- Cardholder billed for a Transaction that was not part of the original Transaction document.

**To reduce Your risk of receiving a Cardholder Disputed related Chargeback:**

receipt or invoice.

- Contact the Cardholder in writing if the merchandise or service cannot be provided or is delayed, and offer the Cardholder the option to cancel if Your internal policies allow.

- In the event that the Cardholder received defective merchandise or the merchandise received was not as described, resolve the issue with the Cardholder at first contact.

- If the merchandise is being picked up by the Cardholder, have them sign for the merchandise after inspection that it was received in good condition.

- Do not charge the Cardholder until the merchandise has been shipped, ship according to the agreed upon terms and obtain signed Proof of Delivery from the Cardholder.

- If unable to provide services or merchandise, issue a Credit to Cardholder in a timely manner.

- Accept only one form of payment per Transaction and ensure the Cardholder is only billed once per Transaction.

- Do not bill Cardholder for loss, theft or damages unless authorized by the Cardholder.

**5.** **Processing Errors.** Error was made when Transaction was processed or it was billed incorrectly.

**The following scenarios could cause a Processing Error related Chargeback to occur:**

- Transaction was not deposited within the Card Organization specified timeframe.

- Cardholder was issued a Credit Draft; however, the Transaction was processed as a sale.

- Transaction was to be processed in a currency other then the currency used to settle the Transaction.

- The account number or Transaction amount utilized in the Transaction was incorrectly entered.

- A single Transaction was processed more than once to the Cardholder's account.

- Cardholder initially presented Card as payment for the Transaction; however, Cardholder decided to use an alternate form of payment.

- Limited amount or self-service terminal Transaction was processed for an amount which is over the pre-determined limit.

**To reduce Your risk of receiving a Processing Error related Chargeback:**

- Process all Transactions within the Card Organization specified timeframes.

- Ensure all Transactions are processed accurately and only one time.

**NOTE:** In the event that a Transaction was processed more than once, immediately issue voids, Transaction reversals or Credits.

- Ensure that credit Transaction receipts are processed as Credits and sale Transaction receipts are processed as sales.

- Ensure all Transactions received a valid Authorization Approval Code prior to processing the Transactions and obtain a legible magnetic swipe or imprinted Sales Draft that is signed.

- Do not alter Transaction documentation or make any adjustment unless the Cardholder has been contacted and agrees to any modifications of the Transaction amount.

- Ensure limited amount, self-service and automated fuel dispenser terminals are set properly to confirm to the pre-determined limits.

**6.** **Non Receipt of Information.** Failure to respond to a Retrieval Request or Cardholder Does Not Recognize.

**The following scenarios could cause a Non Receipt of Information related Chargeback to occur:**

- The Transaction documentation was not provided to fulfill the retrieval request.

- The retrieval request was fulfilled with an illegible Sales Draft or was an invalid fulfillment (incorrect Sales Draft or Sales Draft did not contain required information which may include signature).

- The Cardholder does not recognize or is unfamiliar with the Transaction due to the merchant name and/or location not matching the name and/or location where the Transaction took place.

**To reduce Your risk of receiving a Non Receipt of Information related Chargeback:**

- Provide a clear and legible copy of the Sales Draft that contains all required data elements within the required timeframe that is specified on the retrieval request

- Ensure that the most recognizable merchant name, location, and/or customer service phone number is provided on all Transactions

- Retain copies of all Transaction documentations for the required timeframe that is specified by each Card Organization.

- Develop efficient methods to retrieve Transaction documentation to maximize ability to fulfill requests.

**10.2.** **Other Debits.** We may also debit Your Settlement Account or Your settlement funds in the event we are required to pay Card Organization fees, charges, fines, penalties or other assessments as a consequence of Your sales activities. Such debits shall not be subject to any limitations of time specified elsewhere in the Agreement, including, without limitation the following, which we may add to or delete from this list as changes occur in the Card Organization Rules or our Operating Procedures pursuant to Section 15:

- Card Organization fees, charges, fines, penalties, registration fees, or other assessments including any fees levied against us or any amount for which You are obligated to indemnify us.

Currency conversion was incorrectly calculated. **NOTE: For Discover Network Transactions, You are not permitted to convert from Your local Discover Network approved currency into another currency, nor may You quote the price of a Transaction in U.S. dollars if completed in another approved currency.**

- Discount Rate not previously charged.

- Reversal of deposit posted to Your account in error.

- Debit for Summary Adjustment not previously posted.

- Reversal of Credit for deposit previously posted.

- Debit for Chargeback never posted to Your account.

- Debit for EDC Batch error fee.

- Card Organization Merchant Chargeback/fraud monitoring fees – excessive Chargeback handling fees.

- Failure of Transaction to meet Member Controller Authorization Service ("MCAS") — Cardholder account number on exception file.

- Original Transaction currency (foreign) not provided.

- Travel Voucher exceeds maximum value.

- Debit and/or fee for investigation and/or Chargeback costs related to this Agreement, or for costs related to our collection activities in an amount no less than $100.00.

- Costs arising from replacement or damage to equipment rented.

- Payment of current or past due amounts for any equipment purchase, rental or lease.

- Incorrect merchant descriptor (name and/or city, state) submitted.

- Incorrect Transaction date submitted.

- Shipping and handling interchange fees.

- Costs or expenses associated with responding to any subpoena, garnishment, levy or other legal process associated with Your account in an amount no less than $150.00.

**10.3.    Summary (Deposit) Adjustments/Electronic Rejects.**    Occasionally, it is necessary to adjust the dollar amount of Your summaries/Submissions (deposits) and credit or debit Your Settlement Account or settlement funds accordingly.  The following is a list of the most frequent reasons for Summary (Deposit) Adjustments/ Electronic Rejects:

- Your summary reflected an arithmetic error.

- Submitted sales not included in Your Agreement (e.g., American Express).

- The dollar amount is unreadable/illegible.

- The Cardholder's account number is unreadable/illegible.

- Duplicate Sales Draft submitted.

- Card number is incorrect/incomplete.

- Summary indicated credits, but no credits were submitted.

**10.4.    Disputing Other Debits and Summary Adjustments.** In order to quickly resolve disputed debits and Summary Adjustments, it is extremely important that the items listed in this section be faxed or sent to the address listed on the notification.

If the Summary Adjustment is for an unreadable or incorrect Cardholder account number, resubmit the corrected Sales Draft with Your next deposit. Also, if the Transaction is over thirty (30) calendar days old, You must reauthorize and obtain a valid Authorization Approval Code.

A clear and legible copy of the Sales Draft containing the following should be obtained from Your files.

- Date of sale/Credit;

- Cardholder's account number, name and signature;

- Total amount of the sale and description of goods and services; and

- Date and Authorization Approval Code.

Include a dated cover letter detailing the reasons for requesting a review of the debit or Summary Adjustment and documentation to support Your dispute. (You should retain a copy of the correspondence and all documentation for Your files.)  If the inquiry is related to prior correspondence, be sure to include the control number we previously used.

Immediately fax or mail the Sales Draft or Credit Drafts to the fax number or address provided on Your notification letter.

If You have any questions, please call the Customer Service number provided on the last page of this Program Guide.  If a Customer Service Representative informs You that additional documentation is required in order to fully review the item, please immediately submit Your rebuttal and Transaction documentation to the fax number or address listed on the debit notification.

## 11. ACCOUNT MAINTENANCE

**11.1.    Change of Settlement Account Number.** If You change the Settlement Account in which You receive the proceeds of Your Transactions, You must call Customer Service immediately. If You accept payment types other than Visa, MasterCard and Discover Network (such as the American

Express Card), You are also responsible for contacting the Card Organizations or companies governing those Cards to notify them of this change.

**11.2.** **Change in Your Legal Name or Structure.** You must call Customer Service and request a new Agreement.

**11.3.** **Change in Company DBA Name, Address or Telephone/Facsimile Number.** To change Your company or location DBA name, address (or e-mail address) or telephone/ facsimile number, You must send the request in writing to the address on the Important Customer Service Contact Information page of this Program Guide.

**11.4.** **Other Change(s) in Merchant Profile.** You must immediately notify us of any change to the information on file with us in Your merchant profile, including: (i) any new lines or types of business; (ii) change in ownership; (iii) the opening, closing or liquidation of business or any location; (iv) change in Card processing method (i.e., paper Sales Drafts to POS Device); (v) voluntary or involuntary party to a bankruptcy case; (vi) entry into a loan or other agreement with a Person that seeks to affect this Agreement; and/or (vii) change from a business that exclusively conducts Card-present retail sales to one that accepts Card sales by mail, telephone or Internet Transactions. We retain the right to terminate this Agreement if You fail to notify us of any change to the information in Your merchant profile.

**11.5.** **Charges for Changes to Account Maintenance.** You may be charged for any changes referenced in this Section or any other changes requested by You or otherwise necessary related to account maintenance.

## 12. CARD ORGANIZATION MONITORING

MasterCard, Visa, Discover Network and American Express have established guidelines, merchant monitoring programs and reports to track merchant activity such as, but not limited to excessive Credits, reported fraud and Chargebacks, and increased deposit activity. In the event You exceed the guidelines or engage in practices that could circumvent such monitoring programs or submit suspicious Transactions as identified by an Card Organization or any related program or reports, You may be subject to: (i) operating procedure requirement modifications; (ii) Chargebacks and/or increased fees; (iii) settlement delay or withholding; (iv) termination of Your Agreement; or (v) audit and imposition of fines.

## 13. SUPPLIES

**Placing Orders.**

• To order additional supplies, call the Customer Service number on Your merchant statement. The amount of supplies (based on usage) on hand should not exceed a three to six-month supply.

• You are responsible for unauthorized use of sales/Credit and summary Media. We recommend that You store all supplies in a safe location.

• You may be charged for supplies and applicable shipping and handling charges.

## B. CARD GENERAL TERMS

In addition to the preceding Operating Procedures which focus primarily on Payment Services, our Agreement with You includes the following General Terms applicable to all Services. If You fail to follow any of the provisions of the Operating Procedures or General Terms, You may incur certain liabilities or we may terminate our Agreement.

## 14. PAYMENT SERVICES

Subject to Card Organization Rules, certain Payment Services may be performed by Us or our agents, including, without limitation, our respective Affiliates, including the provision of terminals or other equipment and local support functions in connection with this Agreement. In addition, the Additional Services incorporated herein may be provided by or through iPayment or one or more of iPayment's Affiliates.

## 15. OPERATING PROCEDURES; CARD ORGANIZATION RULES AND COMPLIANCE

You agree to follow all requirements of this Agreement in connection with each Card Transaction and to comply with all applicable Card Organization Rules, including without limitation, the data security requirements described in Section 4 above. From time to time, we may amend the Operating Procedures, by providing You with at least twenty (20) days' prior written notice, and those provisions will be deemed incorporated into this Agreement. However, for changes in the Card Organization Rules or for security reasons, certain changes in Card procedures may become effective on shorter notice. If there are any inconsistencies between the General Terms and the Operating Procedures, the General Terms will govern. You are responsible for staying apprised of all applicable changes to the Card Organization Rules and maintaining compliance with the Card Organization Rules. Card Organization Rules may be available on web sites such as http://usa.visa.com/merchants/ and http://mastercardmerchant.com, as those links may change from time to time.

## 16. SETTLEMENT OF CARD TRANSACTIONS

**16.1.** We will only be required to settle Card Transactions for Card types specified in Your Application. Promptly after presentment of Sales Drafts pursuant to the Operating Procedures, we will initiate a transfer of the applicable settlement funds to You.

**16.2.** Unless otherwise agreed to in writing to the contrary, all discount rates are deducted daily. All settlements for Visa, MasterCard, Discover Network and American Express Card Transactions will be net of Credits, Summary Adjustments, applicable discount fees when due, Chargebacks, any reserve plan dollar amount and any other amounts then due from You. We may also set off from any payments otherwise due, any amounts owed to any of our respective Affiliates whether or not arising out of or related to this Agreement.

**16.3.** All Credits to Your Settlement Account or other payments to You are provisional and are subject to, among other things, our right to deduct fees, our final audit, Chargebacks (including our related losses), and fees and fines imposed by the Card Organizations. You agree that we may debit or credit Your Settlement Account for any deficiencies, overages, fees and pending Chargebacks and any other amounts owed to Us or any of our respective Affiliates, or we may deduct such amounts from settlement funds or other amounts due to You from Us, or our respective

Affiliates. Alternatively, we may elect to invoice You for any such amounts, net due 30 days after the invoice date or on such earlier date as may be specified.

**16.4.** We will not be liable for any delays in receipt of funds or errors in debit and credit entries caused by You or any Person.

**16.5.** In addition to any other remedies available to us under this Agreement, You agree that should any Event of Default (see Section 23.4) occur, we may, with or without notice, change processing or payment terms and/or suspend credits or other payments of any and all funds, money and amounts now due or hereafter to become due to You pursuant to the terms of this Agreement, until we have had reasonable opportunity to investigate such event.

**16.6.** You acknowledge and agree that transfers to and from the Settlement Account shall be based on the account number and routing number supplied by You. We are not responsible for detecting errors in any Settlement Account information You provide, including the account numbers and routing numbers, even if any of those numbers do not correspond to the actual account or financial institution identified by name.

**16.7.** This Agreement is a contract whereby we are extending financial accommodations to You within the meaning of Section 365(c) of the U.S. bankruptcy code. Your right to receive any amounts due or to become due from Us is expressly subject and subordinate to Chargeback, setoff, lien, security interest and our rights to withhold settlement funds under this Agreement, without regard to whether such Chargeback, setoff, lien, security interest and the withholding of settlement funds rights are being applied to claims that are liquidated, unliquidated, fixed, contingent, matured or unmatured.

## 17. EXCLUSIVITY

During the term of this Agreement, You shall use us as Your exclusive provider of all Payment Services. This Agreement is non-exclusive as to any Additional Services.

## 18. FEES; ADJUSTMENTS; COLLECTION OF AMOUNTS DUE

**18.1.** In consideration of the Payment Services provided by Us, You shall be charged, and hereby agree to pay any and all fees set forth in this Agreement (for the purposes of clarity, this includes the Application and any additional pricing supplements or subsequent communications), all of which shall be calculated and payable pursuant to the terms of this Agreement and any additional pricing supplements or subsequent communications. If a Transaction fails to qualify for Your anticipated interchange levels or You inadvertently or intentionally accept a Transaction other than the type anticipated for Your account (including a different Card type), then, as applicable to Your pricing method, You will be charged a higher interchange, Discount Rate or Non-Qualified Interchange Fee, as well as any applicable surcharge for that Transaction, all as further described in Section A.3 of Part III of this Agreement and in the Application. With respect to inadvertent or intentional acceptance of a Transaction other than the type anticipated for Your account (including a different Card type), You will also be subject to payment to Us of our then-current Transaction fee(s) with respect to such Card and/or Transaction and be liable, obligated and responsible under this Agreement for any such Transaction to the same extent as You would be if it was of a Card type elected and approved.

For more information on Visa's and MasterCard's interchange rates, please go to <u>www.visa.com</u> and <u>www.mastercard.com</u>.

**18.2.** All authorization fees will be charged for each Transaction that You attempt to authorize. All capture fees will be charged for each Transaction that You transmit to us for settlement.

**18.3.** The fees for Payment Services set forth in this Agreement are based upon assumptions associated with the anticipated annual volume and average Transaction size for all Payment Services as set forth in this Agreement and Your method of doing business. If the actual volume or average Transaction size are not as expected or if You significantly alter Your method of doing business, we may adjust Your discount fee and Transaction fees without prior notice. Fees for any Additional Services are as set forth in the applicable fee schedule as they may be modified from time to time.

**18.4.** The fees for Payment Services set forth in this Agreement may be adjusted to reflect increases, or new fees imposed by Card Organizations, including without limitation, interchange, assessments and other Card Organization fees, or to pass through increases or new fees charged to Us by other Persons related to the Services. All such adjustments shall be Your responsibility to pay and shall become effective upon the date any such change or addition is implemented by the applicable Card Organization or other Person as specified in our notice to You.

**18.5.** Subject to Section 23.3, we may also increase our fees or add new fees for Payment Services or any Additional Services provided hereunder for any other reason at any time, by notifying You twenty (20) days prior to the effective date of any such change or addition.

**18.6.** If You receive settlement funds by wire transfer, we may charge a wire transfer fee per wire.

**18.7.** To the extent the Automated Clearing House ("ACH") settlement process is used to effect debits or credits to Your Settlement Account, You agree to be bound by the terms of the operating rules of the National Automated Clearing House Association, as in effect from time to time. You hereby authorize us to initiate credit and debit entries and adjustments to Your account through the ACH network and/or through direct instructions to the financial institution where Your Settlement Account is maintained for amounts due under this Agreement and under any agreements with us or our respective Affiliates for any Services, as well as for any credit entries in error. You hereby authorize the financial institution where Your Settlement Account is maintained to effect all such debits and credits to Your account. This authority will remain in full force and effect until we have given written notice to the financial institution where Your Settlement Account is maintained that all monies due under this Agreement and under any other agreements with us or our respective Affiliates for any Services have been paid in full.

**18.8.** You agree to pay any fines imposed on us by any Card Organization resulting from Chargebacks and any other fees or fines imposed by a Card Organization with respect to Your acts or omissions. You are also responsible for any fines or fees imposed on Us as a result of acts or omissions by Your agents or third parties.

**18.9.** If Your Chargeback percentage for any line of business exceeds the estimated industry Chargeback percentage, You shall, in addition to the Chargeback fees and any applicable Chargeback handling fees or fines, pay us an excessive Chargeback fee for all Chargebacks occurring in such month in such line(s) of business. Each estimated industry Chargeback percentage is subject to change from time to time by us in order to reflect changes in the industry Chargeback percentages reported by Visa, MasterCard, Discover Network or American Express. Your Chargeback percentage will be calculated as the larger of (a) the total Visa, MasterCard, Discover Network and American Express Chargeback items in any line of business in any calendar month divided by the number of Visa, MasterCard, Discover Network and American Express Transactions in that line of business submitted that month, or (b) the total dollar amount of Visa, MasterCard, Discover Network and American

Express Chargebacks in any line of business received in any calendar month divided by the total dollar amount of Your Visa, MasterCard, Discover Network and American Express Transactions in that line of business submitted in that month.

**18.10.** You must promptly and carefully review statements or reports provided or made available to You (physically, electronically or otherwise) reflecting Card Transaction activity, including, activity in the Settlement Account and Reserve Account, whether provided by Us or others. If You believe any adjustments should be made with respect to Your Settlement Account, You must notify us in writing within 45 days after any debit or credit is or should have been effected or such shorter period as provided in the terms and conditions that govern such account. If You notify us after such time period, we may, in our discretion, assist You, at Your expense, in investigating whether any adjustments are appropriate and whether any amounts are due to or from other parties, but we shall not have any obligation to investigate or effect any such adjustments. Any voluntary efforts by us to assist You in investigating such matters shall not create any obligation to continue such investigation or any future investigation.

**18.11.** If You do not pay Us all fees and any other amounts due under this Agreement within thirty (30) days of the date of or merchant statement or other statement setting forth the amount due, then we may, in our sole discretion, charge You interest for such time that the amount and all accrued interest remain outstanding at the lesser of (i) the per annum rate equal to Bank's then current prime rate plus two percent (2%), based on a 360 day year, or (ii) the maximum rate permitted by applicable law.

## 19. CHARGEBACKS

**19.1.** You shall be responsible for reimbursing us for all Transactions You submit that are charged back. See the Operating Procedures for additional information regarding Chargebacks and Chargeback procedures.

**19.2.** You shall reimburse us for any Chargebacks, return items, or other losses resulting from Your failure to produce a Card Transaction record requested by us within the applicable time limits.

## 20. REPRESENTATIONS; WARRANTIES; COVENANTS; LIMITATIONS ON LIABILITY; EXCLUSION OF CONSEQUENTIAL DAMAGES

**20.1.** Without limiting any other warranties hereunder, You represent, warrant to and covenant with, Us, and with the submission of each Sales Draft reaffirm, the following representations, warranties, and/or covenants:

**20.1.1.** each Card Transaction is genuine and arises from a bona fide Transaction permissible under the Card Organization Rules by the Cardholder directly with You, represents a valid obligation for the amount shown on the Sales Draft, preauthorized order, or Credit Draft, and does not involve the use of a Card for any other purpose;

**20.1.2.** each Card Transaction represents an obligation of the related Cardholder for the amount of the Card Transaction;

**20.1.3.** the amount charged for the Card Transaction is not subject to any dispute, setoff or counterclaim;

**20.1.4.** each Card Transaction amount is only for respective merchandise or services (including taxes, but without any surcharge) sold, leased or rented or other payments to You and, except for any delayed delivery or advance deposit Card Transactions expressly authorized by this Agreement, the merchandise or service was actually delivered to or performed for the Cardholder entering into the Card Transaction simultaneously upon Your accepting and submitting the Card Transaction for processing;

**20.1.5.** with respect to each Card Transaction, You have no knowledge or notice of any fact, circumstances or defense which would indicate that such Card Transaction was fraudulent or not authorized by the related Cardholder or which would otherwise impair the validity or collectibility of the Cardholder's obligation arising from such Card Transaction or relieve the Cardholder from liability with respect thereto;

**20.1.6.** each Card Transaction is made in accordance with these General Terms, Card Organization Rules and the Operating Procedures; and

**20.1.7.** each Sales Draft is free of any alternation nor authorized by the related Cardholder;

**20.1.8.** You have completed one Card Transaction per sale; or one Card Transaction per shipment of goods for which the Cardholder has agreed to partial shipments;

**20.1.9.** You are validly existing, in good standing and free to enter into this Agreement;

**20.1.10.** each statement made on the Application or other information provided to Us in support of this Agreement is true and correct;

**20.1.11.** You are not doing business under a name or style not previously disclosed to Us;

**20.1.12.** You have not changed the nature of Your business, Card acceptance practices, delivery methods, return policies, or types of products or services sold requiring a different merchant category code under Card Organization Rules, in a way not previously disclosed to Us;

**20.1.13.** You will use the Services only for Your own proper business purposes and will not resell, directly or indirectly, any part of the Services to any Person;

**20.1.14.** You have not filed a bankruptcy petition not previously disclosed to Us;

**20.1.15.** You own and control the Settlement Account, and no third party security interest or lien of any type exists regarding the Settlement Account or any Card Transaction;

**20.1.16.** You will not at any time during the term of this Agreement, or until all amounts due under this Agreement have been paid in full, grant or pledge any security interest or lien in the Reserve Account, Settlement Account or Transaction proceeds to any Person without our consent.

**20.2.** THIS AGREEMENT IS A SERVICE AGREEMENT. WE DISCLAIM ALL REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, MADE TO YOU OR ANY OTHER PERSON, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES REGARDING QUALITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OR OTHERWISE OF ANY SERVICES OR ANY GOODS PROVIDED INCIDENTAL TO THE SERVICES PROVIDED UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, ANY SERVICES OR ANY GOODS PROVIDED BY A THIRD PARTY.

**20.3.** IN NO EVENT SHALL WE OR OUR AFFILIATES OR ANY OF OUR OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL THEORY FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES,

REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER ANY PARTY OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. CLIENT ACKNOWLEDGES AND AGREES THAT PAYMENT OF ANY EARLY TERMINATION FEE OR LIQUIDATED DAMAGES AS PROVIDED ELSEWHERE IN THIS AGREEMENT SHALL NOT BE PROHIBITED BY THIS PARAGRAPH.

20.4. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY (INCLUDING BUT NOT LIMITED TO SECTIONS 26 or 20.5), OUR CUMULATIVE LIABILITY FOR ALL LOSSES, CLAIMS, SUITS, CONTROVERSIES, BREACHES OR DAMAGES FOR ANY CAUSE WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, THOSE ARISING OUT OF OR RELATED TO THIS AGREEMENT), REGARDLESS OF THE FORM OF ACTION OR LEGAL THEORY SHALL NOT EXCEED, (I) $50,000; OR (II) THE AMOUNT OF FEES RECEIVED BY US PURSUANT TO THE AGREEMENT FOR SERVICES PERFORMED IN THE IMMEDIATELY PRECEDING 12 MONTHS, WHICHEVER IS LESS.

20.5. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY (INCLUDING BUT NOT LIMITED TO SECTION 26), OUR LIABILITY FOR ANY DELAY IN FUNDING TRANSACTIONS TO YOU FOR ANY REASON, OTHER THEN FOR ANY REASON DESCRIBED IN SECTIONS 16.4 AND 16.6, WILL BE LIMITED TO INTEREST COMPUTED FROM THE DATE THAT YOU SUBMIT THE TRANSACTION TO THE DATE THAT WE FUND THE TRANSACTION AT THE RATE OF THE FEDERAL FUNDS AS SET BY THE FEDERAL RESERVE BANK OF NEW YORK, NEW YORK, FROM TIME TO TIME, LESS ONE PERCENT (1%).

20.6. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, BANK IS NOT RESPONSIBLE, AND SHALL HAVE NO LIABILITY TO YOU IN ANY WAY WITH RESPECT TO AMERICAN EXPRESS CARD, PIN DEBIT CARD, AND ELECTRONIC BENEFITS TRANSFER TRANSACTIONS, AND TRANSACTIONS INVOLVING CARDS FROM OTHER NON-BANK CARD ORGANIZATIONS, SUCH AS VOYAGER FLEET SYSTEMS, INC., WRIGHT EXPRESS CORPORATION AND WRIGHT EXPRESS FINANCIAL SERVICES CORPORATION.


## 21. CONFIDENTIALITY

21.1. Unless You obtain consents from us and each applicable Card Organization, Issuer and Cardholder, You must not use, disclose, store, sell or disseminate any Cardholder information obtained in connection with a Card Transaction (including the names, addresses and Card account numbers of Cardholders) except for purposes of authorizing, completing and settling Card Transactions and resolving any Chargebacks, Retrieval Requests or similar issues involving Card Transactions, other than pursuant to a court or governmental agency request, subpoena or order. You shall use proper controls for and limit access to, and render unreadable prior to discarding, all records containing Cardholder account numbers and Card imprints. You may not retain or store Magnetic Stripe data or Card Validation Codes after a Transaction has been authorized. If You store any electronically captured signature of a Cardholder, You may not reproduce such signature except upon our specific request.

21.2. You acknowledge that You will not obtain ownership rights in any information relating to and derived from Card Transactions. Cardholder account numbers, personal information and other Card Transaction information, including any databases containing such information, may not be sold or disclosed to a Person as an asset upon a bankruptcy, insolvency or failure of Client's business. Upon a bankruptcy, insolvency or failure of Client's business all Card Transaction information must be returned to Servicers or acceptable proof of the destruction of all Card Transaction information must be provided to Servicers.

21.3. You will treat this Agreement, the Card Organization Rules and any information supplied or otherwise made accessible by Us or our agents as confidential, including without limitation, (i) information about the products, services, operations, procedures, customers, suppliers, sales, pricing, business plans and marketing strategies of Servicers or Bank, their respective Affiliates and the customers, clients and suppliers of any of them; (ii) any scientific or technical information, design, process, procedure, formula, or improvement that is commercially valuable and secret in the sense that its confidentiality affords Servicers or Bank a competitive advantage over it competitors; and (iii) all confidential or proprietary concepts, documentation, reports, data, specifications, computer software, source code, object code, flow charts, databases, inventions, know-how, show-how and trade secrets, whether or not patentable or copyrightable and will not disclose the same to any third parties, provided, however, that these restrictions do not apply to information: (a) rightfully obtained on a non-confidential basis from a Person and Your agents and representatives, which Person was not subject to a duty of confidentiality, (b) rightfully and independently known by You on a non-confidential basis prior to its disclosure or (c) generally available to the public other than through any disclosure by or fault of You, Your agents or representatives.

21.3.1 Our confidential information shall be used by You only to exercise Your rights and to perform Your obligations hereunder. Merchant shall receive our confidential information in confidence and not disclose the confidential information to any third party, except as may be agreed upon in writing by Us. Merchant shall safeguard all of our confidential information using a reasonable degree of care, but not less than that degree of care used by it in safeguarding its own similar information or material. Upon request by Us or upon termination of this Agreement, Merchant shall return to Us or destroy all of our confidential information in its possession or control.

21.3.2 The obligations of confidentiality and restrictions on use in this Section shall not apply to any confidential information that: (i) was in the public domain prior to the date of the Agreement or subsequently came into the public domain through no fault of Merchant; (ii) was received from a third party free of any obligation of confidence of Merchant to the third party and which third party, to Merchant's knowledge, was not under an obligation to keep the information confidential; (iii) was already in Merchant's possession prior to receipt from Us; (iv) is required to be disclosed by law, regulation or court order after giving Us as much advance notice as practical of the possibility of disclosure; or (v) is subsequently and independently developed by Merchant's employees, consultants or agents without use of or reference to out confidential information.

21.3.3 Except as specifically provided herein, this Section does not confer any right, license, interest or title in, to or under our confidential information to Merchant. Except as specifically provided herein, no license is hereby granted to Merchant under any patent, trademark, copyright, trade secret or other proprietary rights of ours.

21.3.4 Merchant acknowledges that breach of the restrictions on use or disclosure of any of our confidential information would result in immediate and irreparable harm to Us, and money damages would be inadequate to compensate for that harm. We shall be entitled to equitable relief, in addition to all other available remedies, to redress any breach.

21.4. With respect to any information received by Us from Merchant via its use of the Services, we will keep such information confidential in accordance with applicable law; provided, that we may disclose such information (i) to third parties as we deem appropriate to provide the Services, (ii) our auditors and attorneys (internal and external) and regulators, (iii) as required or permitted by law, regulations or court order and (iv) to our respective Affiliates as we deem appropriate.

21.5. You shall not assign to any Person, the rights to use the Marks of Servicers, our agents or the Card Organizations.

21.6. All rights, title, and interest in and to all intellectual property related to the Services (including without limitation, the content of any materials, web screens, layouts, processing techniques, procedures, algorithms, and methods), owned, developed or licensed by Us prior to, during the term of,

or after the Agreement, or employed by Us in connection with the Services and any updates, changes alterations, or modifications to or derivative works from such intellectual property, shall be and remain, as among the Parties, our exclusive property of Us.

21.7. Merchant agrees that we may obtain relevant information from any applicable telecommunications provider utilized by Merchant, as necessary to investigate any allegation of fraud, suspected fraud or other alleged wrongful act by Merchant in connection with the Services.

## 22. ASSIGNMENTS

22.1. Any transfer or assignment of this Agreement by You, without our prior written consent, by operation of law or otherwise, is voidable by us. Any transfer of voting control of You or Your parent shall be considered an assignment or transfer of this Agreement. Furthermore, You shall indemnify and hold us harmless from all liabilities, Chargebacks, expenses, costs, fees and fines arising from such transferee's or assignee's Submission of Card Transactions to us for processing. For purposes of this Section 22, any transfer of voting control shall be considered an assignment or transfer of this Agreement.

22.2. The Payment Services provided by us require access to a single bank account in which we may initiate both credits and debits. You may not enter into any agreement that would require, in any circumstance or event, the transfer of any payments or proceeds from Card Transactions covered by this Agreement to the custody or control of any Person. You may not assign any rights, including the right of payment under this Agreement, to any other person. In the event that You make an assignment (or provide a security interest) of receivables covered by this Agreement, then we may, at our option, elect to (a) refuse to acknowledge such assignment unless accompanied by an Authorization to both initiate debits or credits to the bank account of the assignee, (b) terminate this Agreement immediately, or (c) charge for any transfers that we are called upon to make manually to fulfill such an assignment at the rate of $100 per transfer.

22.3. Upon notice to You, another Visa and MasterCard member may be substituted for Bank under whose sponsorship this Agreement is performed with respect to Visa and MasterCard Transactions. Upon substitution, such other Visa and MasterCard member shall be responsible for all obligations required of Bank for Visa and MasterCard Transactions, including without limitation, full responsibility for its bank Card program and such other obligations as may be expressly required by applicable Card Organization Rules.

Subject to Card Organization Rules, we may assign or transfer this Agreement and our rights and obligations hereunder and/or may delegate our duties hereunder, in whole or in part, to any Person, whether in connection with a change in sponsorship, as set forth in the preceding paragraph, or otherwise, without notice to You or Your consent.

22.4. Except as set forth elsewhere in this Section and as provided in the following sentence, this Agreement shall be binding upon successors and assigns and shall inure to the benefit of the parties and their respective permitted successors and assigns. No assignee for the benefit of creditors, custodian, receiver, trustee in bankruptcy, debtor in possession, or other person charged with taking custody of a party's assets or business, shall have any right to continue, assume or assign this Agreement.

## 23. TERM; EVENTS OF DEFAULT

23.1. This Agreement shall become effective upon the date this Agreement is approved by our Credit Department and Merchant is assigned and issued a Merchant Account Number (the "Effective Date"). iPayment will advise Merchant in writing of such Merchant Account Number. The initial term shall commence on the Effective Date and shall continue in force for three (3) years after it becomes effective (the "Initial Term") and shall thereafter automatically renew for additional one-year terms, unless at least thirty (30) days prior to expiration of the then existing term a written notice of termination (to be effective at the expiration of the then existing term) is given either by Merchant to Bank and iPayment or by Bank or iPayment to Merchant, unless sooner terminated in accordance with the provisions of this Agreement. Notwithstanding this three year Initial Term, Merchant may terminate this Agreement by giving thirty (30) days written notice to Bank and iPayment and concurrently with said notice, paying as an early termination fee for each Merchant Account with respect to Payment Services the sum of $495.00 if terminated before completion of the three (3) year Initial Term. Furthermore, notwithstanding anything in this Agreement to the contrary, the parties further agree and acknowledge that in addition to any other remedies contained in this Agreement or otherwise available under applicable law, if this Agreement is terminated by Bank and iPayment prior to the expiration of the Initial Term due to any Event of Default by Merchant, such termination shall also be deemed an early termination and will require the Merchant to pay Bank the early termination fee for each Merchant Account of $495.00 if terminated before completion of the three (3) year Initial Term. Merchant, Bank and iPayment mutually agree that in either event, Bank and iPayment will suffer a substantial injury that is difficult or impossible to accurately estimate. Accordingly, after giving due consideration to the costs that Bank and iPayment may incur by reason of such early termination, including without limitation those incurred in processing the Application and approving Merchant for the Services, and in an effort to liquidate in advance the sum that should represent such damages, parties have agreed that the respective early termination fee amount of $495.00 is a reasonable pre-estimate of the costs, expenses and probable loss that Bank and iPayment will incur as a result of such early termination of this Agreement by Merchant in such event and shall not be construed as a penalty. Merchant's obligation with respect to the Monthly Minimum Discount Fee will end simultaneously with Bank's receipt of the payment of the respective early termination fee amount required pursuant to this Section 23.1. There are no termination fees payable on termination of any Additional Services in which You are enrolled.

23.2. The Initial Term of this Agreement shall commence and shall continue in force **for three years after it becomes effective** unless terminated in accordance with certain provisions under this Section 23. Thereafter, it shall continue in single year periods as provided under Section 23.1 until we or You terminate this Agreement upon written notice to the other in accordance with this Section 23 or as otherwise authorized by this Agreement.

23.3. Notwithstanding the above or any other provisions of this Agreement, we may terminate this Agreement at any time and for any reason by providing 30 days' advance notice to You. We may terminate this Agreement immediately or with shorter notice upon an Event of Default as provided under Section 23.4 of this Agreement. In the event we provide notice to You of any new fees or increases in existing fees for Services, pursuant to Section 18.5, You may terminate this Agreement without further cause or penalty by notifying Us in writing that You are terminating this Agreement prior to the effective date of such new fees or increases. However, maintaining Your Merchant Account, or Your continued use of the Services after the effective date of any such fee changes shall be deemed Your acceptance of such fee changes for the Services, throughout the term of this Agreement.

23.4. If any of the following events shall occur (each an "Event of Default"):

23.4.1. a material adverse change in Your business, financial condition, business prospects; or

23.4.2. any assignment or transfer of voting control of You or Your parent; or

23.4.3. a sale of all or a substantial portion of Your assets; or

**23.4.4.** Irregular Card sales by You, excessive Chargebacks, noncompliance with any applicable data security standards, as determined by Servicers, or any Card Organization, or any other Person, or an actual or suspected data security breach, or any other circumstances which, in our sole discretion, may increase our exposure for Your Chargebacks or otherwise present a financial or security risk to us; or

**23.4.5.** any of Your representations, warranties or covenants in this Agreement are breached in any respect; or

**23.4.6.** You default in any material respect in the performance or observance of any term, condition or agreement contained in this Agreement, including, without limitation, the establishment or maintenance of funds in a Reserve Account, as detailed in Section 24; or

**23.4.7.** You default in any material respect in the performance or observance of any term, covenant or condition contained in any agreement with any of our respective Affiliates; or

**23.4.8.** You default in the payment when due, of any material indebtedness for borrowed money; or

**23.4.9.** You file a petition or have a petition filed by another party under the U.S. bankruptcy code or any other laws relating to bankruptcy, insolvency or similar arrangement for adjustment of debts; consent to or fail to contest in a timely and appropriate manner any petition filed against You in an involuntary case under such laws; apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of You or of a substantial part of Your property; or make a general assignment for the benefit of creditors; or take any action for the purpose of authorizing any of the foregoing; or

**23.4.10.** Your independent certified accountants shall refuse to deliver an unqualified opinion with respect to Your annual financial statements and Your consolidated subsidiaries; or

**23.4.11.** a violation by You of any applicable law or Card Organization Rule or our reasonable belief that termination of this Agreement or suspension of Services is necessary to comply with any law including without limitation the rules and regulations promulgated by the Office of Foreign Assets Control of the US Department of the Treasury or Your breach, as determined by Servicers, of Section 33.2 ("Compliance with Laws"),

then, upon the occurrence of (1) an Event of Default specified in subsections 23.4.4, 23.4.9 or 23.4.11, we may consider this Agreement to be terminated immediately, without notice, and all amounts payable hereunder shall be immediately due and payable in full without demand or other notice of any kind, all of which are expressly waived by You, and (2) any other Event of Default, this Agreement may be terminated by us giving not less than 10 days' notice to You, and upon such notice all amounts payable hereunder shall be due and payable on demand.

**23.5.** Neither the expiration nor termination of this Agreement shall terminate the obligations and rights of the parties pursuant to provisions of this Agreement which by their terms are intended to survive or be perpetual or irrevocable. Such provisions shall survive the expiration or termination of this Agreement. All obligations by You to pay or reimburse us for any obligations associated with Transactions You have submitted to us will survive termination of this Agreement until finally and irrevocably paid in full and settled.

**23.6.** If any Event of Default occurs, regardless of whether such Event of Default has been cured, we may, in our sole discretion, exercise all of our rights and remedies under applicable law, and this Agreement including, without limitation, exercising our rights under Section 24.

**23.7.** In the event You file for protection under the U.S. bankruptcy code or any other laws relating to bankruptcy, insolvency, assignment for the benefit of creditors or similar laws, and You continue to use our Services, it is Your responsibility to open new accounts to distinguish pre and post filing obligations. You acknowledge that as long as You utilize the accounts You established prior to such filing, we will not be able to systematically segregate Your post-filing Transactions or prevent set-off of the pre-existing obligations. In that event, You will be responsible for submitting an accounting supporting any adjustments that You may claim.

**23.8.** The Card Organizations often maintain lists of merchants who have had their merchant agreements or Card Acceptance rights terminated for cause. If this Agreement is terminated for cause, You acknowledge that we may be required to report Your business name and the names and other information regarding its principals to the Card Organizations for inclusion on such list(s). You expressly agree and consent to such reporting if You are terminated as a result of the occurrence of an Event of Default or for any reason specified as cause by Visa, MasterCard or Discover Network. Furthermore, You agree to waive and hold us harmless from and against any and all claims which You may have as a result of such reporting.

**23.9.** After termination of this Agreement for any reason whatsoever, You shall continue to bear total responsibility for all Chargebacks, fees, Credits and adjustments resulting from Card Transactions processed pursuant to this Agreement and all other amounts then due or which thereafter may become due under this Agreement.

## 24. RESERVE ACCOUNT; SECURITY INTEREST

**24.1.** You expressly authorize us to establish a Reserve Account pursuant to the terms and conditions set forth in this Section 24. The amount of such Reserve Account shall be set by us, in our sole discretion, based upon Your processing history and the potential risk of loss to us as we may determine from time to time.

**24.2.** The Reserve Account shall be fully funded upon three (3) days' notice to You, or in instances of fraud or suspected fraud or an Event of Default, Reserve Account funding may be immediate. Such Reserve Account may be funded by all or any combination of the following: (i) one or more debits to Your Settlement Account or any other accounts held by Bank or any of its Affiliates, at any financial institution maintained in the name of Client, any of its principals, or any of its guarantors, or if any of same are authorized signers on such account; (ii) any payments otherwise due to You; (iii) Your delivery to us of a letter of credit; or (iv) if we so agree, Your pledge to us of a freely transferable and negotiable certificate of deposit. Any such letter of credit or certificate of deposit shall be issued or established by a financial institution acceptable to us and shall be in a form satisfactory to us. In the event of termination or expiration of this Agreement by any party, an immediate Reserve Account may be established without notice in the manner provided above. Any Reserve Account will be held by us for the greater of ten (10) months after termination of this Agreement or for such longer period of time as is consistent with our liability for Card Transactions and Chargebacks in accordance with Card Organization Rules. We will hold funds pursuant to this Section 24 in master account(s) with Your funds allocated to separate sub accounts. Unless specifically required by law, You shall not be entitled to interest on any funds held by Us in a Reserve Account.

**24.3.** If Your funds in the Reserve Account are not sufficient to cover the Chargebacks, adjustments, fees and other charges and amounts due from You, or if the funds in the Reserve Account have been released, You agree to promptly pay us such sums upon request.

**24.4.1** To secure Your obligations to Us and our respective Affiliates under this Agreement and any other agreement for the provision of related equipment or related Payment Services (including any obligations for which payments on account of such obligations are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause), You grant to Us a first priority lien and security interest in and to (i) the

Reserve Account and (ii) any of Your funds pertaining to the Card Transactions contemplated by this Agreement now or hereafter in Our possession, whether now or hereafter due or to become due to You from Us. Any such funds, money or amounts now or hereafter in Our possession may be commingled with other funds of Ours, or, in the case of any funds held pursuant to the foregoing paragraphs, with any other funds of other customers of Ours. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, We are hereby authorized by You at any time and from time to time, without notice or demand to You or to any other Person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and to apply any and all such funds against and on account of Your obligations to Us and Our respective Affiliates under this Agreement and any other agreement with Us , or Our respective Affiliates for any related equipment or related Payment Services (including any check services), whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. You agree to duly execute and deliver to Us such instruments and documents as We may reasonably request to perfect and confirm the lien, security interest, right of set off, recoupment and subordination set forth in this Agreement.

24.4.2  To the extent funds are held in a separate Reserve Account, the Reserve Account shall be subject to (i) Servicers' security interest pursuant to this subsection 24.4, and (ii) an account control agreement (as defined by the applicable sections of the Uniform Commercial Code, hereinafter referred to as "Control Agreement") among You, the institution at which the Reserve Account is held (such institution hereinafter referred to as "Settlement Account Bank") and Servicers (such investment account hereinafter referred to as the "Control Account"). The Control Agreement shall be in form and substance satisfactory to Servicers. The Settlement Account Bank shall be a national bank which is mutually acceptable to You and Servicers.

24.4.3  For sake of clarification and notwithstanding anything in the Agreement to the contrary, in the event Servicers deduct, holdback, suspend, off set or set off any settlement monies or amounts otherwise due You pursuant to the terms of this Agreement (collectively, "Set Off Funds"), You acknowledge that such Set Off Funds will be held in a commingled Reserve Account(s) of Servicers unless such Set Off Funds are wired or deposited by Servicers into any Control Account, pursuant to a Control Agreement in which case Servicers will transfer Set Off Funds from their commingled Reserve Account(s) to the Control Account as soon as practicable using commercially reasonable efforts.

24.4.4  If in replacement of or in addition to the first priority lien and security interest in the Reserve Account, You grant to Servicers a first priority lien and security interest in and to one or more certificates of deposit, the certificates of deposit shall be uncertificated and shall be subject to an Acknowledgement of Pledge of Certificate of Deposit and Control Agreement (the "Certificate of Deposit Control Agreement") by, between and among Customers, Servicers and the financial institution that has established and issued the certificate of deposit. The form of the Certificate of Deposit Control Agreement and the financial institution that will establish and issue the certificate of deposit shall be satisfactory and acceptable to Servicers.


## 25. FINANCIAL AND OTHER INFORMATION

25.1.  Upon request, You will provide us and our Affiliates, quarterly financial statements within 45 days after the end of each fiscal quarter and annual audited financial statements within 90 days after the end of each fiscal year. Such financial statements shall be prepared in accordance with generally accepted accounting principles. You will also provide such other financial statements and other information concerning Your business and Your compliance with the terms and provisions of this Agreement as we may reasonably request. You authorize us and our Affiliates to obtain from third parties financial and credit information relating to You in connection with our determination whether to accept this Agreement and our continuing evaluation of Your financial and credit status. We may also access and use information which You have provided to Bank for any other reason. Upon request, You shall provide, and/or cause to be provided, to us and our Affiliates, or our representatives or regulators (as well as those of the Card Organizations) reasonable access to Your or Your Merchant Providers' facilities and records for the purpose of performing any inspection and/or copying of Your books and/or records deemed appropriate. In such event, You shall pay the costs incurred by Us or our Affiliates for such inspection, including, but not limited to, costs incurred for airfare and hotel accommodations.

25.2.  You will provide us with written notice of any judgment, writ, warrant of attachment, execution or levy against any substantial part (25% or more in value) of Your total assets not later than three (3) days after You become aware of same.


## 26. INDEMNIFICATION

26.1.  You agree to indemnify and hold us harmless from and against all losses, liabilities, damages and expenses: (a) resulting from any breach of any warranty, covenant or agreement or any misrepresentation by You under this Agreement; (b) arising out of Your or Your employees' or Your agents' negligence or willful misconduct, in connection with Card Transactions or otherwise arising from Your provision of goods and services to Cardholders; (c) arising out of the Your use of our Service; or (d) arising out of any third party indemnifications we are obligated to make as a result of Your actions (including indemnification of any Card Organization or Issuer).

26.2.  We agree to indemnify and hold You harmless from and against all losses, liabilities, damages and expenses resulting from any breach of any warranty, covenant or agreement or any misrepresentation by us under this Agreement or arising out of our or our employees' gross negligence or willful misconduct in connection with this Agreement; provided that this indemnity obligation shall not apply to Bank with respect to Discover Network Card Transactions, American Express Card Transactions and Other Services, including JCB Card, PIN Debit Card, and Electronic Benefits Transfer Transactions, and Transactions involving Cards from other Non-Bank Card Organizations such as Voyager Fleet Systems, Inc., Wright Express Corporation and Wright Express Financial Services Corporation.


## 27. SPECIAL PROVISION REGARDING NON-BANK CARDS

27.1.  Your Non-Bank Card Transactions are provided to You by iPayment and not by Bank and include Transactions made using Discover Network, American Express, JCB, Voyager and WEX Card types. The Services provided, Transactions processed and other matters contemplated under this Section 27 are subject to the rest of this Agreement, as applicable, except to the extent the terms of this Section 27 directly conflict with another provision of this Agreement, in which case the terms of this Section 27 will control; provided, however, that (i) Bank is not a party to this Agreement insofar as it relates to Non-Bank Card services, and Bank is not liable to You in any way with respect to such Services and (ii) You agree to pay iPayment any per item processing, authorization and other fees described in the Application for any non-acquired Transaction services You receive from iPayment. For the purposes of this section, the words "we," "our" and "us" refer only to the iPayment and not to the Bank. You authorize us to share information from Your Application with American Express, JCB (and Discover Network on its behalf), Discover Network or any other Non-Bank Card Organization.

27.2.  You understand that for American Express Transactions are processed, authorizations are obtained from and are funded by American Express. American Express will provide You with its own agreements that govern those Transactions, unless American Express OnePoint Services are

provided to You the Third Party Agreements. You understand and agree that we are not responsible and assume absolutely no liability with regard to any such Transactions, including but not limited to the funding and settlement of American Express Transactions, and that American Express will charge additional fees for the services they provide.

**27.3.** **If You accept JCB Transactions,** You agree to be bound by all JCB and/or Discover Network provisions of this Agreement. You also acknowledge and agree that JCB Transactions will be processed under and subject to Discover Network Card Organization Rules.

**27.4.** **If You accept Voyager and/or WEX Cards,** You agree to be bound by the WEX and/or Voyager rules. You also agree to be bound by all other provisions of this Agreement which are applicable to WEX and/or Voyager.

**27.5.** **If You execute a WEX Merchant Agreement** (WEX Non Full Service Program), You understand that we will provide such agreement to WEX, but that neither we nor WEX shall have any obligation whatsoever to You with respect to processing WEX Cards unless and until WEX executes Your WEX Merchant Agreement. If WEX executes Your WEX Merchant Agreement and You accept WEX Cards, You understand that WEX Transactions are processed, authorized and funded by WEX. You understand that WEX is solely responsible for all agreements that govern WEX Transactions and that we are not responsible and assume absolutely no liability with regard to any such agreements or WEX Transactions, including but not limited to the funding and settlement of WEX Transactions. You understand that WEX will charge additional fees for the services that it provides.

**27.6.** **If You accept Voyager Cards:**

- In addition to the information stated in Section 1 (MasterCard, Visa, Discover Network and American Express Acceptance) of the Operating Procedures, You should check Fleet Cards for any printed restrictions at the point of sale.

- In addition to the information provided under Section 1.5 (Special Terms) of the Operating Procedures, You shall establish a fair policy for the exchange and return of merchandise. You shall promptly submit credits to us for any returns that are to be credited to a Voyager Cardholder's account. Unless required by law, You shall not give any cash refunds to any Voyager Card holder in connection with a sale.

- In addition to the information required under Section 3.1 (Information Required) of the Operating Regulations, the following information must be contained on the single page document constituting the Sales Draft for Voyager Transactions:

- Time of Transaction

- Type of fuel sold

- As permitted by the applicable POS device, odometer reading

- For all cashier-assisted Sales Drafts and Credit Drafts processed manually using a card Imprinter if required, the identification number from the source credentials provided by Cardholder to valid Cardholder's identity (e.g., Driver's License number).

- If an increase in the number of Voyager Transaction authorization calls from You not due to our or Voyager system outages in excess of 15% for a given month as compared to the previous month occurs, we may, in our discretion, deduct telephone charges, not to exceed $.25 (25 cents) per call, for the increased calls, from Your settlement of Your Voyager Transactions.

- In addition to the information provided under Section 7 (Settlement) of the Operating Procedures, settlement of Voyager Transactions will generally occur by the fourth banking day after we process the applicable card Transactions. We shall reimburse You for the dollar amount of sales submitted for a given day by You, reduced by the amount of Chargebacks, tax exemptions, discounts, credits, and the fees set forth in the Application. Neither we nor Voyager shall be required to reimburse You for sales submitted more than sixty (60) days from the date of purchase.

- For daily transmission of sales data, You shall maintain true and complete records in connection with the information required to be provided under this paragraph for a period of not less than thirty-six (36) months from the date of the generation of the data. You may store records on electronic media. You are responsible for the expense of retaining sale data records and Sales Drafts.

- In addition to the scenario identified in Section 10.1.4 of this Program Guide that could cause an authorization related Chargeback to occur, with respect to Voyager Transactions, Chargebacks shall be made in accordance with any other Voyager rules. Notwithstanding termination or expiration of this paragraph or the Agreement, You shall remain liable for all outstanding Chargebacks on Voyager Transactions.

- In addition to the information provided under Section 20 (Representations; Warranties; Covenants, Limitations of Liability; Exclusion of Consequential Damages) of the General Terms, in no event shall our cumulative liability to You for losses, claims, suits, controversies, breaches or damages for any cause whatsoever in connection with Voyager Transactions the other exceed the lesser of $10,000.00 or the Voyager Transaction fees paid by You to us for the two months prior to the action giving rise to the claim.

- Notwithstanding anything in this Agreement to the contrary, our obligation to provide services to You relating to any Fleet Card will terminate automatically without penalty to us or the related Card Organization upon the earlier of (i) the termination or expiration of our agreement with such Card Organization, (ii) at least twenty (20) days prior written notice by us to You; (iii) Your failure to comply with material terms relating to such Fleet Card Transactions, or (iv) written notice, if an Card Organization discontinues its Card.

## 28. SPECIAL PROVISIONS FOR PIN DEBIT CARD

The special provisions outlined in this Section 28 apply only to those PIN Debit Card Transactions that are processed by a Cardholder entering a PIN. These provisions do not apply to Non-PIN Debit Card Transactions which do not involve entry of a PIN. The Services provided, Transactions processed and other matters contemplated under this Section 28 are subject to the rest of this Agreement, as applicable, except to the extent the terms of this Section 28 directly conflict with another provision of this Agreement, in which case the terms of this Section 28 will control.

**28.1.** **PIN Debit Card Acceptance.** Most, but not all, ATM Cards (Debit Cards) can be accepted at the point of sale at participating locations. Examine the back of the PIN Debit Card to determine if the Card participates in a PIN Debit network that You are authorized to accept. PIN Debit network Mark(s) are usually printed on the back of the Card. If the PIN Debit Card is valid and issued by a financial institution Issuer participating in a PIN Debit network, You must comply with the following general requirements for all participating PIN Debit networks, in addition to the specific requirements of that PIN Debit network.

- You must honor all valid PIN Debit Cards when presented that bear authorized PIN Debit network Marks.

- You must treat these by Cardholders from all Issuers in the same manner.

- You may not establish a minimum or maximum Transaction amount for PIN Debit Card acceptance.

- You may not require additional information, besides the PIN, for the completion of the Transaction unless the circumstances appear suspicious. A signature is not required for PIN Debit Card Transactions.

- You shall not disclose Transaction related information to any party other than Your agent, a PIN Debit network, or Issuer and then only for the purpose of settlement or error resolution.

- You may not process a Credit Card Transaction in order to provide a refund on a PIN Debit Card Transaction.

**28.2. Transaction Processing.** The following general requirements apply to all PIN Debit Card Transactions.

- All PIN Debit Card Transactions must be authorized and processed electronically. There is no Voice Authorization or Imprinter procedure for PIN Debit Card Transactions.

- You may not complete a PIN Debit Card Transaction that has not been authorized. If You cannot obtain an Authorization at the time of sale, You should request another form of payment from the Cardholder or process the Transaction as a Store and Forward or Resubmission, in which case You assume the risk that the Transaction fails to authorize or otherwise declines. The Cardholder should be instructed to contact the Issuer to find out why a Transaction has been declined.

- You may not complete a PIN Debit Card Transaction without entry of the PIN by the Cardholder. The PIN must be entered into the PIN pad only by the Cardholder. You cannot accept the PIN from the Cardholder verbally or in written form.

- The PIN Debit network used to process Your Transaction will depend upon, among other things, our own business considerations, the availability of the PIN Debit network at the time of the Transaction and whether a particular PIN Debit Card is enabled for a particular PIN Debit network. The PIN Debit network utilized to route Your Transaction may or may not be the lowest cost network available. We may, in our sole discretion (i) utilize any PIN Debit network available to us for a given Transaction (including a PIN Debit network affiliated with Servicers) and (ii) add and/or remove PIN Debit networks available to You based on a variety of factors including availability, features, functionality and our own business considerations.

- You must issue a receipt to the Cardholder upon successful completion of a Transaction and effect PAN Truncation on it.

- You may not manually enter the account number. The account number must be read electronically from the Magnetic Stripe. If the Magnetic Stripe is unreadable, You must request another form of payment from the Cardholder.

- Any applicable tax must be included in the total Transaction amount for which Authorization is requested. Tax may not be collected separately in cash.

- **YOU ARE RESPONSIBLE TO SECURE YOUR TERMINALS AND TO INSTITUTE APPROPRIATE CONTROLS TO PREVENT EMPLOYEES OR OTHERS FROM SUBMITTING CREDITS AND VOIDS THAT DO NOT REFLECT BONA FIDE RETURNS OR REIMBURSEMENTS OF PRIOR TRANSACTIONS.**

**28.3. Cash Back From Purchase.** You have the option of offering cash back to Your customers when they make a PIN Debit Card purchase. You may set a minimum and maximum amount of cash back that You will allow. If You are not now offering this service, Your terminal may require additional programming to begin offering cash back.

**28.4. Settlement.** Within one Business Day of the original Transaction, You must balance each location to the system for each Business Day that each location is open.

**28.5. Adjustments.** An adjustment is a Transaction that is initiated to correct a PIN Debit Card Transaction that has been processed in error. You will be responsible for all applicable adjustment fees that may be charged by a PIN Debit Card network. Some PIN Debit networks may have established minimum amounts for adjustments.

**There are several reasons for adjustments being initiated:**

- The Cardholder was charged an incorrect amount, either too little or too much.

- The Cardholder was charged more than once for the same Transaction.

- A processing error may have occurred that caused the Cardholder to be charged even though the Transaction did not complete normally at the point of sale.

All parties involved in processing adjustments are regulated by time frames that are specified in the operating rules of the applicable PIN Debit network, The Electronic Funds Transfer Act, Regulation E, and other applicable law.

## 29. SPECIAL PROVISIONS REGARDING EBT TRANSACTIONS

If You elect to accept EBT Cards and engage in EBT Transactions, the terms and conditions of this Section 29 shall apply.

EBT Transactions are provided to You by Processor and not by Bank. The Services provided, Transactions processed and other matters contemplated under this Section 29 are subject to the rest of this Agreement, as applicable, except to the extent the terms of this Section 29 directly conflict with another section of this Agreement, in which case the terms of this Section 29 will control; provided, however, that Bank is not a party to this Agreement insofar as it relates to EBT Transactions, and Bank is not liable to You in any way with respect to such Services. For the purposes of this section, the words "we," "our" and "us" refer only to the Processor and not to the Bank.

We offer electronic interfaces to EBT networks for the processing, settlement and switching of EBT Transactions initiated through the use of a state-issued EBT card ("EBT Card") at Your POS Terminal(s) for the provision of United States Department of Agriculture, Food and Nutrition Service ("FNS"), Supplemental Nutrition Assistance Program ("SNAP") and Women, Infants and Children Benefits ("WIC Benefits") and/or government delivered Cash Benefits (Cash Benefits, together with FNS, SNAP and WIC Benefits, collectively are referred to as the "EBT benefits") to EBT benefit recipients ("EBT customers"), subject to the terms below.

**29.1. Acceptance of EBT Benefits.** You agree to accept EBT Cards and provide EBT benefits to EBT customers through the use of a POS Terminals, PIN pad and printer or other equipment that meet standards set forth in the EBT Rules ("Authorized Terminal") applicable to such

EBT benefits during Your normal business hours, in a manner consistent with Your normal business practices and in accordance with the EBT Rules.

The "EBT Rules" means (i) all procedures that we establish and provide to You from time-to-time regarding Your acceptance of EBT Cards and provision of EBT benefits to EBT customers; (ii) the Quest Rules, as amended from time-to-time, issued by the National Automated Clearing House Association and as approved by the Financial Management Service of the U.S. Treasury Department, as necessary (and any rules that succeed or replace the Quest Rules); and (iii) other such laws, rules, regulations and procedures that are applicable to the acceptance of EBT Cards and the provision of EBT benefits by You under this Section 29, including without limitation, laws pertaining to delivery of services to EBT customers and EBT customer confidentiality, the federal Civil Rights Act of 1964, Rehabilitation Act of 1973, Americans with Disabilities Act of 1990, Clean Air Act, Clean Water Act, Energy Policy and Conservation Act, Immigration Reform and Control Act of 1986, regulations issued by the Department of Agriculture pertaining to Food Stamp Program, and, any additional procedures specified by the state regarding lost EBT Cards, forgotten PINs, discrepancies in benefits authorized and similar matters by providing EBT customers with information such as telephone numbers and addresses of the state or other appropriate agencies. The "Food Stamp Program" is the government benefits program operated under the authority of the Food Stamp Act of 1964. You will provide EBT benefits to EBT customers, in accordance with the procedures set forth in the EBT Rules, in the amount authorized through Your Authorized Terminal upon presentation by an EBT customer of an EBT Card and such EBT customer's entry of a valid PIN. If the Authorized Terminal fails to print EBT benefit issuance information as approved and validated as a legitimate Transaction, You will comply with the procedures set forth in the EBT Rules for authorization of EBT benefits in such instance. You are solely responsible for Your provision of EBT benefits other than in accordance with authorizations timely received from EBT service provider. You will not resubmit any EBT Card Transaction except as specifically permitted by the EBT Rules and procedures applicable to such EBT Card Transaction. You must provide a receipt for each EBT Transaction to the applicable EBT customer.

You will not accept any EBT Card for any purpose other than providing EBT Benefits, including without limitation acceptance of any EBT Card as security for repayment of any EBT customer obligation to You. In the event of any violation of this provision, You will be obligated to reimburse the state or us for any EBT benefits unlawfully received by either You or an EBT customer to the extent permitted by law. Cash should never be dispensed for FNS, SNAP, and WIC Benefits.

You authorize us to initiate EBT Card Transactions and to receive settlement for such Transactions on Your behalf.

**29.2.   Manual EBT Vouchers.**  In accordance with the procedures set forth in this Section 29 and the EBT Rules, You will manually accept EBT Cards during periods of time when Your Authorized Terminal is not working or the EBT system in not available; You will manually provide EBT benefits in the amount authorized through the applicable EBT service provider to the EBT customers at no cost to the EBT customers upon presentation by an EBT customer of his/her EBT Card. All manual voucher authorizations must be cleared on Your POS terminal for payment of voucher to be made to You. In addition to any procedures set forth in the EBT Rules, the following limitations will apply to manual issuance of FS Benefits by Merchant:

i.  An authorization number for the amount of the purchase must be received by You from the applicable EBT service provider while the respective EBT customer is present and before You provide such EBT customer with any FNS, SNAP and WIC Benefits, or Cash Benefits, as applicable. You must not attempt to voice authorize a manual EBT Transaction if the EBT customer is not present to sign the voucher. The EBT customer must sign the voucher. A copy of the voucher should be given to the EBT customer at the time of authorization and You should retain one copy for Your records.

ii.  Specified EBT customer, clerk and sales information, including the telephone authorization number, must be entered properly and legibly on the manual sales draft.

iii. All manual voucher authorizations must be cleared on Your Authorized Terminal before payment of voucher will be made to You. Vouchers must be cleared within ten (10) Business Days after the date of applicable voice authorization. Vouchers cannot be cleared by any manner except by Your Authorized Terminal therefore You should never mail vouchers requesting payment. If a voucher expires before it has been cleared by Your Authorized Terminal for payment, no further action can be taken to obtain payment for the voucher.

iv. In the event that, due to EBT host failure, EBT benefit availability for an EBT customer cannot be determined at the time You request authorization, the maximum authorized manual Transaction and benefit encumbrance will be $40.00 or such other state specific floor limit as set forth in the most current version of the applicable EBT Rules.

v. Except as specifically provided in the applicable EBT Rules, You will not be reimbursed and will be solely responsible for a manual Transaction when You fail to obtain an authorization number from the applicable EBT service provider as set forth in this Section 29 or otherwise fail to process the manual Transaction in accordance with the EBT Rules.

vi.If You have not received an authorization number in accordance with paragraph 29.1 above, You may not "re-submit" a manual sales draft for payment for the same Transaction.

**29.3.   Acceptance of EBT Cash Benefits**. If You agree to accept EBT Cards and to provide Cash Benefits, You agree to maintain adequate cash on hand to issue EBT service provider authorized Cash Benefits and will issue such Cash Benefits to EBT customers in the same manner and to the same extent cash is provided to Your other customers. You may not require, and may not in Your advertising suggest, that any EBT customers must purchase goods or services from You as a condition to receiving Cash Benefits, unless such condition applies to other customers as well. You may not designate and direct EBT customers to special checkout lanes restricted to use by EBT customers unless You also designate and direct other customers to special checkout lanes for Debit Cards or Credit Cards and/or other payment methods such as checks other than cash.

**29.4.   Interoperability.**  If You accept EBT Cards and provide EBT benefits (FNS, SNAP, and WIC Benefits and/or Cash Benefits), You must do so for EBT customers from all states.

**29.5.   Required Licenses.** If You provide FNS, SNAP and WIC Benefits under this Agreement, You represent and warrant to us that You are a FNS authorized merchant and are not currently disqualified or withdrawn from redeeming food stamp coupons or otherwise disqualified or withdrawn by FNS. You agree to secure and maintain at Your own expense all necessary licenses, permits, franchises, or other authorities required to lawfully effect the issuance and distribution of EBT benefits under this Agreement, including without limitation, any applicable franchise tax certificate and non-governmental contractor's certificate, and covenant that You will not accept EBT Cards or provide EBT benefits at any time during which You are not in compliance with the requirements of any EBT Rules.

**29.6.   Term and Termination.** If You are disqualified or withdrawn from the Food Stamp Program, Your authority to issue benefits will be terminated concurrently therewith. Such disqualification or withdrawal will be deemed a breach of this Agreement with respect to Your authority to issue Cash Benefits and, in the event of such disqualification, we have the right to immediately terminate the provision of service under this Section 29 or the Agreement in its entirety. With respect to the issuance of Cash Benefits only, Your authority to issue Cash Benefits may be suspended or terminated immediately at the sole discretion of us, the state or its EBT service provider, effective upon delivery of a notice of suspension or termination specifying the reasons for such suspension or termination if there will be (i) any suspension, injunction, cessation, or termination of

the EBT service provider's authority to provide EBT services to the state; (ii) failure by You, upon not less than thirty (30) days' prior written notice, to cure any breach by You of these terms and conditions, including without limitation, Your failure to support the issuance of EBT benefits during Your normal business hours consistent with Your normal business practices, Your failure to comply with EBT benefit issuance procedures, Your impermissible acceptance of an EBT Card, or Your disqualification or withdrawal from the Food Stamp Program; or (iii) based on a state's or its EBT service provider's investigation of the relevant facts, evidence that You or any of Your agents or employees are committing, participating in, or have knowledge of fraud or theft in connection with the dispensing of EBT benefits. If You fail to cure any breach as set forth above, You may appeal such suspension of termination to the applicable state for determination in its sole discretion.

In the event that Your authority to accept benefits is suspended or terminated by a state or its EBT service provider, and You successfully appeal such suspension or termination to the state or its EBT service provider, we shall be under no obligation to reinstate the services previously provided under this Section 29 or the Agreement, as applicable.

The provision of services under this Section 29 shall terminate automatically if our agreement or our service provider's agreement with any applicable state's EBT service provider terminates for any reason.

You will give prompt notice to us if You plan to stop accepting EBT Cards and providing EBT benefits or if You are unable to comply with the terms of this Section 29.

**29.7. Confidentiality of EBT System Information.** All information related to EBT customers and/or the issuance of EBT benefits shall be considered confidential information.

Individually identifiable information relating to an EBT customer or applicant for EBT benefits will be held confidential and will not be disclosed by You or Your directors, officers, employees or agents, without prior written approval of the applicable state.

You will: (a) implement appropriate measures designed to: (1) ensure the security and confidentiality of all non-public personal information or materials regarding customers ("NPPI"); (2) protect against any anticipated threats or hazards to the security or integrity of NPPI; (3) protect against unauthorized access to or use of NPPI that could result in substantial harm or inconvenience to any customer and (4) ensure the proper disposal of NPPI; and (b) take appropriate actions to address incidents of unauthorized access to NPPI, including notification to us as soon as possible.

The use of information obtained by You in the performance of Your duties under this Section 29 will be limited to purposes directly connected with such duties.

**29.8. EBT Service Marks.** You will adequately display any applicable state's service Marks or other licensed marks, including the Quest Marks, and other materials supplied by us, (collectively the "Protected Marks"), in accordance with the standards set by the applicable state. You will use the Protected Marks only to indicate that EBT benefits are issued at Your location(s) and will not indicate that we, any state or its EBT service provider endorse Your goods or services. Your right to use such Protected Marks pursuant to this Agreement will continue only so long as this Section 29 remains in effect or until You are notified by us, any state or its EBT service provider to cease their use or display. You will not use the Marks of any EBT service provider without prior written approval from such EBT service provider.

**29.9. Miscellaneous**

**29.9.1. Errors.** You will fully cooperate with us and any other participants in the EBT system in the resolution of errors and disputes regarding EBT Transactions processed pursuant to this Section 29. You will promptly notify us of any such errors or disputes.

**29.9.2. Issuance Records.**

i. You agree to make available such informational materials as may be required by the state, its EBT service provider or any applicable regulations pertaining to the issuance of Benefits.

ii. You will retain all EBT-related records (including but not limited to manual Sales Drafts or vouchers) in the manner required by the EBT Rules or otherwise reasonably requested by us for three (3) years following the date of the applicable EBT Transaction, or for such additional period as may be required by the EBT Rules. Records involving matters in litigation will be kept by You for a period of not less than three (3) years following the termination of the applicable litigation. Copies of any documents in media other than paper (e.g., microfilm, etc.) related to this Section 29 may be substituted for the originals to the extent permitted under applicable EBT Rules and provided that legible paper copies can be reproduced within a reasonable time after such records are requested.

iii. You will make all EBT-related records available for audit upon request to representatives of the state or its EBT service provider, or other authorized state or federal government agency during normal business hours.

iv. To assure compliance with this Agreement, including without limitation this Section 29, the state, its EBT service provider, or other authorized state or federal government agency, will at all times, upon advance notice except in the case of suspected fraud or other similar activity, have the right to enter, during normal business hours, Your premises to inspect or evaluate any work performed under this Agreement, or to obtain any other information required to be provided by You or otherwise related to this Agreement.

**29.9.3. Training.** You will train and permit Your employees to receive training regarding the issuance of EBT benefits.

**29.9.4. Amendments.** Notwithstanding anything to the contrary in this Agreement, if any of these terms and conditions are found to conflict with the EBT Rules or federal or state policy, these terms and conditions are subject to reasonable amendment by Us, a state or its EBT service provider to address such conflict upon twenty (20) days' written notice to You provided that You may, upon written notice, terminate Your obligation under this Section 29 upon receipt of notice of such amendment.

**29.9.5. State Action.** Nothing contained herein shall preclude a state from commencing appropriate administrative or legal action against You or for making any referral for such action to any appropriate federal, state, or local agency.

**29.9.6. Reference to State.** Any references to state herein will mean the state in which You accept EBT benefits pursuant to this Section 29. If You accept EBT benefit in more than one state pursuant this Section 29, then the reference will mean each such state severally, not jointly.

**29.9.7. Third Party Beneficiaries.** These terms and conditions, do not create, and will not be construed as creating, any rights enforceable by any person not having any rights directly under this Agreement, except that the state and its Issuer, as defined in the Quest Rules, will be deemed third party beneficiaries of the representations, warranties, covenants and agreements made by You under the Agreement, including without limitation this Section 29.

**30. SPECIAL PROVISIONS REGARDING WIRELESS SERVICE**

If You elect to purchase the Wireless Equipment from Us as indicated on the Application, then the following terms and conditions of this Section 30, referred to as the **"Wireless Services Terms"**, shall apply. THE WIRELESS SERVICES ARE BEING SOLD TO YOU FOR USE IN BUSINESS AND ARE NOT BEING SOLD TO YOU FOR HOUSEHOLD OR PERSONAL USE. Sale of Wireless Services is made by iPayment and not the Bank. The Services provided, Transactions processed and other matters contemplated under this Section 30 are subject to the rest of this Agreement, as applicable, except to the extent the terms of this Section 30 directly conflict with another section of this Agreement, in which case the terms of this Section 30 will control; provided, however, that Bank is not a party to this Agreement insofar as it relates to Wireless Services, and Bank is not liable to You in any way with respect to such services. For the purposes of this section, the words "we," "our" and "us" refer only to iPayment and not to the Bank.

Through one or more third party vendors ("Wireless Vendors") selected by Us in our sole discretion, we have acquired the right to resell certain wireless data communication services that use radio base stations and switching offered by certain cellular telephone and data networks throughout the country (the "Wireless Networks") in order to allow You to capture and transmit to Processor and Bank certain wireless Card Authorization Transactions or to transmit other communications to our system ("Wireless Services").

If You elect to purchase voice and/or data services directly from a third party provider for use with the Wireless Equipment as permitted by iPayment, You acknowledge and agree that the Agreement does not address or govern those voice and/or data services or Your relationship with that third party provider, and Servicers are in no way responsible for providing, maintaining, servicing or supporting such third party voice and/or data services.

**30.1. Purchase of Wireless Services.** The prices that You will pay for the Wireless Services are set forth on the Application. In connection with Your purchase of Wireless Services, You will receive access to a certain Wireless Network(s).

- Licenses. You agree to obtain any and all licenses, permits or other authorizations required by the Federal Communications Commission ("FCC") or any other regulatory authority, if any, for the lawful operation of Wireless Equipment used by You in connection with Your receipt of Wireless Services. You will promptly provide us with all such information as we may reasonably request with respect to matters relating to the rules and regulations of the FCC.

- Wireless Equipment. You agree that in order to access the Wireless Services, You must use wireless POS Terminals and accessories approved for use with the Wireless Services by Servicers from time to time in its sole discretion (the "Wireless Equipment"). If Wireless Equipment is purchased by You from us as indicated on the Application, then the terms of this Agreement, including without limitation Section 32 of this Agreement, apply to Your use of such Wireless Equipment.

- Improvements/General Administration. We and the Wireless Vendor(s) reserve the right to make changes, from time to time, in the configuration of the Wireless Services, Wireless Networks, Wireless Equipment, Wireless Software, rules of operation, accessibility periods, identification procedures, type and location of equipment, allocation and quantity of resources utilized, programming languages, administrative and operational algorithms and designation of the control center serving You at the particular address. In addition, we reserve the right to schedule, from time to time, interruptions of service for maintenance activities.

- Suspension of Wireless Services. We or a Wireless Network may suspend the Wireless Services to: (a) prevent damages to, or degradation of, our or a Wireless Network's network integrity that may be caused by a third party; (b) comply with any law, regulation, court order or other governmental request which requires immediate action; or (c) otherwise protect us or a Wireless Network from potential legal liability. To the extent commercially reasonable, we shall give notice to You before suspending the Wireless Services to You. If not commercially reasonable to give prior notice, we will give notice to You as soon as commercially practicable thereafter. Availability of the Wireless Services may vary due to events beyond the control of us or our Wireless Vendors. In the event of a suspension of the Wireless Services, we or the applicable Wireless Vendor will promptly restore the Wireless Services after the event giving rise to the suspension has been resolved.

**30.2. Software Licenses.** Servicers hereby grants to You a non-exclusive, non-transferable, revocable limited sublicense to use any wireless software (including any documentation relating to or describing the wireless software) downloaded by You or Your designee from Processor's systems onto the Wireless Equipment in connection with Your purchase and use of the Wireless Services in accordance with the terms of this Agreement, including this Section 30 and Section 32 ("Wireless Software"). Anything in this Agreement to the contrary notwithstanding, we or certain third parties retain all ownership and copyright interest in and to all Wireless Software, related documentation, technology, know-how and processes embodied in or provided in connection with the Wireless Software, and You shall have only a nonexclusive, non-transferable license to use the Wireless Software in Your operation of the Wireless Equipment for the purposes set forth in this Agreement. Nothing in this Agreement confers any title or ownership of any such Wireless Software to You or shall be construed as a sale of any rights in any such Wireless Software to You. You agree to accept, agree to and be bound by all applicable terms and conditions of use and other license terms applicable to such Wireless Software. You shall not reverse engineer, disassemble or decompile the Wireless Software. You shall not give any Person access to the Wireless Software without our prior written consent. Your obligations under this Section 30.2 shall survive the termination of this Agreement. You acknowledge that the only right You obtain to the Wireless Software is the right to use the Wireless Software in accordance with the terms in this Section.

**30.3. Limitation on Liability.** We shall have no liability for any warranties by any party with respect to uninterrupted Wireless Services, as set forth in Section 30.10, or for any Person's unauthorized access to Client's data transmitted through either the Wireless Equipment or Wireless Services (including the Wireless Software), or Wireless Networks, regardless of the form of action (whether in contract, tort (including negligence), strict liability or otherwise). The foregoing notwithstanding, for any other liability arising out of or in any way connected with these Wireless Services terms, including liability resulting solely from loss or damage caused by partial or total failure, delay or nonperformance of the Wireless Services or relating to or arising from Your use of or inability to use the Wireless Services, Processor's, Bank's, iPayment's and Wireless Vendor(s)' liability shall be limited to Your direct damages, if any, and, in any event, shall not exceed the lesser of the amount paid by You for the particular Wireless Services during any period of failure, delay, or nonperformance of the Wireless Services or $50,000.00. In no event shall Servicers, Wireless Vendor(s) or our respective Affiliates be liable for any indirect incidental, special, consequential or punitive damages. The remedies available to You under these Wireless Services Terms will be Your sole and exclusive remedies.

**30.4. Indemnification.** In addition to any other indemnifications as set forth in this Agreement, You will indemnify and hold Servicers, Wireless Vendor(s) and our respective officers, directors, employees, and Affiliates harmless from against any and all losses, claims, liabilities, damages, costs or expenses arising from or related to: (a) the purchase, delivery, acceptance, rejection, ownership, possession, use condition, liens against, or return of the Wireless Services or the Wireless Equipment (including the Wireless Software), as applicable; (b) Your negligent acts or omissions; (c) any breach by You of any of Your obligations under this Section 30; or (d) any Person's unauthorized access to Client's data and/or unauthorized financial activity occurring on Your Merchant Account Number hereunder, except to the extent any losses, liabilities, damages or expenses result from our gross negligence or willful misconduct.

**30.5. Confidentiality.** All information or materials which could reasonably be considered confidential or competitively sensitive that You access from or relate to either Wireless Vendor(s) or Servicers related to the subject matter of these Wireless Services Terms will be considered confidential information. You will safeguard our confidential information with at least the same degree of care and security that You use for Your confidential information, but not less than reasonable care.

**30.6.** **Termination.** In addition to any other provision in this Agreement, the Wireless Services being provided under this Section 30 may terminate:

(a) Immediately upon termination of the agreement between us (or our Affiliates) and Wireless Vendor(s), provided that we will notify You promptly upon our notice or knowledge of termination of such agreement, provided further that if Wireless Vendor(s) loses its authority to operate less than all of the Wireless Services or if the suspension of any authority or non-renewal of any license relates to less than all of the Wireless Services, then these Wireless Services Terms will terminate only as to the portion of the Wireless Services affected by such loss of authority, suspension or non-renewal; or

(b) Immediately if either we or our Affiliates or Wireless Vendor(s) are prevented from providing the Wireless Services by any law, regulation, requirement, ruling or notice issued in any form whatsoever by judicial or governmental authority (including without limitation the FCC).

**30.7.** **Effect of Termination.** Upon termination of these Wireless Services Terms for any reason, You will immediately pay to us all fees due and owing to us hereunder. If these Wireless Services Terms terminates due to a termination of the agreement between us or our Affiliates and Wireless Vendor(s), then we may, in our sole discretion, continue to provide the Wireless Services through Wireless Vendor(s) to You for a period of time to be determined as long as You continue to make timely payment of fees due under these Wireless Services Terms.

**30.8.** **Third Party Beneficiaries.** Wireless Vendor(s) are third party beneficiaries of these Wireless Services terms and may enforce its provisions as if a party hereto.

**30.9.** **Other Applicable Provisions.** You also agree to be bound by all other terms and conditions of this Agreement.

**30.10.** **Disclaimer.** Wireless Services use radio transmissions, so Wireless Services can't be provided unless Your Wireless Equipment is in the range of one of the available Wireless Networks' transmission sites and there is sufficient network capacity available at that moment. There are places, particularly in remote areas, with no service at all. Weather, topography, buildings, Your Wireless Equipment, and other conditions we don't control may also cause failed transmissions or other problems. PROCESSOR, BANK, IPAYMENT, AND WIRELESS VENDOR(S) DISCLAIM ALL REPRESENTATIONS AND WARRANTIES RELATING TO WIRELESS SERVICES. WE CANNOT PROMISE UNINTERRUPTED OR ERROR-FREE WIRELESS SERVICE AND DO NOT AUTHORIZE ANYONE TO MAKE ANY WARRANTIES ON OUR BEHALF.

## 31. SPECIAL PROVISIONS REGARDING ADDITIONAL SERVICES

**31.1.** **iAccess Services.** iAccess services permit Merchant to access its card processing Transaction information on the iPayment system. The iAccess services are among those Additional Services into which You may be enrolled hereunder and are subject to the terms of the Merchant Processing Application, this Program Guide and the iAccess Terms and Conditions located at www.iaccess.merchant-info.com, including documents referenced therein, as they may be amended by iPayment from time to time.

**31.2.** **iAdvantage Services.** Certain Additional Services may be provided through iPayment's Affiliate, iAdvantage LLC ("iAdvantage"). These Additional Services are subject to the terms of the Merchant Processing Application, this Program Guide and the iAdvantage Services Standard Provisions as well as the iAdvantage Website Terms and Conditions. The iAdvantage Services Standard Provisions and the iAdvantage Website Terms and Conditions are available at www.iadvantagesolutions.com, including documents referenced therein, as they may be amended by iPayment or its Affiliates from time to time.

**31.3.** **Bank Not a Party.** Additional Services are provided by iPayment and its wholly owned subsidiary, iAdvantage. Bank is not a party to this Agreement with respect to any Additional Services; for purposes of the Additional Services, Bank and its Affiliates are not included in the definition of Servicers. Bank shall have no liability of any kind whatsoever to Merchant regarding Additional Services. All questions and notices regarding Additional Services must be provided to iPayment or iAdvantage.

**31.4.** **Enrollment in Additional Services.** You may be enrolled by iPayment or its Affiliates upon execution of the Merchant Processing Application and from time to time during the term of the Agreement. iPayment or its Affiliate will notify Merchant in accordance with Section 33.3.1 not less than twenty (20) days prior to the date on which any fees or modifications to fees will be applied to Merchant in accordance with Section 31.7 below.

**31.5.** **Notices.** Notices regarding Additional Services may be given to:

Notification to Merchant: You may be notified about Additional Services in accordance with Section 33.3.1.

Notification to iPayment and iAdvantage: (1) Notice of cancellation required for iAccess Additional Services shall be in writing and in each case shall be sent by overnight carrier, or express, registered or certified United States mail, return receipt requested, postage prepaid, addressed to: iPayment, Inc. 30721 Russell Ranch Road, Suite 200, Westlake Village, CA 91362, Attention: Merchant Services. (2) Notice of cancellation required for iAdvantage Additional Services shall be by completing the notice of cancellation process at www.iadvantagesolutions.com/cancel.

**31.6.** **Cancellation of Additional Services.** During the thirty (30) day period following notice to You of enrollment in an Additional Service or of a fee modification applicable to any Additional Service in which you are enrolled, You may cancel Your enrollment in such Additional Service by giving notice to iPayment with respect to iAccess by calling iPayment Customer Service toll free at 1-800-554-4777 or to iAdvantage with respect to other Additional Services by calling toll free 1-800-716-9638 or by other means as provided in Section 31.5. If You give timely notice of cancellation, You will not be charged for such Additional Service(s).

**31.7.** **Fees for Additional Services.** Fees applicable to Additional Services are payable in accordance with pricing information for iAccess by way of related Merchant notice of enrollment and for iAdvantage at www.iadvantagesolutions.com. Fees for iAccess services are also available by calling iPayment Customer Service toll free at 1-800-554-4777 and for iAdvantage by calling toll free 1-800-716-9638.

**31.8.** **User Documentation.** You will use Additional Services in accordance with all instructions and terms and conditions available on www.iaccess.merchant-info.com and www.iadvantagesolutions.com, as applicable.

**31.9.** **Territory.** Additional Services are offered to and will be provided only to Merchants and their employees located within the United States of America.

**31.10.** **ARBITRATION AND WAIVER AGREEMENT. This Agreement, insofar as it relates to the Merchant and iPayment, is subject to the terms and conditions of this Arbitration and Waiver Agreement. BANK IS NOT A PARTY TO THIS ARBITRATION AND WAIVER AGREEMENT AND IS NOT SUBJECT TO ARBITRATION IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES.**

**31.11.** **BINDING ARBITRATION. If You, Merchant or iPayment (including iPayment's Affiliates) have a dispute arising from the Agreement or in connection with the Additional Services, and are not able to resolve the dispute informally, You and iPayment agree that upon demand by either You, Merchant or iPayment, the dispute will be resolved through the arbitration process set forth in this Arbitration and Waiver Agreement. A "dispute" is any unresolved disagreement between You or Merchant and iPayment. It includes any**

disagreement relating in any way to Additional Services; to Your use of any of iPayment's subcontractors or third party vendors or facilities; or to any means You may use to access your account(s) with iPayment. It includes claims based on broken promises or contracts, torts, or other wrongful actions. It also includes statutory, common law, and equitable claims. "Disputes" include disagreements about the meaning, application or enforceability of this arbitration agreement. This arbitration agreement shall survive any termination of Merchant's account(s). YOU AGREE THAT YOU, MERCHANT AND IPAYMENT ARE WAIVING THE RIGHT TO A JURY TRIAL OR TRIAL BEFORE A JUDGE IN A PUBLIC COURT. As the sole exception to this Arbitration and Waiver Agreement, You, Merchant and iPayment retain the right to pursue in small claims court any dispute that is within that court's jurisdiction. If either You, Merchant or iPayment fail to submit to binding arbitration following lawful demand, the party so failing bears all costs and expenses incurred by the other in compelling arbitration.

**31.12. ARBITRATION PROCEDURE; SEVERABILITY; FEES.** You, Merchant or iPayment (or iPayment's Affiliates) may submit a dispute to binding arbitration at any time, regardless of whether a lawsuit or other proceeding has been previously commenced. NEITHER YOU OR MERCHANT NOR IPAYMENT SHALL BE ENTITLED TO JOIN OR CONSOLIDATE DISPUTES BY OR AGAINST OTHERS IN ANY ARBITRATION, OR TO INCLUDE IN ANY ARBITRATION ANY DISPUTE AS A REPRESENTATIVE OR MEMBER OF A CLASS, OR TO ACT IN ANY ARBITRATION IN THE INTEREST OF THE GENERAL PUBLIC OR IN A PRIVATE ATTORNEY GENERAL CAPACITY. Each arbitration, including the selection of the arbitrator(s), shall be administered by the American Arbitration Association (AAA), or such other administrator as you or Merchant and iPayment may mutually agree to (the AAA or such other mutually agreeable administrator to be referred to hereinafter as the "Arbitration Administrator"), according to the Commercial Arbitration Rules ("AAA Rules"). To the extent that there is any variance between the AAA Rules and this Arbitration Agreement, this Arbitration Agreement shall control. Arbitrators must be members of the state bar of California, with expertise in the substantive laws applicable to the subject matter of the dispute. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation. The parties agree that in this relationship: (1) The parties are participating in transactions involving interstate commerce; (2) The arbitrator shall decide any dispute regarding the enforceability of this arbitration agreement and shall provide a reasoned opinion based on applicable law for the decision and award; (3) All arbitration proceedings shall be held and any award shall be made within the County of Los Angeles, California; (4) No award may be provided in excess of limitations of damages applicable under the Agreement; (5) A judgment shall entered upon the award made pursuant to the application of iPayment, Merchant or You to the U. S. District Court for the Central District of California in Los Angeles, California; and (6) This agreement and any resulting arbitration are governed by the provisions of the Federal Arbitration Act (Title 9 of the United States Code) and, to the extent any provision of that act is inapplicable, unenforceable or invalid, the laws of the state that govern the relationship between You and iPayment. If any of the provisions of this Arbitration and Waiver Agreement dealing with class action, class arbitration, private attorney general action, other representative action, joinder, or consolidation is found to be illegal or unenforceable, that invalid provision shall not be severable and this entire arbitration agreement shall be unenforceable. Arbitration fees shall be determined by the rules or procedures of the Arbitration Administrator, unless limited by applicable law.

**31.13. RIGHTS PRESERVED.** This Arbitration and Waiver Agreement does not prohibit You, Merchant or iPayment (or its Affiliates) from exercising any lawful rights or using other available remedies to preserve, or obtain possession of property; exercise self-help remedies, including setoff rights; or obtain provisional or ancillary remedies such as injunctive relief, attachment, garnishment or the appointment of a receiver by a court of competent jurisdiction. All statutes of limitations applicable to any dispute apply to any arbitration between you or Merchant and iPayment. The provisions of this Arbitration and Waiver Agreement shall survive termination or amendment of the Agreement or any other relationship between you and iPayment.

## 32.  CHOICE OF LAW; VENUE; WAIVER OF JURY TRIAL

**32.1.   Choice of Law.**  Our Agreement shall be governed by and construed in accordance with the laws of the State of California (without regard to its choice of law provisions).

**32.2.   Venue.** We have substantial facilities in the State of California and many of the services provided under this Agreement are provided from these facilities.  The exclusive venue for any actions or claims arising under or related to this Agreement shall be in the appropriate state or federal court located in Marin County, California.

**32.3.   Waiver of Jury Trial.** ALL PARTIES IRREVOCABLY WAIVE ANY AND ALL RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY CLAIM RELATING TO OR ARISING UNDER THIS AGREEMENT.

## 33.  OTHER TERMS

**33.1.   Force Majeure.**  No party shall be liable for any default or delay in the performance of its obligations under this Agreement if and to the extent such default or delay is caused, directly or indirectly, by (i) fire, flood, elements of nature or other acts of God; (ii) any terrorist attacks or outbreak or escalation of hostilities, war, riots or civil disorders in any country; (iii) any act or omission of the other party or any government authority; (iv) any labor disputes (whether or not employees' demands are reasonable or within the party's power to satisfy); or (v) the nonperformance by a Person for any similar cause beyond the reasonable control of such party, including without limitation, failures or fluctuations in telecommunications or other equipment. In any such event, the non-performing party shall be excused from any further performance and observance of the obligations so affected only for as long as such circumstances prevail and such party continues to use commercially reasonable efforts to recommence performance or observance as soon as practicable.  Notwithstanding anything to the contrary in this paragraph, Your failure to receive payment or funds from a Person shall not excuse the performance of Your obligations to us under this Agreement.

**33.2.   Compliance with Laws.**  In performing its obligations under this Agreement, each party agrees to comply with all laws and regulations applicable to it.  You further agree to cooperate and provide information requested by Servicers, as Servicers determine necessary, to facilitate Servicers compliance with any applicable law including without limitation the rules and regulations promulgated by the Office of Foreign Assets Control of the US Department of the Treasury. You further acknowledge and agree that You will not use Your Merchant Account and/or the Services for illegal Transactions, for example, those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et seq, as may be amended from time to time.

**33.3.   Notices.**  Except as otherwise specifically provided, all notices and other communications required or permitted hereunder (other than those involving normal operational matters relating to the processing of Card Transactions) shall be given in accordance with the provisions of Sections 33.3.1 and 33.3.2 below.

**33.3.1. Notification to Merchant.** You may be notified by Servicers, or either of Us, including without limitation, notices of changes in Card Organization Rules or new requirements applicable to You by any means reasonably available to Us, including via email to Your email address indicated in the Application, or by a separate written notice sent by U.S. mail or other courier to Your address appearing in the Application, or by facsimile to Your facsimile number appearing in the Application (facsimile notices shall be confirmed received), or by a "statement stuffer" included with Your regular monthly account statement, including any online presentment of Your account statement that provides notice by use of a "statement message". Any such notice as provided above, shall be deemed to have been given (a) when sent and receipt has been confirmed, if by facsimile or email, or (b) two (2) Business Days after it is sent by United States mail, postage prepaid, or (c) one (1) Business Day after it is sent by overnight courier, or (d) if sent by online presentment of Your account statement, one (1) Business Day after the online presentment of Your account statement that includes such notice by use of a "statement message".

**33.3.2. Notification to Servicers.** Notices required by this Agreement from Merchant to Servicers, or either of Us, shall be in writing and in each case, shall be sent by overnight carrier, or express, registered or certified United States mail, return receipt requested, postage prepaid, addressed to: iPayment, Inc. 30721 Russell Ranch Road, Suite 200, Westlake Village, CA 91362, Attention: Merchant Services, with a copy to: Wells Fargo Bank, N.A., 1200 Montego Way, Walnut Creek, CA 94598, Attention: Merchant Services, and shall be deemed to have been given upon actual receipt.

**33.3.3. Changes.** Merchant and/or Servicers, and each of them, may change the name and address of the person to whom notices or other documents required under this Agreement must be sent at any time by giving written notice to the other parties in the manner provided. Merchant must notify Servicers of any change to Merchant's notice information on or before the effective date of such change.

33.4.    **Headings.**  The headings contained in this Agreement are for convenience of reference only and shall not in any way affect the meaning or construction of any provision of this Agreement.

33.5.    **Severability.**        The parties intend every provision of this Agreement to be severable. If any part of this Agreement is not enforceable, the remaining provisions shall remain valid and enforceable.

33.6.    **Entire Agreement; Waiver.**  This Agreement constitutes the entire agreement between the parties with respect to the subject matter thereof and supersedes any previous agreements and understandings. A party's waiver of a breach of any term or condition of this Agreement shall not be deemed a waiver of any subsequent breach of the same or another term or condition.

33.7.    **Amendment.**    We may modify any provision of this Agreement by providing written notice to You.   You may choose not to accept the requirements of any such change by terminating the Agreement within thirty (30) days of receiving notice.  If You choose to do so, notify Us in writing that You are terminating for this reason so that we may waive any early termination fee that might otherwise apply.  For purposes of this section, an electronic or "click-wrap" notice intended to modify or amend this Agreement and which You check "I Accept" or "I Agree" or otherwise accept through an electronic process, shall constitute in writing as required herein. This Section 33.7 does not apply to fee changes, which are governed by Sections 18.4 and 18.5.

33.8.    **Third Party Beneficiaries.**    Our respective Affiliates and any Persons we use in providing the Services are third party beneficiaries of this Agreement and each of them may enforce its provisions as it was a party hereto. Except as expressly provided in this Agreement, nothing in this Agreement is intended to confer upon any Person any rights or remedies, and the parties do not intend for any Persons to be third-party beneficiaries of this Agreement.

33.9.    **Card Organization Rules.**  The parties acknowledge that the Visa, MasterCard and Discover Network Card Organization Rules give Visa, MasterCard and Discover Network certain rights to require termination or modification of this Agreement with respect to Transactions involving Visa, MasterCard and Discover Network Cards and the Visa, MasterCard and Discover Network Card systems and to investigate You. The parties also acknowledge that issuers of other Cards, for which we perform services on Your behalf, may have similar rights under their applicable Card Organization Rules with respect to this Agreement's applicability to Transactions involving such other Cards.

33.10.   **Publicity.** Merchant may not use the logo, name, trademark, or service mark of Processor and/or Servicers in any manner, including without limitation, in any advertisements, displays, or press releases, without the prior written consent of Processor and Servicers.

33.11.   **E-SIGN AUTHORIZATION.  You consent to the use of electronic records to provide or make available all agreements, terms and conditions, program guides, user manuals, statements, notices and any other documentation ("Electronic Records") in connection with the Payment Services and Additional Services, throughout the term of the Agreement, including renewal terms. You consent and acknowledge that Your clicking on the "I agree" button in an online document, including this Agreement or any other agreement, acknowledgement, consent or authorization, will be Your valid signature and binding on You and Merchant as if provided in writing. You may update contact information for purposes of electronic communication with iPayment by submitting changes in accordance with the procedures set forth above in Section 33.3.2. You acknowledge and agree that at their respective sole discretion, iPayment or Bank may terminate certain or all of the Payment Services and Additional Services which depend upon the ability to deliver documentation electronically or may impose additional fees for such Payment Services and Additional Services if such Services otherwise cannot be delivered to You electronically.  Certain documents may be provided in paper form at the discretion of iPayment and others may be available upon request, for which a fee may apply.  You certify that you have equipment, software, an active email account and internet access required to access, and retain Electronic Records. PLEASE NOTE: IF YOU SUBMITTED YOUR MERCHANT PROCESSING APPLICATION ONLINE, THE APPLICATION IS NOT COMPLETE AND MERCHANT PROCESSING CANNOT BE BEGIN UNTIL IPAYMENT RECEIVES YOUR ELECTRONIC CONFIRMATION.**


**34.  GLOSSARY**

As used in this Program Guide, the following terms means as follows:

**Acquirer:**  Bank in the case of MasterCard, Visa and certain debit Transactions or iPayment in the case of Discover Network Transactions that acquire Card sale Transactions from merchants such as Yourself.

**Additional Services:**  Services other than Payment Services in which You may be enrolled by iPayment from time to time with the option to cancel or modify.  Additional Services are provided by iPayment and/or its Affiliates (without participation or any responsibility or liability of any kind by Bank).

**Address Verification:**  A service provided through which the merchant verifies the Cardholder's address, in whole or in part. Primarily used by Mail/Telephone/Internet order merchants. Address Verification is intended to deter fraudulent Transactions. However, it is not a guarantee that a Transaction is valid

**Affiliate:** A person that, directly or indirectly, (i) owns or controls a party to this Agreement or (ii) is under common ownership or control with a party to this Agreement.

**Agreement:** The agreements among Client, iPayment and Bank contained in the Application, the Program Guide and the Schedules thereto and documents incorporated therein, each as amended from time to time, which collectively constitute the Agreement among the parties.

**Application:** See Merchant Processing Application.

**Approved Monthly Sales Processing Volume Limit** or **Approved Monthly Sales Volume Limit**: The maximum Monthly Sales Processing Volume or maximum Monthly Sales Volume that Merchant is approved to process during a calendar month pursuant to this Agreement.

**Authorization:** Approval by, or on behalf of, the Issuer to validate a Transaction. An Authorization indicates only the availability of the Cardholder's Credit Limit or funds at the time the Authorization is requested

**Authorization Approval Code:** A number issued to a participating merchant by the Authorization Center which confirms the Authorization for a sale or service.

**Authorization Center:** A department that electronically communicates a merchant's request for Authorization on Credit Card Transactions to the Cardholder's bank and transmits such Authorization to the merchant via electronic equipment or by voice Authorization.

**Bank:** Wells Fargo Bank, N.A., located at 1200 Montego Way, Walnut Creek, CA 94598 is the bank identified on the Application document signed by You (the "Bank"), and if Your Application is approved by Bank and iPayment, will be a party to the Agreement. Wells Fargo Bank, N.A is a member bank of Visa and MasterCard and offers settlement services to merchants that accept a valid credit card or valid off-line debit card bearing the service Mark of Visa or MasterCard (hereinafter each a "Card") for payment for Products. Bank is not a sponsor of Discover Network Card Transactions under this Agreement and is not a party to this Agreement insofar as it relates to Discover Network Card Transactions.

**Bankruptcy Code:** Title 11 of the United States Code, as amended from time to time.

**Batch:** A single Submission to us of a group of Transactions (sales and Credits) for settlement. A Batch usually represents a day's worth of Transactions. In addition to a Batch Header Fee, all Batch Submissions require a communication with the Processor, for which an Authorization fee will be charged.

**Batch Header Fee:** The charge Client is billed each time a Batch is transmitted to the Processor.

**Business Day:** Monday through Friday, excluding Bank holidays.

**Card:** See either Credit Card or Debit Card.

**Cardholder:** Means the Person whose name is embossed on a Card (or Debit Card, as applicable) and any authorized user of such Card.

**Card Not Present Sale/Transaction:** A Transaction that occurs when the Card is not present at the point of sale, including Internet, mail order and telephone order Card sales.

**Card Organization:** Any entity formed to administer and promote Cards, including without limitation MasterCard Worldwide ("MasterCard"), Visa U.S.A., Inc.("Visa"), DFS Services LLC ("Discover Network") and any applicable debit networks.

**Card Organization Rules:** The rules, regulations, releases, interpretations and other requirements (whether contractual or otherwise) imposed or adopted by any Card Organization and related authorities, including without limitation, those of the PCI Security Standards Council, LLC and the National Automated Clearing House Association (including, with respect to EBTs, the Quest Operating Rules).

**Card Validation Codes:** A three-digit value printed in the signature panel of most Cards and a four-digit value printed on the front of an American Express Card. Visa's Card Validation Code is known as CVV2; MasterCard's Card Validation Code is known as CVC2; Discover Network's Card Validation Code is known as CID. Card Validation Codes are used to deter fraudulent use of an account number in a non-face-to-face environment, (e.g. mail orders, telephone orders and Internet orders).

**Card Verification Value (CVV)/Card Validation Code (CVC):** A unique value encoded on the Magnetic Stripe of a Card used to validate Card information during the Authorization process.

**Cash Benefits:** An EBT account maintained by an Issuer that represents pre-funded or day-of-draw benefits, or both, administered by one or more Government entities, and for which the Issuer has agreed to provide access under the EBT program. Multiple benefits may be combined in a single cash benefit account.

**Cash Over Transaction:** Dispensing of cash by a merchant in connection with a Card sale, other than a PIN Debit Card Transaction, for the purchase of goods or services.

**Chargeback:** A Card Transaction (or disputed portion) that is returned to us by the Issuer. Client is responsible for payment to us for all Chargebacks.

**Client:** The party identified as Merchant on the Application. The words "Subscriber," "You" and "Your" also refer to Client.

**Credit:** A refund or price adjustment given for a previous purchase Transaction.

**Credit Card:** A device bearing a valid Organization Mark of Visa, MasterCard, Discover Network or American Express and authorizing the Cardholder to buy goods or services on credit and, to the extent the Schedules so provide, a valid device authorizing the Cardholder to buy goods or services on credit and issued by any other Card Organization specified on such Schedules.

**Credit Draft:** A document evidencing the return of merchandise by a Cardholder to a merchant, or other refund or price adjustment made by the Merchant to the Cardholder, whether electronic, paper or some other form, all of which must conform to Card Organization Rules and applicable law.

**Credit Limit:** The credit line set by the Issuer for the Cardholder's Credit Card account.

**Customer Activated Terminal (CAT):** A magnetic stripe terminal or chip reading device (such as an automatic dispensing machine, Limited Amount Terminal, or Self Service Terminal) that is not an ATM.

**Data Usage Charge:** Charged to You for our processing of Sales Data sent to us.

**Debit Card:** See either PIN Debit Card or Non-PIN Debit Card

**Dial-Up Terminal:** An Authorization device which, like a telephone, dials an Authorization Center for validation of Transactions.

**Discount Rate:** A percentage rate and/or amount charged to a merchant for processing its qualifying daily Credit Card and Non-PIN Debit Card Transactions, as set forth in the Application. Transactions that fail to meet applicable Interchange requirements will be charged additional amounts as set forth in Section 18.1.

**Discover International Processing Fee:** Charged per Discover Network settled sale (including Cash Over amounts and Cash Advance Transactions) when the Card is issued in a country other than the country that the merchant is located in, excluding JCB and China Unionpay Cards.

**Discover International Service Fee:** Charged per Discover Network settled sale (excluding Cash Over amounts) on Transactions when the Card is not issued in the U.S. but the Transaction occurs in the U.S., excluding JCB and China Unionpay Cards.

**Electronic Benefit Transfer (EBT):** An Electronic Benefits Transfer system used to deliver certain government delivered benefits, including without limitation Cash Benefits and FNS, SNAP and WIC Benefits, to EBT customers.

**Electronic Draft Capture (EDC):** A process which allows a merchant's Dial-Up Terminal to receive Authorization and capture Transactions, and electronically transmit them to the Processor. This eliminates the need to submit paper for processing.

**Enhanced Recovery Reduced Rate:** A surcharge applied to any Transaction that fails to qualify for the anticipated discounted interchange program in the MC/Visa/Discover Qualified Rate referenced in the fee section of the Application and is therefore downgraded to a lower discounted interchange program. This is in addition to the difference between the MC/Visa/Discover Discount Qualified Rate agreed to in the fee section of the Application and the actual discounted interchange rate assessed to the downgraded Transaction, which is also Your responsibility.

**Factoring:** The submission of authorization requests and/or Sales Drafts by a merchant for Card sales or cash advances transacted by another business.

**General Terms:** Section of the Program Guide, including any amendments or modifications.

**Gross:** When referred to in connection with Transaction amounts or fees, refers to the total amount of Card sales, without set-off for any refunds or Credits.

**Imprinter:** A manual or electric machine used to physically imprint the merchant's name and ID number as well as the Cardholder's name and Card number on Sales Drafts.

**Interchange Fee:** The fee which is paid daily by Bank or iPayment to VISA, MasterCard and/or Discover Network or other Association for entering Sales Records and Credit Records into their respective settlement networks.

**iPayment:** iPayment, Inc., with corporate headquarters located at 30721 Russell Ranch Road, Suite 200, Westlake Village, CA 91362 ("iPayment") is a registered Independent Sales Organization ("ISO") and Merchant Service Provider ("MSP") (as those terms are respectively defined by the Rules) and has agreed with Bank to provide certain processing services, (including by or through authorized third party service providers, including without limitation Processor and/or Affiliates) to merchants that use the Bank's settlement services for Card Transactions by Cardholders for payment of Products obtained from such merchants, and if Your Application is approved by Bank and iPayment, will be a party to the Agreement. iPayment, Inc. has entered into a program with Discover Financial Services, LLC to allow us to provide merchant processing services for Discover ® Network Card Transactions. The provisions of this Agreement regarding Discover Network Card constitute an agreement solely between Merchant and iPayment.

**Issuer:** The financial institution or Card Organization which has issued a Card to a Person.

**Limited Amount Terminal:** A Customer Activated Terminal that has data capture only capability, and accepts payment for items such as parking garage fees, road tolls, motion picture theater entrance, or magnetic stripe telephones.

**Magnetic Stripe:** A stripe of magnetic information affixed to the back of a plastic Credit or Debit Card. The Magnetic Stripe contains essential Cardholder and account information.

**Marks:** Names, logos, emblems, brands, service marks, trademarks, trade names, tag lines or other proprietary designations.

**MasterCard Processing Integrity Fee:** The MasterCard Processing Integrity Fee is assessed in the event MasterCard cannot match an approved authorization to a settled Transaction (within 120 days from the date the authorization was granted) or a reversal request (within a specific time frame). The Processing Integrity Fee can be avoided by settling Transactions only with an approved authorization. If an authorization approval is no longer needed, it must be electronically reversed within 24 hours for a card-present Transaction or within 72 hours for card not present Transaction.

**MC Cross Border Fee (USD):** Assessed on any MasterCard[1] settled sale processed in USD Currency in which the country code of the merchant differs from the country code of the Cardholder (i.e., U.S. Merchant, Non U.S. Issued Card).

**Media:** The documentation of monetary Transactions (i.e., Sales Drafts, Credit Drafts, computer printouts, etc.)

**Merchant:** The person or entity (the party) identified or named in this Agreement (including the signatories of the Merchant Application portion hereof) and, if approved by Bank and/or iPayment, who enters into this Agreement with Bank and iPayment. Merchant is also sometimes referred to as "Client", "You" or "Your" in the Merchant Application portion of this Agreement and elsewhere in this Agreement.

**Merchant Account:** An account assigned and issued by iPayment or Bank to Merchant, if and only if, Merchant is approved and this Agreement is accepted by Bank and iPayment. Merchant can be issued multiple Merchant Accounts based on product and/or service sold by Merchant, method of accepting Payment Services, multiple Merchant locations, and/or any other reason requiring an additional Merchant Account. Each Merchant Account is reflected by its unique Merchant Account Number issued by iPayment or Bank to Merchant.

**Merchant Account Number (Merchant Number):** A number assigned and issued by iPayment or Bank to Merchant, if and only if, Merchant is approved and this Agreement is accepted by Bank and iPayment, that numerically identifies each Merchant location, outlet, or line of business to the Processor and Servicers for accounting, billing, customer service and other related purposes in connection with the Payment Services. Issuance of the approved Merchant Account Number to Merchant will evidence the acceptance and approval of Merchant for the Payment Services under this Agreement.

**Merchant Identification Card:** A plastic embossed card supplied to each merchant to be used for imprinting information to be submitted with each Batch of paper Sales Drafts. Embossed data includes Merchant Account Number, name, and sometimes merchant ID code and terminal number.

---

[1] MasterCard Credit or Debit Card, Cirrus Card, or Maestro Card.

**Merchant Processing Application:** Refers to and means the document entitled "Merchant Processing Application" (including the "Association Disclosure Page") which indicates Merchant as the party/business named therein and executed by Merchant, and if approved by Bank and/or iPayment is one of the documents comprising the Agreement. Merchant is also sometimes referred to as ""Client", "You" or "Your" in the Merchant Application portion of this Agreement and elsewhere in this Agreement.

**Merchant Provider:** Any Person engaged by You to provide services to You involving or relating to (i) access to Cardholder data, Transaction data or information related to either Cardholder data or Transaction data or (ii) PIN encryption, including without limitation, Encryption Service Organizations (ESOs).

**Monthly Sales Processing Volume:** The gross dollar amount of Card Sales Records, before return, refund, or exchange that are generated by Merchant and processed by Processor during a calendar month pursuant to this Agreement.

**Non-PIN Debit Card:** A device with a Visa, MasterCard or Discover Network Mark that is tied to a Cardholder's bank account or a prepaid account and which is processed without the use of a PIN.

**Non-Qualified Interchange Fee:** The difference between the Interchange Fee associated with the Anticipated Interchange Level and the Interchange Fee associated with the more costly Interchange level at which the Transaction actually processed,

**Non-Qualified Surcharge:** A surcharge applied to any Transaction that fails to qualify for the Anticipated Interchange Level and is therefore downgraded to a more costly Interchange level. The Non-Qualified Surcharge (the amount of which is set forth in the Schedule of Fees section of the Application is in addition to the Non-Qualified Interchange Fee, which is also Your responsibility (see above and Section 18.1).

**Operating Procedures:** The manual prepared by Servicers, containing operational procedures, instructions and other directives relating to Card Transactions. The current Operating Procedures are set forth in the Program Guide.

**Other Services:** Other Services include all services related to JCB Card, PIN Debit Card, and EBT Transactions, Loyalty Services and Transactions involving Cards from other Non-Bank Card Organizations such as Voyager Fleet Systems, Inc., Wright Express Corporation and Wright Express Financial Services Corporation.

**PAN Truncation:** A procedure by which a Cardholder's copy of a Sales Draft or Credit Draft, or as required by applicable law, the Sales Draft or Credit Draft You retain, will only reflect the last four digits of the Card account number.

**Payment Services:** The activities undertaken by Processor, iPayment and Bank (including by or through authorized third party service providers) to authorize, process and settle all United States Dollar denominated Visa, MasterCard, Discover Network and American Express Transactions undertaken by Cardholders at Client's location(s) in the United States, and all other activities necessary for Processor, Bank and iPayment to perform the functions required by this Agreement for all other Cards covered by this Agreement.

**Pass-Through Interchange:** Interchange Fees assessed at the Transaction level that are set by Association (MasterCard, Visa and Discover Network) with no surcharge assessed.

**Person:** A third party individual or entity, other than the Client, Processor or Servicers.

**PIN:** A Personal Identification Number entered by the Cardholder to submit a PIN Debit Card Transaction.

**PIN Debit Card:** A device bearing the Marks of ATM networks (such as NYCE or Star) used at a merchant location by means of a Cardholder-entered PIN in the merchant PIN Pad.

**PIN Debit Sponsor Bank:** The PIN Debit Sponsor Bank(s) identified on the Application signed by You that is/are the sponsoring or acquiring bank(s) for certain PIN Debit networks.

**Point of Sale (POS) Terminal:** A device placed in a merchant location which is connected to the Processor's system via telephone lines and is designed to authorize, record and transmit settlement data by electronic means for all sales Transactions with Processor.

**Processor:** The entity engaged in the business of processing and transmitting electronic data exclusively of a financial, banking or economic nature, including but not limited to Card Transactions. Processor initially means First Data Merchant Services Corporation ("FDMS"). For purposes of this Agreement, any reference to Processor shall also mean the provider(s) of services in replacement of FDMS, selected from time to time by iPayment and approved by Bank, to provide certain services on behalf of iPayment and Bank in connection with the Payment Services provided under this Agreement.

**Products:** The goods and/or services sold, rented or rendered by Merchant.

**Program Guide (also known as the Merchant Services Program Terms and Conditions):** This booklet which contains Operating Procedures, General Terms, Third Party Agreements and Confirmation Page, which, together with the Merchant Processing Application and the Schedules thereto and documents incorporated or referenced therein, constitute Your Agreement with iPayment and Bank.

**Recurring Payment Indicator:** A value used to identify Transactions for which a Cardholder provides permission to a merchant to bill the Cardholder's Card account at either a predetermined interval or as agreed by the Cardholder for recurring goods or services.

**Referral:** This message received from an Issuer when an attempt for Authorization requires a call to the Voice Authorization Center or Voice Response Unit (VRU).

**Reserve Account:** An account established and funded at our request or on Your behalf, pursuant to Section 24 of the Agreement.

**Resubmission:** A Transaction that the Merchant originally processed as a Store and Forward Transaction but received a soft denial from the respective debit network or Card Organization. The resubmission Transaction allows the merchant to attempt to obtain an approval for the soft denial, in which case Merchant assumes the risk that the Transaction fails.

**Retrieval Request/Transaction Documentation Request:** A request for documentation related to a Card Transaction such as a copy of a Sales Draft or other Transaction source documents.

**Sales/Credit Summary:** The identifying form used by a paper Submission merchant to indicate a Batch of Sales Drafts and Credit Drafts (usually one day's work). Not a Batch header, which is used by electronic merchants.

**Sales Draft:** Evidence of a purchase, rental or lease of goods or services by a Cardholder from, and other payments to, Client using a Card, including preauthorized orders and recurring Transactions (unless the context requires otherwise); regardless of whether the form of such evidence is in paper or electronic form or otherwise, all of which must conform to Card Organization Rules and applicable law.

**Sales Record:** See **Sales Draft**

**Schedules:** The attachments, addenda and other documents, including revisions thereto, which may be incorporated into and made part of this Agreement concurrently with or after the date of this Agreement.

**Self Service Terminal:** A Customer Activated Terminal that accepts payment of goods or services such as prepaid cards or video rental, has electronic capability, and does not accept PINs.

**Servicers:** Bank and iPayment collectively. The words "we," "us," and "our" refer to Servicers, unless otherwise indicated in this Program Guide.

**Services:** Collectively, the Payment Services and any Additional Services as may be covered by this Agreement.

**Settlement Account:** An account at a financial institution designated by Client as the account to be debited and credited by Servicers for Card Transactions, fees, Chargebacks and other amounts due under the Agreement or in connection with the Agreement.

**Split Dial:** A process which allows the Authorization terminal to dial directly to different Card processors (e.g., American Express) for Authorization. In this instance, the merchant cannot be both EDC and Split Dial. Split Dial is also utilized for Check Guarantee companies.

**Split Dial/Capture:** Process which allows the Authorization terminal to dial directly to different Card processors (e.g., American Express) for Authorization and Electronic Draft Capture.

**Store and Forward:** A Transaction that has been authorized by a merchant when the merchant cannot obtain an Authorization while the customer is present, typically due to a communications failure. The merchant will store the Transaction electronically in their host system and retransmit the Transaction when communications have been restored. Your Credit Card terminal and software need to have store and forward as a feature when desiring to use this option.

**Submission:** The process of sending Batch deposits to Processor for processing. This must be done electronically or by mail.

**Summary Adjustment:** An adjustment to Your Submission and/or Settlement Accounts in order to correct errors. (See Sections 10.3 and 10.4)

**Telecommunication Card Sale:** Individual local or long-distance telephone calls, for which the telephone service provider is paid directly by use of a Card. These do not include, however, calls paid for with pre-paid telephone service cards. Telecommunication Card Sales are considered Card Not Present sales.

**Transaction:** The initiation of a sale inquiry, or a consummation of a sale/rental of Products or of a credit to a Cardholder by Merchant by means of a Sales Record or Credit, respectively, as well as a Batch closing to Processor.

**Transaction Fees:** Service costs charged to a merchant on a per Transaction basis.

**Transmittal:** The process whereby Sales Records and Credits are electronically transferred in the form of electronic records.

**Us, We and Our:** See Servicers

**Visa International Service Fee:** Assessed on any Visa settled sale where the merchant is located in the U.S. and the Card is issued outside of the U.S. (i.e., U.S. Merchant, Non U.S. Issued Card).

**Visa Misuse of Auth:** Charged to Visa authorized Transactions that are not followed by a matching Visa settled Transaction (or in the case of a canceled Transaction, not properly reversed). The fee can be avoided by settling Your Transactions within 10 days for Non Travel and Entertainment (T&E) Merchants Segments and 20 days for T&E merchants. If an authorization is not needed, the authorization must be electronically reversed within 24 hours for face to face authorizations and reversed within 72 hours for Card Absent authorizations.

**Visa Network Participation Fee (NPF):** A fixed fee that applies to the acceptance of all Visa-branded products. The NPF is a fixed fee assessed per merchant Taxpayer ID, based on the number of U.S. merchant locations, merchant category code (MCC), and monthly total gross merchant sales volume associated with each Taxpayer ID.

**Visa Zero $ Verification:** Charged for Visa Card verification requests (without an actual dollar authorization). This fee can be avoided by obtaining an authorization request for the amount of the sale. If the authorization is not needed, the authorization request must be electronically reversed within 24 hours for face to face authorizations and reversed within 72 hours for Card Absent authorizations (to avoid the Visa Misuse of Authorization System fee).

**Visa Zero Floor Limit:** Charged when a Visa sale is settled without the required authorization (Transaction ID is used to match the authorization to settled sale). All Transactions above zero dollars require an authorization approval. This fee can be avoided by only settling Transactions that have been approved. If an authorization is declined, the merchant must request another form of payment.

**You, Your, Yourself:** See Merchant and also Client. With respect to the four (4) page Merchant Processing Application which forms part of the Agreement, references to "You" therein refer to the undersigned executing the personal guaranty on behalf of Merchant.

# PART II: THIRD PARTY AGREEMENTS

The following Agreements are Third Party Agreements entered into between Client and the Third Parties identified in the Third Party Agreements.

If Client desires to receive the products and/or services offered under a Third Party Agreement, Client must check the appropriate box or otherwise indicate such desire in the Merchant Processing Application, in which case the terms and conditions of the Third Party Agreement shall be binding upon Client. The Signature page in the Merchant Processing Application and any Schedule thereto shall also serve as a signature page to the Third Party Agreement(s).

Client acknowledges that the Third Parties are relying upon the information contained on the Merchant Processing Application and the Schedules thereto, all of which are incorporated by reference into the Third Party Agreements. Client authorizes iPayment and Bank to share and exchange with the Third Parties the information on the Application and to receive and exchange information about Client. You agree that: (a) iPayment, Processor and the Third Parties may use and provide each other with any information provided to or obtained by them, or any of them, and each of their respective Affiliates for purposes related to the Agreement and or Third Party Agreements.

## EQUIPMENT LEASE AGREEMENT

This Equipment Lease Agreement ("Lease Agreement") is being entered into by and between Merchant Lynx Services and the Lessee identified in the signature panel of this Merchant Processing Application ("MPA"). In this Lease Agreement, the words "we," "our" and "us" refer to Merchant Lynx Services and its successors and assigns and the words "You" and "Your" refer to Lessee and its permitted successors and assigns.

Lessee hereby authorizes us or our designees, successors or assigns (hereinafter "Lessor") to withdraw any amounts including any and all sales taxes now due or hereinafter imposed, owed by Lessee in conjunction with this Lease Agreement by initiating debit entries to the bank account designated by Lessee on the MPA (the "Settlement Account"). In the event of default of Lessee's obligation hereunder, Lessee authorizes debit of its account for the full amount due under this Lease Agreement. Further, Lessee authorizes its financial institution to accept and to charge any debit entries initiated by Lessor to Lessee's account. In the event that Lessor withdraws funds erroneously from Lessee's account, Lessee authorizes Lessor to credit Lessee's account for an amount not to exceed the original amount of the debit. This authorization is to remain in full force and effect until Lessor has received written notice from Lessee of its termination in such time and in such manner as to afford Lessor a reasonable opportunity to act. Lessee also authorizes Lessor from time to time to obtain investigative credit reports from a credit bureau or a credit agency concerning Lessee.

**1. Equipment.** We agree to lease to You and You agree to lease from us the equipment identified on the MPA or such other comparable equipment we provide You (the "Equipment"), according to the terms and conditions of this Lease Agreement. We are providing the Equipment to You "as is" and make no representations or warranties of any kind as to the suitability of the Equipment for any particular purpose. The term Equipment includes the Equipment initially deployed under the Lease Agreement and/or any additions, replacements, substitutions, or additions thereto.

**2. Effective Date, Term and Interim Rent.** (a). This Lease Agreement becomes effective on the earlier of the date we deliver any piece of Equipment to You (the "Delivery Date") or acceptance by us. This Lease Agreement remains in effect until all of Your obligations and all of our obligations under it have been satisfied. We will deliver the Equipment to the site designated by You. (b) The term of this Lease Agreement begins on a date designated by us after receipt of all required documentation and acceptance by us (the "Commencement Date"), and continues for the number of months indicated on the MPA. THIS IS A NON-CANCELABLE LEASE FOR THE TERM INDICATED.(c) You agree to pay an Interim Lease Payment in the amount of one-thirtieth (1/30th) of the monthly lease charge for each day from and including the Delivery Date until the date preceding the Commencement Date.(d) YOU ACKNOWLEDGE THAT THE EQUIPMENT AND/OR SOFTWARE YOU LEASE UNDER THIS LEASE AGREEMENT MAY NOT BE COMPATIBLE WITH ANOTHER PROCESSOR'S SYSTEMS AND THAT WE DO NOT HAVE ANY OBLIGATION TO MAKE SUCH SOFTWARE AND/OR EQUIPMENT COMPATIBLE IN THE EVENT THAT YOU ELECT TO USE ANOTHER SERVICE PROVIDER. UPON TERMINATION OF YOUR MERCHANT PROCESSING AGREEMENT, YOU ACKNOWLEDGE THAT YOU MAY NOT BE ABLE TO USE THE EQUIPMENT AND/OR SOFTWARE LEASED UNDER THIS LEASE AGREEMENT WITH SAID SERVICE PROVIDER.

**3. Site Preparation.** You will prepare the installation site(s) for the Equipment, including but not limited to the power supply circuits and phone lines, in conformance with the manufacturer's and our specifications and will make the site(s) available to us by the confirmed shipping date.

**4. Payment of Amounts Due.** (a) The monthly lease charge is due and payable monthly, in advance. You agree to pay all assessed costs for delivery and installation of Equipment. (b) In addition to the monthly lease charge, You shall pay, or reimburse us for, amounts equal to any taxes or assessments on or arising out of this Lease Agreement or the Equipment, and related supplies or any services, use or activities hereunder, including without limitation, state and local sales, use, property, privilege and excise tax, tax preparation, compliance expenses, but exclusive of taxes based on our net income. Property taxes are calculated and charged based on the average of the estimated annual property taxes over the course of the term of the lease. You will also be charged an annual Tax Handling Fee, as set forth in the MPA and/or applicable Fee Schedule. (c) Your lease payments will be due despite dissatisfaction with the Equipment for any reason. (d) Whenever any payment is not made by You in full when due, You shall pay us as a late charge, an amount equal to ten percent of the amount due but no less than $5.00 for each month during which it remains unpaid (prorated for any partial month), but in no event more than the maximum amount permitted by law. You shall also pay to us an administrative charge of $10.00 for any debit we attempt to make against Your Settlement Account that is rejected. (e) In the event Your account is placed into collections for past due lease amounts, You agree that we can recover a collection expense charge of $50 for each aggregate payment requiring a collection effort.

**5. Use and Return of Equipment; Insurance; Equipment Service Program.** (a) You shall cause the Equipment to be operated by competent and qualified personnel in accordance with any operating instructions furnished by us or the manufacturer. You shall maintain the Equipment in good operating condition and protect it from deterioration, normal wear and tear expected. (b) You shall not permit any physical alteration or modification of the Equipment, or change the installation site of the Equipment, without our prior written consent. (c) You shall not create, incur, assume or allow to exist any consensually or judicially imposed liens or encumbrances on, or part with possession of, or sublease the Equipment without our prior written consent. (d) You shall comply with all governmental laws, rules and regulations relating to the use of the Equipment. You are also responsible for obtaining all permits required to operate the Equipment at Your facility. (e) We or our representatives may, at any time, enter Your premises for purposes of inspecting, examining or repairing the Equipment. (f) The Equipment shall remain our personal property and shall not under any circumstances be considered to be a fixture affixed to Your real estate. You shall permit us to affix suitable labels or stencils to the Equipment evidencing our ownership. (g) You shall keep the Equipment adequately insured against loss by fire, theft, and all other hazards and You shall provide proof of insurance. **The loss, destruction, theft, or damage of or to the Equipment shall not relieve You from Your obligation to pay the full purchase price or total monthly lease charges hereunder.** (h) You may choose not to insure the Equipment and participate in the Equipment Service Program. The Equipment Service Program provides a replacement of the Equipment for as long as You participate in the program during the Lease Term. The Equipment Service Program includes (i) free comparable replacement terminal (new or refurbished) in the event of a defect or malfunction (terminal defects or malfunctions caused by acts of God are not covered by this program), (ii) free shipping & handling on both the replacement terminal and return of defective terminal, (iii) free overnight shipping & handling on replacement terminal if requested by 3:00 pm ET (Monday-Thursday). If You don't return Your damaged equipment, You will be charged the full purchase price of the replacement equipment sent to You. The monthly fee of $4.95 for the optional Equipment Service Program is a per terminal fee. You can choose to insure the Equipment and terminate Your participation in the program at any time by calling our Customer Service department.

**6. Title to Equipment.** The Equipment is, and shall at all times be and remain, our sole and exclusive property, and You shall have no right, title or interest in or to the Equipment except as expressly set forth in this Lease Agreement or otherwise agreed in writing. Except as expressly provided in Section 8, no transference of intellectual property rights is intended by or conferred in this Lease Agreement. You agree to execute and deliver to us any statement or instrument that we may request to confirm or evidence our ownership of the Equipment, and You irrevocably appoint us as Your attorney-in-fact to execute and file the same in Your name and on Your behalf. If a court determines that the leasing Transaction contemplated by this Lease Agreement does not constitute a financing and is not a lease of the Equipment, then we shall be deemed to have a first lien security interest on the Equipment as of the date of this Lease Agreement, and You will execute such documentation as we may request to evidence such security interest. If this Lease Agreement is deemed a loan despite the intention of the parties, then in no contingency or event whatsoever shall interest deemed charged hereunder, however such interest may be characterized or computed, exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto.

**7. Return or Purchase of Equipment at End of Lease Period.** Upon the completion of Your lease term or any extension thereof, You will have the option to (a) return the Equipment to us, or (b) purchase the Equipment from us for its then fair market value, calculated as a percentage of the aggregate lease payments in accordance with the following: If the term of this Lease is forty-eight (48) months or more, the buyout option as a

percentage of the aggregate lease payments shall be ten percent (10%). If the term of this lease is thirty-six (36) to forty-seven (47) months, the buyout option as a percentage of the aggregate lease payments shall be fifteen percent (15%). If the term of this lease is twenty-four (24) to thirty-five (35) months, the buyout option as a percentage of the aggregate lease payments shall be twenty percent (20%). If the term of this lease is twelve (12) to twenty-three (23) months, the buyout option as a percentage of the aggregate lease payments shall be twenty-five percent (25). In the absence of an affirmative election by You to purchase or return the Equipment, this lease will continue on a month-to-month basis at the existing monthly lease payment. If we terminate the lease pursuant to Section 12(b) due to a default by You, then You shall immediately return the Equipment to us no later than the tenth business day after termination, or remit to us the fair market value of the Equipment as determined in good faith by us. We may collect any amounts due to us under this Section 7 by debiting Your Settlement Account, and to the extent we are unable to obtain full satisfaction in this manner, You agree to pay the amounts owed to us promptly upon our request.

**8. Disclosure of Information.** You acknowledge that Merchant Lynx Services and First Data Merchant Services Corporation may share information among each other regarding Your account including business and personal credit information.

**9. Software License.** We retain all ownership and copyright interest in and to all computer software, related documentation, technology, know-how and processes embodied in or provided in connection with the Equipment other than those owned or licensed by the manufacturer of the Equipment (collectively "Software"), and You shall have only a nonexclusive license to use the Software in Your operation of the Equipment.

**10. Limitation on Liability.** We are not liable for any loss, damage or expense of any kind or nature caused directly or indirectly by the Equipment, including any damage or injury to persons or property caused by the Equipment. We are not liable for the use or maintenance of the Equipment, its failure to operate, any repairs or service to it, or by any interruption of service or loss of use of the Equipment or resulting loss of business. Our liability arising out of or in any way connected with this Lease Agreement shall not exceed the aggregate lease amount paid to us for the particular Equipment involved. In no event shall we be liable for any indirect, incidental, special or consequential damages. The remedies available to You under this Lease Agreement are Your sole and exclusive remedies.

**11. Warranties.** a) All warranties, express or implied, made to You or any other person are hereby disclaimed, including without limitation, any warranties regarding quality, suitability, merchantability, fitness for a particular purpose, quiet enjoyment, or non-infringement. b) You warrant that You will only use the Equipment for commercial purposes and will not use the Equipment for any household or personal purposes.

**12. Indemnification.** You shall indemnify and hold us harmless from and against any and all losses, liabilities, damages and expenses resulting from (a) the operation, use, condition, liens against, or return of the Equipment or (b) any breach by You of any of Your obligations hereunder, except to the extent any losses, liabilities, damages or expenses result from our gross negligence or willful misconduct.

**13. Default; Remedies.** (a) If any debit of Your Settlement Account initiated by us is rejected when due, or if You otherwise fail to pay us any amounts due hereunder when due, or if You default in any material respect in the performance or observance of any obligation or provision of this Lease Agreement or any agreement with any of our affiliates or joint ventures, any such event shall be a default hereunder. Without limiting the foregoing, any default by You under a Merchant Processing Agreement ("MPA") with us or with an affiliate or joint venture to which we are a party shall be treated as a default under this Lease Agreement. Such a default would include a default resulting from early termination of the MPA. (b) Upon the occurrence of any default, we may at our option, effective immediately without notice, either (i) terminate this lease and our future obligations under this Lease Agreement, repossess the Equipment and proceed in any lawful manner against You for collection of all charges that have accrued and are due and payable, or (ii) accelerate and declare immediately due and payable all monthly lease charges for the remainder of the applicable lease period together with the fair market value of the Equipment (as determined by us), not as a penalty but as liquidated damages for our loss of the bargain. Upon any such termination for default, we may proceed in any lawful manner to obtain satisfaction of the amounts owed to us and, if applicable, our recovery of the Equipment, including entering onto Your premises to recover the Equipment. In any case, You shall also be responsible for our costs of collection, court costs, as well as applicable shipping, repair and refurbishing costs of recovered Equipment. You agree that we shall be entitled to recover any amounts due to us under this Lease Agreement by charging Your Settlement Account or any other funds of yours that come into our possession or control, or within the possession or control of our affiliates or joint ventures, or by setting off amounts that You owe to us against any amounts we may owe to You, in any case without notifying You prior to doing so. Without limiting the foregoing, You agree that we are entitled to recover amounts owed to us under this Lease Agreement by obtaining directly from an affiliate or joint venture to which we are a party and which You have entered into an MPA any funds held or available as security for payment under the terms of the MPA, including funds available under the "Reserve Account; Security Interest" section of the MPA, if applicable.

**14. Assignment.** You may not assign or transfer this Lease Agreement, by operation of law or otherwise, without our prior written consent. For purposes of this Lease Agreement, any transfer of voting control of You or Your parent shall be considered an assignment or transfer hereof. We will assign this Lease Agreement after its execution to First Data Global Leasing (FDGL), a business unit First Data Merchant Services Corporation. Upon any assignment, Merchant Lynx Services shall be released from any further liability or obligation.

**15. Lease Guaranty.** No guarantor shall have any right of subrogation to any of our rights in the Equipment or this Lease Agreement or against You, and any such right of subrogation is hereby waived and released. All indebtedness that exists now or arises after the execution of this Lease Agreement between You and any guarantor is hereby subordinated to all of Your present and future obligations, and those of Your guarantor, to us, and no payment shall be made or accepted on such indebtedness due to You from a guarantor until the obligations due to us are paid and satisfied in full.

**16. Governing Law; Venue; Miscellaneous.** This Lease Agreement shall be governed by and will be construed in accordance with the laws of the State of New York (without applying its conflicts of laws principles). The exclusive venue for any actions or claims arising under or related to this Lease Agreement shall be in the appropriate state of federal court located in Suffolk County, New York. If any part of this Lease Agreement is not enforceable, the remaining provisions will remain valid and enforceable.

**17. Notices.** All notices must be in writing, and shall be given (a) if sent by mail, when received, and (b) if sent by courier, when delivered; if to You at the address appearing on the MPA, and if to us at 4000 Coral Ridge Drive, Coral Springs, Florida 33065 Attn: Lease Department. Customer Service toll free number 1-877-257-2094.

**18. Entire Agreement.** This Lease Agreement constitutes the entire Agreement between the parties with respect to the Equipment, supersedes any previous agreements and understandings and can be changed only by a written agreement signed by all parties. This Lease Agreement may be executed in any number of counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Lease Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Lease Agreement.


## AUTHORIZE.NET PAYMENT GATEWAY AGREEMENT


Merchant acknowledges and agrees on behalf of Merchant and on behalf of Merchant's Company that (i) Merchant is entering into binding contract with Authorize.Net LLC for payment gateway services ("Gateway Account"); (ii) Merchant is authorized to execute this contract on behalf of Merchant's Company; (iii) billing for the Gateway Account shall be in accordance with the Merchant Application; and (iv) Merchant has read and agrees to be bound by the terms and conditions of the Authorize.Net Payment Gateway Merchant Service Agreement incorporated herein by reference and located at the following URL: http://www.authorizenet.com/files/Authorize.Net_Service_Agreement.pdf. The Authorize.Net Payment Gateway Merchant Service Agreement is between Authorize.Net LLC and Merchant.

## AMERICAN EXPRESS CARD ACCEPTANCE AGREEMENT

**Agreement for**
**American Express® Card Acceptance**
**American Express OnePoint® Program**
The Agreement is by and between **American Express Travel Related Services Company, Inc.**, a New York corporation, and **You, the Merchant.** By accepting the American Express® Card, You agree to be bound by the Agreement.

**General Provisions**

1.    SCOPE AND OTHER PARTS OF AGREEMENT; DEFINITIONS

   a.    **Scope of the Agreement.** The Agreement governs Your acceptance of American Express Cards in the United States (but not Puerto Rico, the U.S. Virgin Islands, and other U.S. territories and possessions) under our American Express OnePoint Program, which makes available to eligible merchants an integrated service through our agent iPayment, Inc., among other agents. Schedule A contains important provisions governing Your acceptance of the Card under this program. The Agreement covers You *alone.* You must not obtain Authorizations, submit Charges or Credits, or receive payments on behalf of any other party, except as otherwise expressly permitted in the Merchant Regulations.

   b.    **Other Parts of the Agreement.**

      i.    **Merchant Regulations.** The Merchant Regulations set forth the policies and procedures governing Your acceptance of the Card. You shall ensure that Your personnel interacting with customers are fully familiar with the Merchant Regulations. The Merchant Regulations are a part of, and are hereby incorporated by reference into, the Agreement. You agree to be bound by and accept all provisions in the Merchant Regulations (as changed from time to time) as if fully set out herein and as a condition of Your agreement to accept the Card. We reserve the right to make changes to the Merchant Regulations in scheduled changes and at any time in unscheduled changes as set forth in section 8.j below. The Merchant Regulations and releases of scheduled changes therein are provided only in electronic form, existing at the website specified below in the definition of "Merchant Regulations" or its successor website. However, we shall provide You a paper copy of or a CD-ROM containing the Merchant Regulations or releases of scheduled changes therein upon Your request. To order a copy, please call our agent iPayment, Inc. (telephone: 1-800-554-4777). We may charge You a fee for each copy that You request.

      ii.    **Schedule A.** Schedule A, attached hereto or which we otherwise may provide to You, contains other important provisions governing Your acceptance of the Card. Schedule A is a part of, and is hereby incorporated by reference into, the Agreement.

   c.    **Definitions.** Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Merchant Regulations. Some definitions are repeated here for ease of reference.

   *Affiliate* means any Entity that controls, is controlled by, or is under common control with either party, including its subsidiaries. As used in this definition, *control* means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an Entity, whether through the ownership of voting securities, by contract, or otherwise. For the avoidance of doubt, but not by way of limitation, the direct or indirect ownership of more than 50% of (i) the voting securities or (ii) an interest in the assets, profits, or earnings of an Entity shall be deemed to constitute "control" of the Entity.

   *Agreement* means these General Provisions, Schedule A and any other accompanying schedules and exhibits, and the Merchant Regulations, collectively.

   *American Express Card* and *Card* mean (i) any card, account access device, or payment device bearing our or our Affiliates' Marks and issued by an Issuer or (ii) a Card Number.

   *Cardmember* means an individual or Entity (i) that has entered into an agreement establishing a Card account with an Issuer or (ii) whose name appears on the Card.

   *Charge* means a payment or purchase made on the Card.

   *Chargeback* (sometimes called "full recourse" or "Full Recourse" in our materials), when used as a verb, means our reimbursement from You for the amount of a Charge subject to such right; when used as a noun, means the amount of a Charge subject to reimbursement from You.

   *Claim* means any claim (including initial claims, counterclaims, cross-claims, and third party claims), dispute, or controversy between You and us arising from or relating to the Agreement or prior Card acceptance agreements, or the relationship resulting therefrom, whether based in contract, tort (including negligence, strict liability, fraud, or otherwise), statutes, regulations, or any other theory, including any question relating to the existence, validity, performance, construction, interpretation, enforcement, or termination of the Agreement or prior Card acceptance agreements or the relationship resulting therefrom.

   *Credit* means the amount of the Charge that You refund to Cardmembers for purchases or payments made on the Card.

   *Discount*  means the amount that we charge You for accepting the Card, which amount is: (i) a percentage (*Discount Rate*) of the face amount of the Charge that You submit; or a flat Transaction fee, or a combination of both; and/or (ii) a Monthly Flat Fee (if You meet our requirements).

   *Disputed Charge* means a Charge about which a claim, complaint, or question has been brought.

   *Entity* means a corporation, partnership, sole proprietorship, trust, association, or any other legally recognized entity or organization.

   *Establishments* means any or all of Your and Your Affiliates' locations, outlets, websites, online networks, and all other methods for selling goods and services, including methods that You adopt in the future.

   *General Provisions* means the provisions set out in this document other than in Schedule A or any other accompanying schedule or exhibit hereto.

   *Marks* mean names, logos, service marks, trade names, taglines, or other proprietary designs or designations.

   *Merchant Number* (sometimes called the "Merchant ID" or "Establishment" or "SE" number in our materials) means the unique ten-digit number we assign to Your Establishment; if You have more than one Establishment, we may assign to each a separate Merchant Number.

*Merchant Regulations* means the American Express Merchant Regulations – U.S., which are available from our agent.

*Other Agreement* means any agreement, other than the Agreement, between (i) You or any of Your Affiliates and (ii) us or any of our Affiliates.

*Other Payment Products* mean any charge, credit, debit, stored value or smart cards, account access devices, or other payment cards, services, or products other than the Card.

*Reserve* means a fund established and/or collateral held by us as security for Your or any of Your Affiliates' obligations to us or any of our Affiliates under the Agreement or any Other Agreement.

*We*, *our*, and *us* mean American Express Travel Related Services Company, Inc.

*You* and *Your* (sometimes called the "Merchant", "Service Establishment," or "SE" in our materials) mean the Entity accepting the Card under the Agreement, and its Affiliates conducting business in the same industry.

    d. **List of Affiliates.** You must provide to our agent a complete list of Your Affiliates conducting business in Your industry and notify our agent promptly of any subsequent changes in the list.

2. ACCEPTING THE CARD

    a. **Acceptance.** You must accept the Card as payment for all goods and services sold at all of Your Establishments, except as otherwise expressly specified in the Merchant Regulations. You agree that the provisions of Chapter 3 (Card Acceptance) of the Merchant Regulations are reasonable and necessary to protect the Cardmember's choice of which Card to use and that charge and credit Cards, including corporate Cards, are interchangeable. You are responsible and jointly and severally liable for the performance by Your Establishment of all provisions of the Agreement and all obligations of Your Establishments under the Agreement.

    b. **Transaction Processing and Payments.** Our Card acceptance, processing, and payment requirements are set forth in the Merchant Regulations. Some requirements are summarized here for ease of reference, but do not supersede the provisions in the Merchant Regulations.

        i. **Format.** You must create a Charge Record for every Charge and a Credit Record for every Credit that comply with our requirements, as described in the Merchant Regulations. You may create multiple Charge Records for a single purchase placed on different Cards, but You must not create multiple Charge Records for a single purchase to the same Card, by dividing the purchase into more than one Charge.

        ii. **Authorization.** You must obtain from and submit to us an Authorization Approval code for all Charges. Authorization does not guarantee that we will accept the Charge without exercising Chargeback, nor is it a guarantee that the person making the Charge is the Cardmember or that You will be paid.

        iii. **Submitting Charges and Credits.** Your Establishments must submit Charges and Credits in U.S. dollars. You must not issue a Credit when there is no corresponding Charge. You must issue Credits to the Card account used to make the original purchase, except as otherwise expressly specified in the Merchant Regulations.

        iv. **Payment for Charges.** We will pay You, through our agent, according to Your payment plan in U.S. dollars for the face amount of Charges submitted from Your Establishments less: (i) the Discount, (ii) any amounts You owe us or our Affiliates, (iii) any amounts for which we have Chargebacks, and (iv) any Credits You submit. Your initial Discount is indicated in the Agreement or otherwise provided to You in writing by us. In addition to Your Discount we may charge You additional fees and assessments, as listed in the Merchant Regulations. We may adjust any of these amounts and may change any other amount we charge You for accepting the Card.

        v. **Chargeback.** We and our agent have Chargeback rights, as described in the Merchant Regulations. We and our agent may Chargeback by deducting, withholding, recouping from, or offsetting against our payments to You (or debiting Your Account), or we or our agent may notify You of Your obligation to pay us, which You must do promptly and fully. Our or our agent's failure to demand payment does not waive our Chargeback rights.

        vi. **Protecting Cardmember Information.** You must protect Cardmember Information, as described in the Merchant Regulations. You have additional obligations based on Your Transaction volume, including providing to us documentation validating Your compliance with the PCI DSS performed by Qualified Security Assessors or Approved Scanning Vendors (or both).

3. PROTECTIVE ACTIONS

    a. **Creating a Reserve.** Regardless of any contrary provision in the Agreement, we have the right in our sole discretion to determine that it is necessary to create a Reserve, and we may immediately establish a Reserve or terminate the Agreement. We may establish a Reserve by (i) withholding amounts from payment we otherwise would make to You under the Agreement or (ii) requiring You to deposit funds or other collateral with us. Any collateral provide pursuant to this Section 2.3 of the General Provisions is subject to prior written approval. We may increase the amount of the Reserve at any time so long as the amount of the Reserve does not exceed an amount sufficient, in our reasonable judgment, to satisfy any financial exposure or risk to us under the Agreement (including Charges submitted by You for goods or services not yet received by Cardmembers and our costs of handling Disputed Charges) or to us or our Affiliates under any Other Agreement or to Cardmembers. Upon the occurrence of an event described in Section 2.3.b.viii of the General Provisions, and during any continuation of such event, we may take immediate action to establish or increase the amount of any Reserve to an amount proportional to the risk covered by such event.

    b. **Trigger Events for Reserve.** Some of the events that may cause us to establish a Reserve include: (i) Your ceasing a substantial portion of or adversely altering Your operations; (ii) Your selling all or substantially all of Your assets or any party acquiring 25% or more of the equity interests issued by You (other than parties currently owning 25% or more of such interests), whether through acquisition of new equity interests, previously outstanding interests, or otherwise; (iii) Your suffering a material adverse change in Your business; (iv) Your becoming insolvent; (v) our receiving a disproportionate number or amount of Disputed Charges at Your Establishments; (vi) our reasonable belief that You will not be able to perform Your obligations under the Agreement, under any Other Agreement, or to Cardmembers; or (vii) the establishment of a reserve or other protective action taken by any Entity with whom You have entered into an arrangement for the acceptance or processing (or both) of Other Payment Products that (A) results in the withholding of funds that would otherwise have been payable to You, (B) requires You to make a direct payment into a reserve account or similar device or (C) requires You to provide such Entity with a letter of credit or other third-party guaranty of payment.

    c. **Application of Reserve.** We may deduct and withhold from, and recoup and set-off against, the Reserve (i) any amounts You or any of Your Affiliates owe us or any of our Affiliates under the Agreement or any Other Agreement (ii) any costs incurred by us in connection with the administration of the Reserve, including attorney's fees, and (iii) any costs incurred by us as a result of Your failure to fulfill any obligations to us, any of our Affiliates, or to Cardmembers, including Attorney Fees and our cost of handling Disputed Charges.

terminate the Agreement. We shall inform You if we establish a Reserve. We may increase the amount of the Reserve at any time as long as the amount of the Reserve does not exceed an amount sufficient, in our reasonable judgment, to satisfy any financial exposure or risk to us under the Agreement (including from Charges submitted by You for goods or services not yet received by Cardmembers) or to us or our Affiliates under any Other Agreement, or to Cardmembers.

e.  **Other Protections.** We may take other reasonable actions to protect our rights and rights of any of our Affiliates, including changing the speed or method of payment for Charges, exercising Chargeback under any of our Chargeback programs, or charging You fees for Disputed Charges.

f.  **Providing Information.** You must provide to us promptly, upon request, information about Your and Your Affiliates, Your finances, creditworthiness, and operations, including Your most recent certified financial statements. You must notify us immediately of the occurrence of any event described in Section 3.b vii of the General Provisions.

## 4.  NOTICES

a.  **Delivery and Receipt.** Unless otherwise explicitly provided for herein, all notices hereunder must be in writing and sent by hand delivery; or by U.S. postal service, such as first class mail or third class mail, postage prepaid; or by expedited mail courier service; or by electronic mail (*e-mail*); or by facsimile transmission, to the addresses set out below. Notices are deemed received and effective as follows: If hand-delivered, upon delivery; if sent by e-mail or facsimile transmission, upon sending; if mailed, upon the earlier of (i) receipt or (ii) three days after being deposited in the mail if mailed by first class postage or ten days after being deposited in the mail if mailed by third class postage. If the addressee provided for below rejects or otherwise refuses to accept the notice, or if the notice cannot be delivered because of a change in address for which no notice was appropriately given, then notice is effective upon the rejection, refusal or inability to deliver.

b.  **Our Notice Address.** Unless we notify You otherwise, You shall send notices to our agent, at:
American Express Travel Related Services Company, Inc.
c/o iPayment, Inc., P.O. Box 3429, Thousand Oaks, CA 91359

c.  **Your Notice Address.** Our agent shall send notice to You at the address, e-mail address, or facsimile number You indicated on Your application to accept the Card. You must notify our agent immediately of any change in Your notice address.

## 5.  INDEMNIFICATION AND LIMITATION OF LIABILITY

a.  **Indemnity.** You shall indemnify, defend, and hold harmless us and our Affiliates, agents, successors, assigns, and third party licensees, from and against all damages, liabilities, losses, costs, and expenses, including legal fees, arising or alleged to have arisen from Your breach, negligent or wrongful act or omission, failure to perform under the Agreement, or failure in the provision of Your goods or services.

b.  **Limitation of Liability.** In no event shall we or our Affiliates, agents, successors, or assigns be liable to You for any incidental, indirect, speculative, consequential, special, punitive, or exemplary damages of any kind (whether based in contract, tort, including negligence, strict liability, fraud, or otherwise, or statutes, regulations, or any other theory) arising out of or in connection with the Agreement, even if advised of such potential damages. Neither You nor we (and our agent) will be responsible to the other for damages arising from delays or problems caused by telecommunications carriers or the banking system, except that our (and our agent's) rights to create Reserves and exercise Chargebacks will not be impaired by such events.

## 6.  TERM AND TERMINATION

a.  **Effective Date/Termination Date.** The Agreement begins as of the date (i) You first accept the Card after receipt of the Agreement or otherwise indicate Your intention to be bound by the Agreement or (ii) we approve Your application to accept the Card, whichever occurs first. Either party can terminate the Agreement without cause (and notwithstanding any other rights established under the Agreement) at any time by notifying the other party. Termination will take effect according to the notice period specified in section 4.a of the General Provisions.

b.  **Grounds for Termination.** In addition to our rights in sections 3.c and 6.a. of the General Provisions, we may terminate the Agreement at any time without notice to You and without waiving our other rights and remedies if You have not submitted a Charge within any twelve month period. The Agreement is a contract to extend financial accommodations, and if bankruptcy or similar proceedings are filed with respect to Your business, then the Agreement will terminate automatically.

c.  **Post-Termination.** If the Agreement terminates, without waiving our other rights and remedies, we and our agent may withhold from You any payments until we have fully recovered all amounts owing to us and our Affiliates. If any amounts remain unpaid, then You and Your successors and permitted assigns remain liable for such amounts and shall pay us within thirty days of our request. You must also remove all displays of our Marks, return our materials and equipment immediately, and submit to our agent any Charges and Credits incurred prior to termination.

d.  **Effect of Termination.** Termination of the Agreement for any reason does not relieve the parties of their respective rights and duties arising prior to the effective date of termination that by their nature are intended to survive termination, including the provisions of sections 1, 3, 5, 6, 7, and 8 of these General Provisions, our Chargeback rights, and Your duties set forth in the Merchant Regulations to protect Cardmember Information, indemnify us, retain documents evidencing Transactions, and notify Your Recurring Billing customers of such termination. Our and our agent's right of direct access to the Demand Deposit Account will also survive until such time as all credits and debits permitted by the Agreement, and relating to Transactions prior to the effective date of termination, have been made.

## 7.  DISPUTE RESOLUTION

a.  **Arbitration Rights.** All Claims shall be resolved, upon Your or our election, through arbitration pursuant to this section 7 rather than by litigation.

b.  **Arbitration Rules/Organizations.** The party asserting the Claim shall select one of the following arbitration organizations, which shall apply its rules in effect at the time the Claim is filed. In the event of an inconsistency between this section 7 and any rule or procedure of the arbitration organization, this section 7 controls. The party asserting the Claim shall simultaneously notify the other party of its selection. If our selection is not acceptable to You, then You may select another of the following organizations within thirty days after You receive notice of our initial selection. Any arbitration hearing that You attend shall take place in the federal judicial district where Your headquarters is located.

- National Arbitration Forum (*NAF*): P.O. Box 50191, Minneapolis, MN 55404-0191; (800) 474-2371; www.arbitration-forum.com

- American Arbitration Association (*AAA*): 335 Madison Avenue, New York, NY 10017; (800) 778-7879; www.adr.org

c. **Limitation of Rights.** IF ARBITRATION IS CHOSEN BY A PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE SHALL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM, OR TO ENGAGE IN PRE-ARBITRATION DISCOVERY EXCEPT AS PROVIDED IN THE RULES OR PROCEDURES OF NAF OR AAA, AS APPLICABLE. FURTHER, YOU SHALL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM. OTHER RIGHTS THAT YOU WOULD HAVE IN COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION. NOTWITHSTANDING ANY OTHER PROVISION IN THE AGREEMENT AND WITHOUT WAIVING EITHER PARTY'S RIGHT TO APPEAL SUCH DECISION, IF ANY PORTION OF THIS SECTION 7.c OR OF SECTION 7.d. BELOW IS DEEMED INVALID OR UNENFORCEABLE, THEN THIS ENTIRE SECTION 7 (OTHER THAN THIS SENTENCE) SHALL NOT APPLY.

d. **Individually Named Parties Only.** All parties to the arbitration must be individually named. There is no right or authority for any Claims to be arbitrated or litigated on a class-action or consolidated basis, on behalf of the general public or other parties, or joined or consolidated with claims of other parties, and You and we are specifically barred from doing so. This prohibition is intended to, and does, preclude any trade association or other organization from arbitrating any Claim on a representative basis on behalf of the organization's members. The arbitrator's authority to resolve Claims is limited to Claims between You and us alone, and the arbitrator's authority to make awards is limited to awards to You and us alone.

e. **Application of Provision.** For the avoidance of any confusion, and not to limit its scope, this section 7 applies to any putative class action lawsuit that has been filed against us prior to the effective date of the Agreement relating to the "Honor All Cards," "non-discrimination," or "no steering" provisions of the Agreement as described in sections 1 and 2 of these General Provisions and Chapter 3 (Card Acceptance) of the Merchant Regulations, or prior versions of a Card acceptance agreement.

f. **Equitable Relief.** The arbitrator shall have the power and authority to grant equitable relief (e.g., injunction, specific performance) and, cumulative with all other remedies, shall grant specific performance whenever possible. The arbitrator shall have no power or authority to alter the Agreement or any of its separate provisions, including this section 7, nor to determine any matter or make any award except as provided in this section 7.

g. **Small-Claims Court; Injunctive Relief.** We shall not elect to use arbitration under this section for any individual Claim that You properly file in a small claims court so long as the Claim is pending only in that court. Injunctive relief sought to enforce the provisions of sections 8.a and 8.b of these General Provisions is not subject to the requirements of this section 7. This section 7 is not intended to, and does not, substitute for our ordinary business practices, policies, and procedures, including our rights to Chargeback and to create Reserves.

h. **Governing Law/Appeal/Entry of Judgment.** This section 7 is made pursuant to a Transaction involving interstate commerce and is governed by the Federal Arbitration Act, 9 U.S.C. § 16 et seq. (FAA). The arbitrator shall apply New York law and applicable statutes of limitations, honor claims of privilege recognized by law and, at the timely request of either party, provide a written and reasoned opinion explaining his or her decision. The arbitrator shall apply the rules of the arbitration organization selected, as applicable to matters relating to evidence and discovery, not the federal or any state rules of civil procedure or rules of evidence. The arbitrator's decision shall be final and binding, except for any rights of appeal provided by the FAA or if the amount of the award exceeds US $100,000, in which case either party can appeal that award to a three-arbitrator panel administered by NAF, AAA, or JAMS, as applicable, which shall reconsider de novo any aspect of the initial award requested by majority vote and whose decision shall be final and binding. The decision of that three-person panel may be appealed as provided by the FAA. The costs of such an appeal shall be borne by the appellant regardless of the outcome of the appeal. Judgment upon the award rendered by the arbitrator may be entered in any state or federal court in the federal judicial district where Your headquarters or Your assets are located.

i. **Confidential Proceedings.** The arbitration proceeding and all testimony, filings, documents, and any information relating to or presented during the proceedings shall be deemed to be confidential information not to be disclosed to any other party. All offers, promises, conduct, and statements, whether written or oral, made in the course of the negotiations, arbitrations, and proceedings to confirm arbitration awards by either party, its agents, employees, experts or attorneys, or by the arbitrator, including any arbitration award or judgment related thereto, are confidential, privileged, and inadmissible for any purpose, including impeachment or estoppel, in any other litigation or proceeding involving any of the parties or non-parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation or arbitration.

j. **Split Proceedings for Equitable Relief.** Either You or we may seek equitable relief in arbitration prior to arbitration on the merits to preserve the status quo pending completion of such process. This section shall be enforced by any court of competent jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, including legal fees, to be paid by the party against whom enforcement is ordered. Except as otherwise provided in section 7.c. above, if any portion of this section 7 (other than section 7.c. or d.) is deemed invalid or unenforceable, it shall not invalidate the remaining portions of this section 7, the Agreement, or any predecessor agreement You may have had with us, each of which shall be enforceable regardless of such invalidity.

k. **Costs of Arbitration Proceedings.** You will be responsible for paying Your share, if any of the arbitration fees (including filing, administrative, hearing and/or other fees) provided by the Arbitration Rules, to the extent such fees do not exceed the amount of the filing fees You would have incurred if the Claim had been brought in a state or federal court that would have jurisdiction over the Claim located in the federal judicial district where Your headquarters is located. We will be responsible for paying the remainder of any arbitration fees. At Your written request we will consider in good faith making a temporary advance of all or part of Your share of the arbitration fees for any Claim You initiate as to which You or we seek arbitration. You will not be assessed any arbitration fees in excess of Your share if You do not prevail in any arbitration with us.

8. MISCELLANEOUS

a. **Confidentiality.** You must keep confidential and not disclose to any third party the provisions of the Agreement and any information that You receive from us that is not publicly available.

b. **Proprietary Rights and Permitted Uses.** Neither party has any rights in the other party's Marks, except as otherwise expressly specified in the Merchant Regulations, nor shall one party use the other party's Marks without its prior written consent, except that we may use Your name, address (including Your website addresses or URLs), and customer service telephone numbers in any media at any time.

c. **Your Representations and Warranties.** You represent and warrant to us that: (i) You are duly organized, validly existing, and in good standing under the laws of the jurisdiction in which You are organized; (ii) You are duly qualified and licensed to do business in all jurisdictions in which You conduct business; (iii) You have full authority to enter into the Agreement and all necessary assets and liquidity to perform Your obligations and pay Your debts hereunder as they become due; (iv) there is no circumstance threatened or pending that might have a material adverse effect on Your business or Your ability to perform Your obligations or pay Your debts hereunder; (v) You are authorized to enter into

this Agreement on behalf of Your Establishments and Affiliates, including those indicated in this Agreement, and the individual who signs this Agreement or otherwise enters into it has authority to bind You and them to it; (vi) You are not (1) listed on the U.S. Department of Treasury, Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List (available at **www.treas.gov/ofac**), (2) listed on the U.S. Department of State's Terrorist Exclusion List (available at **www.state.gov**), or (3) located in or operating under license issued by a jurisdiction identified by the U.S. Department of State as a sponsor of international terrorism, by the U.S. Secretary of the Treasury as warranting special measures due to money laundering concerns, or as noncooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization of which the United States is a member; (vii) You have not assigned to any third party any payments due to You under this Agreement; (viii) all information that You provided in connection with this Agreement is true, accurate, and complete; and (ix) You have read this Agreement and kept a copy for Your file. If any of Your representations or warranties in this Agreement becomes untrue, inaccurate, or incomplete at any time, we may immediately terminate this Agreement in our discretion.

d. **Compliance with Laws.** You shall comply with all applicable laws, regulations, and rules.

e. **Governing Law; Jurisdiction; Venue.** The Agreement and all Claims are governed by and shall be construed and enforced according to the laws of the State of New York without regard to internal principles of conflicts of law. Notwithstanding the immediately preceding sentence, the parties agree that an electronic transmission contemplated hereunder is being provided in connection with a Transaction affecting interstate commerce that is subject to the federal Electronic Signatures in Global and National Commerce Act, 15 U.S.C. §1700 et seq. (E-Sign Act). The parties intend that the *E-Sign Act* apply to the fullest extent possible to validate their ability to electronically transmit and electronically commit to be bound by the obligations and form assent described in the Merchant Regulations and releases of scheduled changes therein. Subject to section 7, any action by either party hereunder shall be brought only in the appropriate federal or state court located in the County and State of New York. Each party consents to the exclusive jurisdiction of such court and waives any claim of lack of jurisdiction or forum non conveniens.

f. **Interpretation.** In construing the Agreement, unless the context requires otherwise: (i) the singular includes the plural and vice versa; (ii) the term "or" is not exclusive; (iii) the term "including" means "including, but not limited to;" (iv) the term "day" means "calendar day;" (v) any reference to any agreement (including the Agreement), instrument, contract, policy, procedure, or other document refers to it as amended, supplemented, modified, suspended, replaced, restated, or notated from time to time; (vi) all captions, headings, and similar terms are for reference only; and (vii) where specific language is used to illustrate by example or clarify a general statement such specific language shall not be interpreted to modify, limit, or restrict the construction of the general statement. To the extent possible, these General Provisions, the provisions of Schedule A, and the provisions of the Merchant Regulations shall be interpreted to give each their full effect. However, if a conflict is deemed to exist between them, then that conflict shall be resolved in the following order of precedence: Schedule A and any accompanying exhibits shall control over these General Provisions or the Merchant Regulations (or both) and the Merchant Regulations shall control over these General Provisions.

g. **Assignment.** You shall not assign the Agreement, whether voluntarily or by operation of law (including by way of sale of assets, merger, or consolidation), without our prior written consent. Any purported assignment by operation of law is voidable in our sole discretion. We may assign the Agreement without Your consent. Except as otherwise specified herein, the Agreement binds, and inures to the benefit of, the parties and their respective successors and permitted assigns.

h. **Waiver; Cumulative Rights.** Either party's failure to exercise any of its rights under the Agreement, its delay in enforcing any right, or its waiver of its rights on any occasion, shall not constitute a waiver of such rights on any other occasion. No course of dealing by either party in exercising any of its rights shall constitute a waiver thereof. No waiver of any provision of the Agreement shall be effective unless it is in writing and signed by the party against whom the waiver is sought to be enforced. All rights and remedies of the parties are cumulative, not alternative.

i. **Savings Clause.** Other than as set forth in the last sentence of section 7.c of the General Provisions, if any provision of the Agreement is held by a court of competent jurisdiction to be illegal or unenforceable, that provision shall be replaced by an enforceable provision most closely reflecting the parties' intentions, with the balance of the Agreement remaining unaffected.

j. **Amendments.** We reserve the right to change the Agreement at any time (including by amending any of its provisions, adding new provisions, or deleting or modifying existing provisions) on at least ten days' prior notice to You, provided that we shall change the Merchant Regulations pursuant to the following provisions. You agree to accept all changes (and further to abide by the changed provisions in the Merchant Regulations) as a condition of Your agreement to accept the Card. We are not bound by any changes that You propose in the Agreement, unless we expressly agree in a writing signed by our authorized representative. An e-mail does not constitute such a signed writing.

   **(1)** **Scheduled Changes.** The Merchant Regulations are published twice each year, in April and October. We have the right to, and hereby notify You that we may, change the provisions of the Merchant Regulations in scheduled releases (sometimes called "Notification of Changes" in our materials) as follows:

- a release of scheduled changes, to be published every April, which changes shall take effect in the following October (or in a later) edition of the Merchant Regulations or during the period between two editions of the Merchant Regulations, and

- a release of scheduled changes, to be published every October, which changes shall take effect in the following April (or in a later) edition of the Merchant Regulations or during the period between two editions of the Merchant Regulations.

   Where a change is to take effect during the period between two editions of the Merchant Regulations, we shall also include the change in the edition of the Merchant Regulations covering the period during which the change shall take effect, noting the effective date of the change therein.

   **(2)** **Unscheduled Changes.** We also have the right to, and hereby notify You that we may, change the provisions of the Merchant Regulations in separate unscheduled releases, which generally shall take effect ten days after notice to You (unless another effective date is specified in the notice).

k. **Entire Agreement.** You The Agreement is the complete and exclusive expression of the agreement between You and us regarding the subject matter hereof and supersedes any prior contemporaneous agreements, understandings, or courses of dealing regarding the subject matter hereof.

l. **Disclaimer of Warranties.** WE DO NOT MAKE AND HEREBY DISCLAIM ANY AND ALL REPRESENTATIONS, WARRANTIES, AND LIABILITIES, WHETHER EXPRESS, IMPLIED, OR ARISING BY LAW OR FROM A COURSE OF DEALING OR USAGE OF TRADE, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY WARRANTY OF TITLE OR NON-INFRINGEMENT.

m. **No Third-Party Beneficiaries.** The Agreement does not and is not intended to confer any rights or benefits on any person that is not a party hereto and none of the provisions of the Agreement shall be enforceable by any person other than the parties hereto, their successors and

n. **Press Releases.** You shall not issue any press release or make any public announcement (or both) in respect of the Agreement or us without our prior written consent.

o. **Independent Contractors.** You and we are independent contractors. No agency, partnership, joint-venture, or employment relationship is created between the parties by the Agreement. Each party is solely responsible for its own acts and omissions and those of its respective agents, employees, representatives, and subcontractors in connection with the Agreement.

AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.

By:

Kim C. Goodman
President
Merchant Services, Americas

**Schedule A**
**Other Important Provisions for Card Acceptance**
**American Express OnePoint Program**

## 1. OVERVIEW OF AMERICAN EXPRESS ONEPOINT PROGRAM

a. **Eligibility; Transition to Our Standard Card Acceptance Program.** Our American Express OnePoint Program provides integrated Card acceptance services to eligible Entities through our agents, including iPayment, Inc. If You do not qualify for this program, You may be enrolled in our standard American Express Card acceptance program, which has different servicing terms (e.g., different speeds of payment); You may terminate the Agreement if You do not wish to so be enrolled. If You become ineligible for our American Express OnePoint Program, we will transition You to our standard American Express Card acceptance program upon forty-five day's prior notice, unless You opt-out of that transition by notifying our agent in writing no later than fifteen days prior to the effective date of transition.

b. **Program Services.** We may perform our obligations and exercise our rights under the Agreement directly or through our agents. Since we are acting through our agent in many instances under the Agreement, the terms *we, our,* or *us* also may refer to our agent above, as the context requires. ***Please direct all inquiries and notices under the American Express OnePoint Program to our agent:***

iPayment, Inc., P.O. Box 3429, Thousand Oaks, CA 91359; Telephone (800) 554-4777

c. **Merchant Regulations.** The Merchant Regulations set forth the policies and procedures of our standard American Express Card acceptance program. The provisions of this Schedule A describe the different terms that apply to You under the American Express OnePoint Program and take precedence over the corresponding provisions of the Merchant Regulations. For example, since Entities classified in certain industries do not qualify for the American Express OnePoint Program, references in the Merchant Regulations to those industries may not apply to You. Please contact our agent for a copy of the Merchant Regulations and with any questions about specific industries under the program.

## 2. DOING BUSINESS WITH AMERICAN EXPRESS

a. **Certain American Express Terms Not Applicable.** Our Online Merchant Services, the terms applicable to Corporate Purchasing Cards, and our Monthly Flat Fee option are not available to You under the American Express OnePoint Program. During Your participation in the program, You are not required to configure Your systems to communicate directly with our systems and You must not provide Payment Services or otherwise act as a Payment Service Provider.

b. **Merchant Number; Your Merchant Information.** Under the American Express OnePoint Program, You will not receive a standard American Express Merchant Number. Our agent will instead assign a unique OnePoint Program "merchant" or "account" number to Your Establishment; if You have more than one Establishment (or a sales channel for Internet Orders), it may assign to each a separate number. You will need that number each time You call our agent under the American Express OnePoint Program. (If You are enrolled in or transition to our standard Card acceptance program, we (not our agent) will assign You a standard American Express Merchant Number.) You must notify our agent of any changes in Your business and banking information and any closings of Your Establishments. Our agent may verify and disclose information about You, including by requesting reports about You and the person signing Your application to accept the Card.

## 3. AUTHORIZATION

During Your participation in the American Express OnePoint Program, You must initiate an Authorization for each Charge according to the Authorization procedures of our agent and contact our agent about all Authorization responses. You must obtain from and submit to our agent an Authorization Approval code for all Charges. Authorization does not guarantee that we or our agent will accept the Charge without exercising Chargeback, nor is it a guarantee that the person making the Charge is the Cardmember or that You will be paid.

## 4. SUBMISSION

During Your participation in the American Express OnePoint Program, You must submit Charges and Credits electronically to our agent according to its Submission procedures under the OnePoint Program "merchant" or "account" number of the Establishment where the Charge or Credit originated. You must not submit Charges and Credits on paper.

## 5. SETTLEMENT

a. **Settlement Amount.** Our agent will pay You according to Your payment plan, as de-scribed below, in U.S. dollars for the face amount of Charges submitted from Your Establishments less all applicable deductions, which may include: (i) the Discount, (ii) any amounts You owe us or our Affiliates, (iii) any amounts for which we have Chargebacks, and (iv) any Credits You submit. Our agent will subtract the full amount of all applicable deductions from this payment to You (or debit Your Demand Deposit Account), but if it cannot, then You must pay it promptly upon demand.

b. **Discount.** Your initial Discount and other fees and assessments are indicated in the Agreement or otherwise provided to You in writing by our agent. We or our agent may adjust any of these amounts and may change any other amount charged to You for accepting the Card. We or our agent may charge You different Discount Rates for Charges submitted by Your Establishments that are in different industries. We or our agent will notify You of such fees, such adjustments and charges, and assessments and any different Discount Rates or Transactions fees that apply to You.

c. **Payment Plan.** During Your participation in the American Express OnePoint Program, the terms of Your payment plan (e.g., speed of payment, payment and reconciliation options) with our agent govern settlement payments to You. Our agent will send payments for Charges from Your

Establishments according to Your payment plan to Your Demand Deposit Account that You designate to it. You must notify Your bank that we, through our agent, will have access to Your account for debiting and crediting the Demand Deposit Account.

## 6. PROTECTING CARDMEMBER INFORMATION
You must notify our agent immediately if You know or suspect that Cardmember Information has been accessed or used without authorization or used other than in accordance with the Agreement. You must promptly provide to us and our agent all Card Numbers related to the data incident and audit reports of the data incident, and You must work with us and our agent to rectify any issues arising from the data incident, as specified in the Merchant Regulations.

## 7. RISK EVALUATION
a. **Prohibited/High Risk Merchants and Activities.** Entities classified in certain industries or accepting Transactions for certain prohibited activities do not qualify for the American Express OnePoint Program, but may qualify for our standard American Express Card acceptance program. Please contact our agent with any questions about those risk evaluation procedures under the program.
b. **Protective Actions.** Our agent may take actions to protect our rights or those of any of our Affiliates on our behalf. For example, the determination to establish a Reserve may be triggered by events identified by our agent and may include requiring You to deposit funds or other collateral with us or our agent, changing the speed of payment for Charges, exercising Immediate Chargeback, and charging You fees for Disputed charges. Our agent may establish the Reserve; increase the Reserve from time to time; make deductions and withhold from, and recoup and offset against the Reserve any amounts owed under the Agreement; and terminate the Agreement on our behalf. Our agent will inform You if a Reserve is established. You must provide to our agent promptly, upon request, information about Your finances, creditworthiness, and operations, including Your most recent certified financial statements. You must notify our Agent immediately of the occurrence of any event described in Section 3.b vii of the General Provisions.

## 8. INQUIRIES AND CHARGEBACKS
During Your participation in the American Express OnePoint Program, our agent's procedures for Inquiries, Disputed Charges, and Chargebacks govern the Disputed Charge process, provided that nothing therein waives our Chargeback rights under the Agreement. Our agent may Chargeback by deducting, withholding, recouping from, or offsetting against our payments to You (or debiting Your Account), or our agent may notify You of Your obligation to pay us (through our agent), which You must do promptly and fully. Our or our agent's failure to demand payment does not waive our Chargeback rights.

**Schedule B**
Intentionally Omitted

**Schedule C**
Intentionally Omitted

## PART III: ADDITIONAL IMPORTANT INFORMATION FOR CARDS

**A.1. ELECTRONIC FUNDING AUTHORIZATION**

All payments to Client shall be through the Automated Clearing House ("ACH") and shall normally be electronically transmitted directly to the Settlement Account You have designated or any successor account designated to receive provisional funding of Client's Card sales pursuant to the Agreement. Client agrees that any Settlement Account designated pursuant to the preceding sentence will be an account primarily used for business purposes. Neither Bank, iPayment or Processor can guarantee the time frame in which payment may be credited by Client's financial institution where the Settlement Account is maintained.

Client hereby authorizes Bank and its authorized representative, including First Data Merchant Services Corporation, to access information from the Settlement Account and to initiate credit and/or debit entries by bank wire or ACH transfer and to authorize Your financial institution to block or to initiate, if necessary, reversing entries and adjustments for any original entries made to the Settlement Account and to authorize Your financial institution to provide such access and to credit and/or debit or to block the same to such account. This authorization is without respect to the source of any funds in the Settlement Account, is irrevocable and coupled with an interest. This authority extends to any equipment rental or purchase agreements which may exist with Client as well as to any fees and assessments and Chargeback amounts of whatever kind or nature due to iPayment or Bank under terms of this Agreement whether arising during or after termination of the Agreement. This authority is to remain in full force and effect at all times unless and until and Bank and iPayment have consented to its termination at such time and in such a manner as to afford them a reasonable opportunity to act on it. In addition, Client shall be charged twenty five dollars ($25.00) for each ACH which cannot be processed, and all subsequent funding may be suspended until Client either (i) notifies iPayment and Bank that ACH's can be processed or (ii) a new electronic funding agreement is signed by Client. Client's Settlement Account must be able to process or accept electronic transfers via ACH.

**A.2. FUNDING ACKNOWLEDGMENT**

**Automated Clearing House (ACH).** Your funds for MasterCard, Visa, Discover Network Transactions will ordinarily be processed and transferred to Your financial institution within two (2) Business Days from the time a batch is received by Processor if Your financial institution is the Bank. If Your financial institution is not the Bank, Your MasterCard, Visa, Discover Network Transactions will ordinarily be processed via the Federal Reserve within two (2) Business Days from the time a batch is received by Processor. The Federal Reserve will transfer such amounts to Your financial institution, unless directed otherwise by Bank or iPayment Credit Underwriting.

**A.3. ADDITIONAL FEES AND EARLY TERMINATION FEE**

If Client's MasterCard, Visa and Discover Network Transaction(s) fail to qualify for the discount level contemplated in the rates set forth in the Application, Client will be billed the fee indicated in the Mid-Qualified Discount field or Non-Qualified Discount field. If You are utilizing the Enhanced Recovery Reduced Discount option, the Client will be charged the Enhanced Recovery Reduced Rate on the volume of said Transaction that failed to qualify, in addition to the difference between the MasterCard/Visa/Discover Network Qualified Rate agreed to in the Schedule of Fees section of the Application and the actual Interchange rate assessed to the downgraded Transaction.

Your initial MasterCard, Visa and Discover Network rates are stated in the Schedule of Fees section of the Application and may be adjusted from time to time including to reflect:

a. Any increases or decreases in the Interchange and/or assessment portion of the fees,

b. The appropriate interchange level as is consistent with the qualifying criteria of each Transaction submitted by Client,

c. Increases in any applicable sales or telecommunications charges or taxes levied by any state, federal or local authority related to the delivery of the services provided by Servicers when such costs are included in the Service or other fixed fees.

The discount fees shown in the Schedule of Fees section of the Application shall be calculated based on the gross sales volume of all Visa, MasterCard and Discover Network volume.

A Monthly Minimum Processing Fee will be assessed immediately after the date Client's Application is approved. (Refer to the Merchant Processing Application, if applicable)

In addition to the PIN Debit Card Transaction Fees set forth on the Application, Client shall be responsible for the amount of any fees imposed upon a Transaction by the applicable debit network.

You will be subject to the applicable early termination fee if within three (3) years from the date of approval You terminate this Agreement or due to an Event of Default it is terminated by Servicers. Merchant will be charged a fee for each Merchant Account for such early termination equal to $495.00 (see Section 23.1 of the Program Guide).

Pursuant to Section 6050W of the Internal Revenue Code, merchant acquiring entities and third party settlement organizations are required to file an information return for each calendar year beginning January 1, 2011 reporting all payment card Transactions and third party network Transactions with payees occurring in that calendar year. Accordingly, You will receive a Form 1099 reporting Your gross Transaction amounts for each calendar year beginning with Transactions processed in calendar year 2011. In addition, amounts reportable under Section 6050W are subject to backup withholding requirements. Payors are required to perform backup withholding by deducting and withholding income tax from reportable Transactions if (a) the payee fails to provide the payee's taxpayer identification number (TIN) to the payor, or (b) if the IRS notifies the payor that the TIN (when matched with the name) provided by the payee is incorrect. Accordingly, to avoid backup withholding, it is very important that You provide us with the correct name and TIN that You use when filing Your tax return that includes the Transactions for Your business.

**A.4. ADDRESSES FOR NOTICES**

**SERVICER:**

**iPayment, Inc.**                     **Important Phone Numbers:**

P.O. Box 3429                          Customer Service: (800) 554-4777

Thousand Oaks, CA 91359                Fax Number: (818) 540-6712

Attn: Merchant Services                *(see also Sections 3.3 and 5.4)*

**BANK:**

**Wells Fargo Bank, N.A.**

1200 Montego Way

Walnut Creek, CA 94598

Attn: Merchant Services

(925) 746-4172

**PART IV: CONFIRMATION PAGE**

Please read the Program Guide in its entirety. It describes the terms under which we will provide merchant processing Services to You. If You have any questions about Your Merchant Account, the terms and conditions of this Agreement, or about any of the information provided in the Program Guide, please contact a Customer Service Representative for assistance.

**SERVICER INFORMATION:**     **Merchant Lynx Services and iPayment, Inc.**

P.O. Box 3429, Thousand Oaks, CA 91359

www.merchantlynx.com

Customer Service Number: (800) 554-4777

Fax Number: (818) 540-6712

**CARD ORGANIZATION DISCLOSURE:**

**Visa and MasterCard Member Bank Information: Wells Fargo Bank, N.A.**

The Bank's mailing address is 1200 Montego Way, Walnut Creek, CA 94598 and its phone number is (925) 746-4172

**Important Member Bank Responsibilities:**

(a) The Bank is the only entity approved to extend acceptance of Card Organization products directly to a merchant.

(b) The Bank must be a principal (signer) to the Merchant Agreement.

(c) The Bank is responsible for educating Merchants on pertinent Visa and MasterCard Rules with which Merchants must comply; but this information may be provided to You by Servicer or Processor.

(d) The Bank is responsible for and must provide settlement funds to the Merchant.

(e) The Bank is responsible for all funds held in reserve that are derived from settlement.

**Important Merchant Responsibilities:**

(a) Ensure compliance with Cardholder data security and storage requirements.

(b) Maintain fraud and Chargebacks below Card Organization thresholds.

(c) Review and understand the terms of the Merchant Agreement.

(d) Comply with Card Organization Rules.

(e) Retain a signed copy of this Disclosure Page.

(f) You may download "Visa Regulations" from Visa's website at: http://usa.visa.com/merchants/operations/op_regulations.html.

(g) You may download "MasterCard Regulations" from MasterCard's website at: http://mastercard.com/us/merchant/support/rules.html.

Print Merchant's Business Legal Name: _____

**By its signature below, Merchant acknowledges that is has received the complete Program Guide (Revision 0212) consisting of 56 pages (including this confirmation).**

**Merchant further acknowledges reading and agreeing to all terms in the Program Guide, which shall be incorporated into Merchant's Agreement. Upon receipt of a signed facsimile or original of this Confirmation Page by us, Merchant's Application will be processed.**

**NO ALTERATIONS OR STRIKE-OUTS TO THE PROGRAM GUIDE WILL BE ACCEPTED.**

**Merchant's Business Principal:**
**Signature** (Please sign below):

**X** _____     _____     _____

                                                                              Title                                        Date

_____
Please Print Name of Signer